UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

———————————————————————— x
   :
NEIMENGGU FUFENG BIOTECHNOLOGIES  :
CO., SHANDONG FUFENG FERMENTATION  :
CO., LTD., and XINJIANG FUFENG  :
BIOTECHNOLOGIES CO., LTD.,  :
   :      Consol. Court No. 23-00068
      Plaintiff,  :
   :
    v.  :
   :
UNITED STATES,  :
   :
      Defendant.  :
   :
———————————————————————— x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO USCIT RULE 56.2

Ned H. Marshak*
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

1201 New York Ave., NW, Suite 650
Washington, DC 20005

*599 Lexington Ave., 36th Floor
New York, NY 10022
(212) 557-4000

*Counsel for Plaintiffs Neimenggu Fufeng
Biotechnologies Co., Shandong Fufeng
Fermentation Co., Ltd., and Xinjiang Fufeng
Biotechnologies Co., Ltd.*

Dated: October 30, 2023

## TABLE OF CONTENTS

STATEMENT PURSUANT TO USCIT RULE 56.2 ................................................................ 1

    A.   Administrative Determination Subject to Appeal ............................................. 1
    B.   Issues of Law & Argument Summary .............................................................. 1
    C.   Reasons for Contesting the Determination ...................................................... 3

STANDARD OF REVIEW ................................................................................................ 3

STATEMENT OF FACTS ................................................................................................. 4

ARGUMENT .................................................................................................................... 7

   I.   COMMERCE UNLAWFULLY VALUED FUFENG'S ENERGY FOPS IN ITS NV
       CALCULATION ....................................................................................................... 7
    A.   Commerce's Well-Established Practice Values Energy Using Ajinomoto's Financial
        Statements ..................................................................................................... 8
    B.   Ajinomoto's 2020-21 Statement Layout is Similar to Prior Statements For Which the
        Department Did Not Separately Value Energy FOPs .................................... 13
    C.   Commerce's AR8 Methodology is Less Accurate Than its AR5/6/7 Methodology and
        Distorts NV ................................................................................................. 18
    D.   *Chlor Iso* Does Not Support Commerce's New Methodology ..................... 20

  II.  COMMERCE UNLAWFULLY VALUED FUFENG'S ENERGY COAL UNDER HTS
      2701.12.9000 INSTEAD OF 2701.19 ..................................................................... 21
    A.   Fufeng's Energy Coal Has Heat Value <5800 kcal/kg Covered By HTS 2701.19 ...... 22
    B.   Commerce Unlawfully Rejected Coal Test Reports Evidencing Heat Value .............. 26

 III.  COMMERCE UNLAWFULLY DEDUCTED SECTION 301 DUTIES FROM U.S.
      PRICE ................................................................................................................... 30
    A.   Commerce Erroneously Differentiated Section 301 Duties from Remedial Special
        Duties and Equated Them with U.S. Import Duties ...................................... 30
    B.   Imposing Section 301 Duties During the POR Does Not Make Them Normal U.S.
        Import Duties ............................................................................................... 35
    C.   Deducting Section 301 Duties "Double-Counts" the Amount of Those Duties .......... 35
    D.   Deducting Section 301 Duties from U.S. Price is Contrary to Law, Procedurally
        Defective, and Contrary to the United States' WTO Obligations ................. 37

 IV.  COMMERCE UNLAWFULLY APPLIED ITS COHEN'S D METHODOLOGY ......... 37
    A.   Controlling Law and Judicial Precedent Constrain Application of the Cohen's *d* Test
        to Specific Circumstances ............................................................................ 38
    B.   Commerce Unlawfully Determined the Denominator in the Cohen's d Test ............. 43
    C.   The Results of the Cohen's *d* Test Are Arbitrary ........................................ 45

CONCLUSION .............................................................................................................. 46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AK Steel Corp. v. United States*,
  988 F.Supp.594 (CIT 1998)..................................................................................36

*Carbon Activated Tianjin Co. v. United States*,
  2023 WL 4678995 (CIT July 21, 2023).............................................................24, 25

*Carbon Activated Tianjin Co. v. United States*,
  547 F.Supp.3d 1310 (CIT 2021).......................................................................23, 24

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938)............................................................................................3

*Dillinger France S.A. v. United States*,
  981 F.3d 1318 (Fed. Cir. 2020).............................................................................39

*Gerald Metals, Inc. v. United States*,
  132 F.3d 716 (Fed. Cir. 1997)...............................................................................3

*HiSteel Co. v. United States*,
  2023 WL 5944119 (CIT Sept. 12, 2023).................................................................45

*Hoogovens Staal v. United States*,
  4 F.Supp.2d 1213 (CIT 1998)...............................................................................36

*Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States*,
  322 F.Supp.3d 1308 (CIT 2018)...........................................................................22

*Matsushita Elec. Indus. Co. v. United States*,
  750 F.2d 927 (Fed. Cir. 1984)................................................................................3

*Mid Continent Steel & Wire, Inc. v. United States*,
  31 F.4th 1367 (Fed. Cir. 2022) ........................................................................43, 44

*Motor Vehicle Mfgrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)...............................................................................................3

*NEXTEEL Co. v. United States*,
  28 F.4th 1226 (Fed. Cir. 2022) .............................................................................42

*Queen's Flowers de Colom. v. United States*,
  21 CIT 968 (1997) ..............................................................................................17

*SeAH Steel Corp. v. United States*,
  539 F.Supp.3d 1341 (CIT 2021)......................................................................42, 43

*SeAH Steel Corp. v. United States*,
    589 F.Supp.3d 1288 (CIT 2022) .........................................................43

*Shanghai Tainai Bearing Co. v. United States*,
    2023 WL 5974083 (CIT Sept. 24, 2023) ......................................32, 33

*Stupp Corp. v. United States*,
    5 F.4th 1341 (Fed. Cir. 2021) ................................................... *passim*

*Ticaret A.S. v. United States*,
    63 F.4th 25 (Fed. Cir. 2023) .............................................................32

*Tung Mung Dev. Co. v. United States*,
    25 CIT 752 (2001) ...........................................................................18

*Wheatland Tube Co. v. United States*,
    495 F.3d 1355 (Fed. Cir. 2007)................................................ *passim*

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
    716 F.3d 1370 (Fed. Cir. 2013)..................................................34, 45

*Zhaoqing Tifo New Fibre Co. v. United States*,
    355 F.Supp.3d 1285 (CIT 2018) ...............................................12, 13

**Statutes**

19 U.S.C. § 1516a ......................................................................................3

19 U.S.C. § 1671 ......................................................................................34

19 U.S.C. § 1673 ......................................................................................34

19 U.S.C. § 1677a .....................................................................................30

19 U.S.C. § 1677b .......................................................................................4

19 U.S.C. § 1677f-1 ..............................................................................38, 39

19 U.S.C. § 2411 ......................................................................................31

**Regulations**

19 C.F.R. § 351.102 ..................................................................................27

19 C.F.R. § 351.301 ..................................................................................27

19 C.F.R. § 351.414 ..................................................................................38

**Federal Register Publications**

*Activated Carbon from China*, 86 Fed. Reg. 73,731 (Dec. 28, 2021) (final results)....................24

*China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual
    Property, and Innovation*, 83 Fed. Reg. 14,906 (Apr. 6, 2018)...............................................31

*Chlorinated Isocyanurates from China*, 78 Fed. Reg. 4,386 (Jan 22, 2013)
    (final results) ...............................................................................................................20, 21

*Circular Welded Carbon-Quality Steel Pipe from Oman*, 86 Fed. Reg. 18,513
    (Apr. 9, 2021) (final results) .................................................................................................32

*Citric Acid and Certain Citrate Salts from China,* 74 Fed. Reg. 16,838
    (Apr. 13, 2009) (final determination) ...................................................................................8, 9

*Corrosion-Resistant Steel Products from China,* 83 Fed. Reg. 23,895
    (May 23, 2018) (final circumvention determination) .............................................................11

*Fabricated Structural Steel from China,* 84 Fed. Reg. 47,491 (Sep. 10, 2019)
    (preliminary determination) ..................................................................................................11

*Fabricated Structural Steel from China,* 85 Fed. Reg. 5,376 (Jan. 30, 2020)
    (final determination) ..............................................................................................................11

*Glycine from China,* 80 Fed. Reg. 18,814 (Apr. 8, 2015) (preliminary results)...........................10

*Glycine from China,* 80 Fed. Reg. 62,027 (Oct. 15, 2015) (final results) ....................................10

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
    86 Fed. Reg. 50,034 (Sept. 7, 2021) ......................................................................................4

*Oil Country Tubular Goods from China*, 75 Fed. Reg. 20,335 (Apr. 19, 2010)
    (final determination) ..............................................................................................................25

*Oil Country Tubular Goods from Mexico,* 70 Fed. Reg. 60,492 (Oct. 18, 2005)
    (final results)..........................................................................................................................29

*Passenger Vehicle and Light Truck Tires from China,* 84 Fed. Reg. 17,781
    (Apr. 26, 2019) (final results) ................................................................................................10

*Polyester Staple Fiber from China,* 78 Fed. Reg. 2366 (Jan. 11, 2013)
    (final results)..........................................................................................................................12

*Seamless Refined Copper Pipe and Rube from China,* 82 Fed. Reg. 27,688
    (June 16, 2017) (final results) ................................................................................................11

iv

*Seamless Refined Copper Pipe and Tube from China*, 81 Fed. Reg. 95,110 (Dec. 27, 2016) (preliminary results) ..................................................................11

*Shrimp from China,* 77 Fed. Reg. 53,856 (Sep. 4, 2012) (final results) ........................................10

*Stainless Steel Wire Rod from Korea*, 69 Fed. Reg. 19,153 (Apr. 12, 2004) (final results) ....30, 31

*Steel Racks and Parts Thereof from China*, 87 Fed. Reg. 20,817 (Apr. 8, 2022) (final results) ..................................................................................11

*Steel Threaded Rod from China*, 77 Fed. Reg. 27,022, 27,027 (May 8, 2012) (preliminary results) ..............................................................11

*Steel Wire Garment Hangers from China*, 83 Fed. Reg. 32,634 (July 13, 2018) (preliminary results) ..............................................................11

Steel Wire Garment Hangers from China, 83 Fed. Reg. 53,449 (Oct. 23, 2018) (final results) ..................................................................11

*Tapered Roller Bearings from China,* 83 Fed. Reg. 32,263 (July 12, 2018) (preliminary results) ..............................................................10

*Tapered Roller Bearings from China,* 84 Fed. Reg. 6,132 (Feb. 26, 2019) (final results) ..................................................................10

*Xanthan Gum from China*, 88 Fed. Reg. 9861 (Feb. 2, 2023) (final results) ...................... *passim*

*Xanthan Gum from China*, 87 Fed. Reg. 47,970 (Aug. 5, 2022) (preliminary results) .......................................................... *passim*

*Xanthan Gum from China*, 84 Fed. Reg. 64,831 (Nov. 25, 2019) (final results) .........................35

*Xanthan Gum from China*, 84 Fed. Reg. 26,813 (June 10, 2019) (preliminary results) ..............................................................35

**Other Authorities**

J. Cohen, *Statistical Power Analysis for the Behavioral Sciences* (2d ed. 1988) .........................40

Johnson Ching-Hong Li, *Effect size measures in a two-independent- samples case with nonnormal and nonhomogeneous data,* 48 Behavioral Research 1560 (2015) ..................................................................41

R. Grissom & J. Kim, *Effect Sizes for Research*: *Univariate and Multivariate* (2d ed. 2012) ..................................................................40, 41

World Trade Organization, *DS543: United States – Tariff Measures on Certain Goods from China* (Sept. 15, 2020) ..................................................37

This Memorandum of Law is filed by Plaintiffs Neimenggu Fufeng Biotechnologies Co., Shandong Fufeng Fermentation Co., Ltd., and Xinjiang Fufeng Biotechnologies Co., Ltd. (collectively, "Fufeng") to support their Motion for Judgment on the Agency Record.

## STATEMENT PURSUANT TO USCIT RULE 56.2

### A.    Administrative Determination Subject to Appeal

Fufeng seeks judicial review of the U.S. Department of Commerce's ("Commerce" or "Department") final results in the eighth administrative review ("AR8") of the antidumping duty ("ADD") Order on Xanthan Gum from the People's Republic of China ("China"), covering the period of review ("POR") July 1, 2020, through June 30, 2021. *Xanthan Gum from China*, 88 Fed. Reg. 9861 (Feb. 2, 2023), PR241 ("*Final Results*"), Issues and Decision Memorandum, PR233 ("IDM").

### B.    Issues of Law & Argument Summary

#### 1.    Did Commerce lawfully value Fufeng's energy FOPs in its normal value calculation?

No. Commerce's new methodology to directly value Fufeng's energy factors of production ("FOP") instead of indirectly valuing them as part of sales, general, and administrative expense ("SGA") ratios of Ajinomoto's 2020-21 financial statement is contrary to its longstanding precedent established in *Citric Acid* and it progeny, as well as three preceding reviews of this ADD Order. Since Ajinomoto's 2020-21 statement's layout is essentially similar to those in preceding reviews, Commerce should have adhered to its prior methodology. Commerce's determination that "Administrative and other expenses" sub-line item under "Other Operating expenses" represents the cost of energy is facially wrong because administrative cost is SGA and "other expenses" is a basket category that potentially includes non-energy cost. By transferring "Administrative and other expenses" from SGA to material, labor and energy

1

expenses ("MLE"), Commerce distorted resulting overhead and SGA ratios. Consequently, Commerce's new AR8 methodology is less accurate than that used in preceding reviews. Further, Commerce improperly relied on *Chlorinated Isocyanurates from China* ("*Chlor Iso*"), which is distinguishable and does not support the Department's new methodology.

## 2. Did Commerce lawfully value Fufeng's energy coal?

No. Fufeng's energy coal undeniably has heat value less than 5,800 kilocalories per kilogram ("kcal/kg"). Because Harmonized Tariff Schedule ("HTS") subheading 2701.12.9000 read in conjunction with harmonized Chapter 27, subheading Note 2 limits the scope of HTS 2701.12.9000 to bituminous coal having calorific value equal to or exceeding 5,833 kcal/kg, Fufeng's lower heat value coal is not covered under this subheading. Instead, Fufeng's coal is covered under HTS 2701.19. Commerce also unlawfully redacted from the record the coal test reports Fufeng submitted to evidence the lower heat value of its coal. These test reports are not untimely submitted new factual information ("NFI"), but were properly submitted in response to Commerce's questions or, alternatively, as other factual information.

## 3. Did Commerce lawfully deduct Section 301 duties from U.S. price?

No. Commerce should not have deducted Section 301 duties paid by Fufeng's importers from U.S. prices. There is no basis to distinguish Section 301 duties, which are intended to offset specific harm to domestic companies, from other remedial, special duties such as Section 201 duties, ADD, and countervailing duties ("CVD"). There is also no basis to equate Section 301 duties, imposed to provided temporary relief from injurious effects of imports, with normal U.S. Customs duties, which are unrelated to any adverse effects to U.S. industry as a result of imports and also do not have any termination provision. Deducting 301 duties from U.S. prices constitutes improper double-counting.

### 4.   Did Commerce lawfully apply its differential pricing methodology?

No. Under the U.S. Court of Appeals for the Federal Circuit ("CAFC") *Stupp* decision, Commerce's differential pricing methodology is unlawful because the agency failed to demonstrate that Fufeng's U.S. sales data fulfills the three threshold preconditions—numerosity of data, normality of distribution, and homogeneity of variances—necessary for the application of Cohen's *d* test. Further, under the CAFC's *Mid Continent* decision, Commerce unlawfully determined the denominator in the Cohen's *d* formula, by a simple averaging of variances instead of their weighted averaging.

### C.   Reasons for Contesting the Determination

Fufeng's reasons for contesting the *Final Results* are set out below.

## STANDARD OF REVIEW

This Court must hold unlawful any aspect of Commerce's final determination that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Substantial evidence requires more than mere assertion of "evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quotation omitted). For decisions to be supported by substantial evidence, "Commerce may not base that determination 'on the basis of mere conjecture or supposition.' {19 U.S.C.} § 1677(7)(F)(ii). Commerce, as any agency, must 'cogently explain why it has exercised its discretion in a given manner.'" *Motor Vehicle Mfgrs.*

*Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983).

"In valuing {FOPs, Commerce} . . . shall utilize, to the extent possible, the prices or costs of {FOPs} in one or more market economy countries that are – (A) at a level of economic development comparable to that of the nonmarket economy; and (B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4) (emphases added). Such "valuation . . . shall be based on the best available information regarding the values of such factors in a market economy country or countries." 19 U.S.C. § 1677b(c)(1)(B).

## STATEMENT OF FACTS

In October 2021, Commerce initiated AR8 of the ADD Order on xanthan gum from China for specified exporters including Fufeng. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 50,034, 50,043 (Sept. 7, 2021), P.R. 30. Fufeng was selected as the sole mandatory respondent later that month. Respondent Selection Memo (Oct. 21, 2021), C.R. 8, P.R. 36. Fufeng fully participated in AR8, submitting responses to multiple Commerce questionnaires including its Supplemental Section D Questionnaire Response (Feb. 16, 2022), CR78-83, PR126-27 ("SDQR"), and Fourth Supplemental Questionnaire Response (July 28, 2022), CR125, PR194 ("4SQR").

In February and March 2022, Fufeng provided surrogate value ("SV") information to value FOPs and calculate surrogate financial ratios. The information included Malaysian HTS subheading 2701.19 import data and the 2020-21 financial statement of Ajinomoto (Malaysia) Berhad ("Ajinomoto"). Fufeng First SV Comments (Feb. 2, 2022, refiled Mar. 31, 2022), PR147-50 ("First SV Submission"), Exhibits 2 & 8; Fufeng Final SV Comments (Mar. 3, 2022, refiled Mar. 31, 2022), PR152 ("Final SV Submission"). In May 2022, Fufeng submitted additional information regarding the SV of coal, but Commerce rejected and removed this

4

information from the record, treating it as untimely filed, unsolicited NFI. Fufeng Submission of

Factual Information (May 27, 2022), CR121, PR172; Commerce Memorandum (July 27, 2022),

PR191; Commerce Letter to Fufeng (July 27, 2022), PR193 ("Commerce July 27 Rejection

Letter"). Likewise, Commerce rejected and removed from the record exhibits containing coal test

reports that Fufeng submitted in its 4SQR, treating this information as untimely filed, unsolicited

NFI. Commerce Letter to Fufeng (July 27, 2022), PR192 ("Commerce July 27 4SQR Rejection

Letter"); Commerce Memorandum (July 27, 2022). Pursuant to Commerce's instructions, Fufeng

refiled a redacted 4SQR.

On August 5, 2022, Commerce issued its preliminary results of AR8, assigning Fufeng a

0% ADD rate. *Xanthan Gum from China*, 87 Fed. Reg. 47,970, 47,972 (Aug. 5, 2022), PR202

("*Preliminary Results*"), Preliminary Decision Memorandum (July 29, 2022), PR196 ("PDM").

In this decision, Commerce valued energy based on data in Ajinomoto's financial statement,

rather than calculating energy based on its FOPs. Commerce Memorandum (July 29, 2022),

PR197, at 3; Fufeng First SV Submission Exhibit 8.

In September 2022, Fufeng submitted its case brief, challenging the SV data used by

Commerce to value ocean freight and truck freight. Fufeng Case Brief (Sept. 12, 2022), PR209,

at 2-11. Fufeng also challenged Commerce's preliminary determinations to deduct Section 301

duties from U.S. price and to apply the Cohen's *d* test to Fufeng's U.S. sales as part of its

"differential pricing" analysis. *Id*. at 11-22. In its case brief, Petitioner C.P. Kelco U.S., Inc.

("Petitioner") challenged Commerce's preliminary decision to decline to directly value Fufeng's

energy inputs, including coal. Petitioner Case Brief (Sept. 12, 2022), CR129, PR211, at 2-20. To

support the direct valuation of Fufeng's energy inputs, Petitioner, *inter alia*, argued that in

calculating financial ratios for overhead and SGA from Ajinomoto's 2020-21 statement,

Commerce should include the entirety of "administrative and Other expenses" as an energy expense. *Id*. at 19-20.

Fufeng filed its rebuttal brief in September 2023. Fufeng Rebuttal Brief (Sept. 21, 2022), CR130, PR214. Petitioner thereafter requested that Commerce reject Fufeng's Rebuttal Brief alleging that it contained untimely filed NFI. Petitioner's Request to Reject Fufeng's Rebuttal Brief (Sept. 30, 2022), PR216. Fufeng opposed Petitioner's request. Fufeng's Opposition to Petitioner's Request to Reject Fufeng's Rebuttal Brief (Oct. 3, 2023), PR217 ("Fufeng's Opposition Comments"). On November 18, 2022, Commerce agreed with Petitioner, rejecting Fufeng's Rebuttal Brief and Fufeng's Opposition Comments for containing untimely NFI, while permitting Fufeng to resubmit both the Rebuttal Brief and Opposition Comments after redacting certain information. Commerce Letter to Fufeng (Nov. 18, 2022), CR131, PR223 ("Commerce Nov. 18 Rejection Letter").

In November 2022, Commerce removed both of the Fufeng's filings from the record. Commerce Letter to Fufeng (Nov. 21, 2022), PR225. Thereafter, Fufeng resubmitted a redacted opposition letter asking that Commerce reject Petitioner's request to reject Fufeng's rebuttal brief. Fufeng's Resubmission of Its Opposition to Petitioner's Request to Reject Fufeng's Rebuttal Brief (Nov. 21, 2022) PR 228. On the same date, Fufeng also submitted a redacted version of its rebuttal brief. Fufeng Rebuttal Brief Resubmission (Nov. 21, 2022), CR132, PR227. The redacted rebuttal brief was again rejected because Commerce identified additional untimely NFI in the resubmitted brief. Commerce Letter to Fufeng (Dec. 12, 2022), PR229 ("Commerce Dec. 12 Rejection Letter"); Commerce Memorandum to File (Dec. 13, 2022), P.R. 230. On December 14, 2022, Fufeng submitted its redacted Rebuttal Brief, which Commerce accepted. Fufeng Redacted Rebuttal Brief (Dec. 14, 2022), CR133, PR231.

In February 2023, Commerce published its *Final Results*, modifying its *Preliminary Results* and assigning Fufeng a 17.36% ADD rate. 88 Fed. Reg. 9,861, 9,862. In its *Final Results*, *inter alia*, Commerce: (1) continued to use Ajinomoto financial data to value overhead, SGA and profit ratios, but revised the calculations from the *Preliminary Results*; (2) directly valued energy coal based on HTS 2701.12.9000; (3) accepted Fufeng's valuation of ocean freight and truck freight; (4) deducted Section 301 duties paid by the importer of record ("IOR") upon entry from its U.S. price calculation; and (5) applied the Cohen's *d* test to Fufeng's U.S. sales. IDM Cmts. 1, 5-8. Fufeng initiated this appeal in March 2023. Summons (Mar. 16, 2023); Complaint (Apr. 17, 2023). This Court subsequently enjoined Fufeng's AR8 entries from liquidation and consolidated Fufeng's appeal with that of Meihua. Order (Apr. 20, 2023), ECF15; Order (July 5, 2023), ECF22.

## **ARGUMENT**

## I.   **COMMERCE UNLAWFULLY VALUED FUFENG'S ENERGY FOPS IN ITS NV CALCULATION**

In its *Final Results*, Commerce when calculating normal value ("NV"), "calculate{d} the energy cost by directly valuing Fufeng's submitted energy FOPs." IDM at 11-14. In doing so, Commerce reversed its well-established practice from the fifth, sixth, and seventh administrative reviews of this ADD Order ("AR5," "AR6," and "AR7," respectively), wherein it had valued Fufeng's energy cost by applying the SGA ratios of Ajinomoto's financial statements. Commerce reasoned that a new layout of Ajinomoto's 2021 statement compared to its prior statements removed the embargo against valuing Fufeng's FOPs, so as to avoid double-counting of energy costs. As discussed below, Commerce's decision is unsupported by substantial evidence and is contrary to its well-established correct practice in AR5–7.

## A.    Commerce's Well-Established Practice Values Energy Using Ajinomoto's Financial Statements

Commerce's established practice is to not separately value energy FOPs—to avoid double-counting energy costs. When such costs are not itemized in a surrogate financial statement and, consequently, could potentially be included in surrogate overhead or SGA ratios.

As background, in a surrogate financial statement, the overhead ratio is computed by dividing factory overhead expenses by the sum total of MLE. The SGA ratio is obtained by dividing the SGA expenses by the sum total of MLE, factory overheads and cost of traded goods ("TOTCOM"). To calculate accurate ratios, the financial statement should separately itemize discrete expenses for direct cost of production—*i.e.*, raw materials, labor, and energy—as well as elements of overhead and SGA expenses. Preferably, energy expenses should be separately identified in the statement so they can be segregated and excluded from overhead and SGA expenses that are used for overhead and SGA ratio calculations. However, when energy expenses are not clearly identified in any line item in the Cost of Goods Sold ("COGS") section of the statement, and the financial statement has a basket category line item encompassing overheads and/or SGA expenses, the basket category line item potentially includes energy expenses. In such situations, if energy expenses cannot be isolated from either overhead or SGA and transferred to MLE, Commerce's ordinary practice—summarized in the seminal case, *Citric Acid and Certain Citrate Salts from China*—requires that the entire reported expense in the basket category line item be allocated solely to overhead or SGA in the numerator of the overhead or SGA ratio calculation formula. 74 Fed. Reg. 16,838 (Apr. 13, 2009) (final determination) ("*Citric Acid*"), IDM Cmt. 2 (followed in AR5/6/7).  Under these circumstances, the overhead or SGA ratio potentially includes the cost of energy. Therefore, a direct valuation of a respondent's energy FOPs would result in double-counting energy costs.

In *Citric Acid,* Commerce explained this methodology, which is based on the necessity of avoiding double-counting energy expenses:

> PT Budi's financial statement does not include a separate line item for energy in the reported cost of manufacturing, thus the Department has concluded that energy is recorded as part of PT Budi's factory overhead. Therefore, the calculated overhead ratio for the *Preliminary Determination* included the surrogate company's energy costs. Because we also calculated a separate energy cost for each of the respondents, we inadvertently double counted their energy costs. Accordingly, for the final determination, we have excluded respondents' energy expenses in the calculation of {NV} to avoid double-counting energy expenses.

*Id.*

*Citric Acid* involved an insufficiently detailed financial statement lacking a separate line item for energy that did not enable segregation and exclusion of the potentially embedded energy cost under overhead expenses. In such situations, Commerce's practice is to avoid estimating the portion of such invisible and indivisible energy cost and then migrating it to MLE in order to form a predicate for "using energy consumption data that reflects the mandatory respondent's *actual* experience." IDM at 12 (emphasis in original). Instead, Commerce's practice is to indirectly value the energy cost as part of the overhead ratios rather than directly valuing the energy FOPs. This methodology:

(1) avoids double-counting of energy; and

(2) avoids distorting overhead/SGA ratios.

As a result, it yields the most accurate margin.

For thirteen years, Commerce adhered to the *Citric Acid* methodology. In *Shrimp from China,* Commerce held:

> {W}e note that because Kiang Huat, Kongphop, and Sea Bonanza do not itemize electricity in their financial statements, we will disregard Regal's energy inputs in the calculation of {NV} in order to avoid double-counting energy costs which have necessarily been captured in the surrogate financial ratios.

9

77 Fed. Reg. 53,856 (Sep. 4, 2012) (final results), IDM Cmt. 12.

In *Glycine from China*, Commerce explained:

{E}nergy expenses were not specifically itemized in the {COGS} section of the financial statements and were most likely included in the companies' production expenses (*i.e.*, overhead). Thus, we were unable to segregate these expenses and, therefore, were unable to exclude energy costs for production from the calculation of the surrogate financial ratios. Accordingly, as we have done in other reviews, we have disregarded Baoding Mantong's energy inputs (coal and electricity) in the calculation of {NV}, by setting them to zero, in order to avoid double-counting energy costs that have been captured in the surrogate financial ratios.

80 Fed. Reg. 18,814 (Apr. 8, 2015), PDM at 19-20, unchanged, 80 Fed. Reg. 62,027 (Oct. 15,

2015) (final results).

In *Tapered Roller Bearings from China*, Commerce likewise explained:

Commerce used FOPs reported by GGB for materials, labor, and packing, but excluded energy (*i.e.*, electricity), because the financial statements used to calculate the financial ratios for these preliminary results were not sufficiently detailed to allow Commerce to isolate energy expenses from other expenses such as selling, general, and administrative expenses. When energy costs are not specifically broken out in the financial statements, Commerce presumes that these costs are accounted for in the surrogate financial ratios. Therefore, Commerce was able to calculate an overhead surrogate ratio based on the full cost of manufacturing, including energy. In order to not double count GGB's energy costs, we have not separately valued energy expenses in our NV calculation.

83 Fed. Reg. 32,263 (July 12, 2018), PDM at 22, unchanged, 84 Fed. Reg. 6,132 (Feb. 26, 2019)

(final results).

In *Passenger Vehicle and Light Truck Tires from China*, Commerce reasoned:

{W}e have excluded the energy FOPs (*e.g.*, electricity and steam) reported by Junhong from our calculation of NV for these final results. We find that the Goodyear Thailand 2017 Statements used to calculate the financial ratios are not sufficiently detailed for Commerce to isolate energy expenses from other expenses, such as factory overhead or SG&A expenses. When energy costs are not specifically broken out in the financial statements, Commerce presumes that these costs are accounted for in the surrogate financial ratios.

84 Fed. Reg. 17,781 (Apr. 26, 2019) (final results), IDM Cmt. 6.

The same rationale was discussed in *Fabricated Structural Steel from China*:

Commerce used FOPs reported by the respondents for materials (including welding supplies and welding gases) and packing, but excluded electricity and labor, because the financial statements used to calculate the financial ratios for this preliminary determination were not sufficiently detailed to allow Commerce to isolate energy and labor expenses from other expenses such as selling, general, and administrative expenses. When individual costs are not specifically broken out in the financial statements, Commerce presumes that these costs are accounted for in the surrogate financial ratios. Therefore, Commerce was able to calculate an overhead surrogate ratio based on the full cost of manufacturing, including electricity and labor. In order to not double count the respondents' electricity and labor costs, we have not separately valued these costs in our NV calculation.

84 Fed. Reg. 47,491 (Sep. 10, 2019) (preliminary determination), PDM at 29, unchanged, 85

Fed. Reg. 5,376 (Jan. 30, 2020) (final determination).

In *Corrosion-Resistant Steel Products from China*, Commerce stated:

{T}he energy component of COGS relates to production. In this case, there is no way to discern how much energy is included in the overhead component of COGS (which includes other production-related costs) in the surrogate financial statements because the financial statements lack this detail. No party has put forth arguments for how it would be possible to break out the energy costs included in the overhead component of the COGS in the financial statements, in the absence of such detail. Accordingly, we have continued to decline to separately value the respondents' energy costs in the value-added calculation to avoid distortion that would arise from double counting energy included in overhead in the surrogate financial ratios.

83 Fed. Reg. 23,895 (May 23, 2018) (final circumvention determination), IDM Cmt. 8.

Multiple other decisions, issued as recently as April 2022, rely on the identical rationale

and methodology.[1] These decisions reveal that Commerce has a longstanding, established

---

[1] *See Steel Threaded Rod from China*, 77 Fed. Reg. 27,022, 27,027 (May 8, 2012) (preliminary results); *Seamless Refined Copper Pipe and Tube from China*, 81 Fed. Reg. 95,110 (Dec. 27, 2016) (preliminary results), unchanged, 82 Fed. Reg. 27,688 (June 16, 2017); *Steel Wire Garment Hangers from China*, 83 Fed. Reg. 32,634 (July 13, 2018) (preliminary results), unchanged, 83 Fed. Reg. 53,449 (Oct. 23, 2018) (final results); *Steel Racks and Parts Thereof from China*, 87 Fed. Reg. 20,817 (Apr. 8, 2022) (final results).

practice to not separately value energy FOPs where such energy expenses are potentially included in surrogate financial ratios but cannot be segregated. Notably, Commerce in administering the ADD Order on Xanthan Gum from China, when using financial statements of the same company, Ajinomoto, in three consecutive prior segments (AR5/6/7), indirectly valued Fufeng's energy cost as part of its SGA expenses instead of directly valuing Fufeng's energy FOPs.

Commerce's *Citric Acid* methodology—which was used in AR5/6/7 of this Order—has been affirmed by this Court. This Court not only affirmed Commerce's practice to not value energy FOPs in order to avoid double-counting of energy cost in surrogate ratios, but also required that Commerce exclude valuation of **<u>all</u>** forms of production energy FOPs that are potentially included in surrogate ratios. In *Polyester Staple Fiber from China*, Commerce "in order to prevent double counting, . . . placed all electricity and water costs into the overhead numerator and omitted the valuation of electricity and water consumption factors." 78 Fed. Reg. 2366 (Jan. 11, 2013) (final results), IDM Cmt. 2. While endorsing Commerce's decision to not value electricity and water, this Court remanded Commerce's decision to reconsider the valuation of the remaining energy input, coal FOPs. In *Zhaoqing Tifo New Fibre Co. v. United States*, this Court affirmed Commerce's decision to exclude coal FOPs from the NV calculation:

> Commerce's Final Determination inexplicably left coal in the FOP database. Commerce gave no rationale as to why concerns about double counting – which led the agency to exclude water and electricity from the FOP database in the Final Determination – did not similarly compel the exclusion of coal. . . .

> In the pending Second Remand Results, which Commerce has filed "under protest," Commerce has used the financial statements of P.T. Tifico to derive surrogate financial ratios, as it did in the Final Determination. However, because the costs of energy (including coal) are embedded in the surrogate financial ratios, Commerce has excluded those costs from the FOP database to avoid double-counting.

355 F.Supp.3d 1285, 1296 (CIT 2018).

In sum, Commerce's proffered rationale for its new methodology in AR8 contradicts longstanding agency and judicial precedent, as well as substantial evidence (discussed *infra*).

**B.      Ajinomoto's 2020-21 Statement Layout is Similar to Prior Statements For Which the Department Did Not Separately Value Energy FOPs**

To support its new methodology for valuing energy cost based on Fufeng's reported energy FOPs, Commerce reasoned that Ajinomoto's 2020-21 statement is presented differently than its statements upon which Commerce relied in AR5/6/7. Commerce initially describes the layout of pre-2020-21 Ajinomoto statements:

> {I}n prior reviews of the *Order*, the surrogate financial statements of Ajinomoto{} on which Commerce relied **did not separately break out energy costs from selling expenses or G&A**. Instead, the surrogate financial statements simply reported **a single line item "other operating expenses,"** which Commerce determined to **include energy**.

IDM at 12 (emphases added).

Commerce then explains its prior rationale for indirectly valuing energy cost as part of Ajinomoto's SGA ratio instead of directly valuing directly Fufeng's energy FOPs:

> **Since Commerce could not break out the SG&A from the energy costs** per the surrogate financial statements, in prior reviews Commerce did not include the energy FOPs reported by the mandatory respondent in the NV calculation, and instead **included the entire "other operating expenses" amount in the SG&A expense ratio**.

*Id*. (emphases added)

Commerce thereafter asserts that there is a critical distinction between the layouts of Ajinomoto's 2020-21 financial and its prior statements:

> Consistent with the prior reviews that relied upon the financial statements of Ajinomoto{}, we find that energy costs are contained in the "other operating expenses" line item in Ajinomoto{}'s 2020-2021 financial statement. However, **unlike prior reviews, the 2021 financial statements of Ajinomoto{} breaks out the SG&A expense line item for "other operating expenses" into two sub-line**

**items, "selling and distribution expenses," and "administrative and other expenses."**

*Id*. at 12-13 (emphasis added).

Finally, Commerce employs the two-way split of the line item—"other operating expenses"—to support its direct valuation of Fufeng's energy FOPs instead of valuing Fufeng's energy costs as an indivisible component of its SGA expenses based on Ajinomoto's SGA ratios:

> {W}e determine that energy costs in the 2021 financial statements of Ajinomoto{} are not captured in the "selling and distribution expenses" sub-line item for "other operating expenses." . . . **{W}e determine that energy costs *are* contained in the "administrative and other expenses" sub-line item** of the 2021 financial statements of Ajinomoto . . . .
>
> For these final results, Commerce included the "selling and distribution expenses" line item in the SG&A ratio calculation, **excluded the "administrative and other expenses" line item from the SG&A ratio calculation, included the "administrative and other expenses" in the MLE denominator, and valued energy expenses using the FOPs reported by the mandatory respondent.**

*Id*. at 13 (emphases modified).

By migrating the sub-line item, "administrative and other expenses" from the SGA numerator to the MLE (sum of material, labor and energy) denominator, Commerce effectively determined that the entire expense reported in this sub-line item solely represented Ajinomoto's energy cost. As explained below, substantial evidence does not support Commerce's finding that this solitary change—split of "other operating expenses" line item—resulted in a disaggregation of the energy cost in Ajinomoto's 2020-21 statement.

To demonstrate that the Ajinomoto 2020-21 statement layout is identical to its prior statements (except a solitary line item being split), Fufeng reproduces below the relevant pages of Ajinomoto's 2020-2021 and 2019-2020 financial statements, as submitted by Petitioner in AR8.

14

### 2020-2021 Financial Statement (used in AR8)

| | Note | 2021 RM | 2020 RM |
|---|---|---|---|
| **Revenue** | 4 | 443,119,251 | 461,689,082 |
| **Other items of income** | 5 | 4,513,466 | 9,919,758 |
| **Items of expenses** | | | |
| Changes in inventories of finished goods and work in progress | | 2,708,411 | 6,239,755 |
| Raw materials and packaging materials consumed | | (195,508,714) | (202,793,283) |
| Finished goods purchased | | (38,920,150) | (45,288,839) |
| Employee benefits expense | 6 | (60,357,575) | (60,129,824) |
| Depreciation of property, plant and equipment | 13 | (16,592,499) | (16,787,566) |
| Amortisation of intangible assets | 14 | (824,194) | (485,727) |
| Depreciation of right-of-use assets | 15 | (1,287,001) | (1,151,705) |
| Other operating expenses | 9 | (75,595,156) | (73,464,599) |
| Profit before tax | 8 | 61,255,839 | 77,747,052 |
| Income tax expense | 10 | (14,753,522) | (17,893,385) |
| **Profit net of tax** | | 46,502,317 | 59,853,667 |

**9.   OTHER OPERATING EXPENSES**

| | 2021 RM | 2020 RM |
|---|---|---|
| Selling and distribution expenses | 39,813,854 | 36,619,140 |
| Administrative and other expenses | 35,781,302 | 36,845,459 |
| | 75,595,156 | 73,464,599 |

Petitioner SV Submission (Feb. 2, 2022), Exhibit 9 at 49, 70.

### 2019-20 Financial Statement (used in AR7)

| | Note | 2020 RM | 2019 RM |
|---|---|---|---|
| **Revenue** | 4 | 461,689,082 | 447,730,739 |
| **Other items of income** | 5 | 9,919,758 | 11,861,763 |
| **Items of expenses** | | | |
| Changes in inventories of finished goods and work in progress | | 6,239,755 | 2,003 |
| Raw materials and packaging materials consumed | | (202,793,283) | (210,027,041) |
| Finished goods purchased | | (45,288,839) | (40,673,321) |
| Employee benefits expense | 6 | (60,129,824) | (53,325,247) |
| Depreciation of property, plant and equipment | 12 | (16,787,566) | (16,114,700) |
| Amortisation of intangible assets | 13 | (485,727) | - |
| Depreciation of right-of-use assets | 14 | (1,151,705) | - |
| Other operating expenses | | (73,464,599) | (66,795,085) |
| Profit before tax | 8 | 77,747,052 | 72,659,111 |
| Income tax expense | 9 | (17,893,385) | (16,078,508) |
| **Profit net of tax** | | 59,853,667 | 56,580,603 |

*Id.* Exhibit 12 at 48. Ajinomoto's 2018-19 (used in AR6) and 2017-18 (used in AR5) have similar layouts to the 2019-20 statement. *Id.* Exhibit 10 at 47, Exhibit 11 at 46.

A comparative analysis establishes that in all of Ajinomoto's statements, the main expense categories are identical. None of the statements has a line item for COGS, which ordinarily encompasses energy costs. Further, the relationship between "other operating expenses" and all other expenses remains the same. Ajinomoto's 2020-21 statement simply subdivides "other operating expenses" line item into two sub-line items:

(1) Selling and distribution expenses; and

(2) Administrative and **Other expenses**.

The "Other expenses" component of the sub-line item "Administrative and Other expenses" in the 2020-21 statement is akin to the "other operating expenses" line item in the 2019-20 and prior statements. This is because "Other expenses": (a) remains a residual basket category of another basket category, "other operating expenses"; and (b) potentially includes the cost of energy, since Ajinomoto's 2020-21 statement does not breakout energy anywhere else. In AR5/6/7, Commerce correctly concluded that energy expenses were embedded in the line item "other operating expenses" in the Ajinomoto statements, since the energy expense was an indivisible component of this line item. The rationale upon which Commerce relied in AR8—that the scope of the SGA line items had changed—is not supported by record evidence.

The additional breakout of "Administrative and Other expenses" under "other operating expenses" in Ajinomoto's 2020-21 statement did not cause any material change in Ajinomoto's reporting of expenses, especially for its reporting of energy costs. Notably, as with prior statements, energy cost continues to be reported in the 2020-21 statement as an indivisible component of a line item, a fact that Commerce acknowledges: "we determine that energy costs

*are* contained in the 'administrative and other expenses' sub-line item." IDM at 13 (emphasis in original)

The mere fact that energy cost is embedded in a subset of "other operating expenses" in the 2020-21 statement fails to overcome the threshold limitation that the energy cost is embedded as an indivisible component in a basket category line item. Consequently, Commerce should have determined that energy costs in Ajinomoto's 2020-21 statement could not be isolated from its SGA expenses in the same manner as it had construed Ajinomoto's previous statements in AR5/6/7.

Commerce's imposition of an arbitrary new rationale—that the sub-line item "administrative and other expenses" represents energy cost—while ignoring substantial record evidence supporting the fact that this sub-line item is a basket category that includes several non-energy, SGA-related expenses, is inconsistent with Commerce's AR5/6/7 precedent, and accordingly should not be affirmed.

> It is "a general rule that an agency must either conform itself to its prior decisions or explain the reasons for its departure . . . to insure consistency in an agency's administration of a statute." The rule also . . . "prohibit{s} the agency from adopting significantly inconsistent policies that result in the creation of "conflicting lines of precedent governing the identical situation." . . . Commerce has the flexibility to change its position providing that it explain the basis for its change and providing that the explanation is in accordance with law and supported by substantial evidence. Commerce gave no explanation for its departure from its position in Roses and Pocket Lighters. In fact, Commerce did not acknowledge that an inconsistency exists between those cases and the determination here.

*Queen's Flowers de Colom. v. United States,* 21 CIT 968, 976-977 (1997) (citations omitted).

Likewise, Commerce here "adopt{s} significantly inconsistent policies that result in the creation of 'conflicting lines of precedent governing the identical situation.'" *Id*. Therefore, Commerce's decision, which is inconsistent with its longstanding practice, cannot be affirmed.

*Tung Mung Dev. Co. v. United States*, 25 CIT 752, 770-73 (2001) ("The case for judicial deference is less compelling with respect to agency positions that are inconsistent with previously held views.").

### C.   Commerce's AR8 Methodology is Less Accurate Than its AR5/6/7 Methodology and Distorts NV

Commerce claims that its new methodology of "directly valuing Fufeng's reported energy FOPs reflects its actual production experience, and thus, more accurately captures the direct production experience and expenses of the company" and "results in the calculation of a *more* accurate margin." IDM at 13 (emphasis in original). However, as explained below, this methodology results in distorted overhead and SGA ratios, which consequently yields a <u>*less accurate margin*</u> than the margins calculated by Commerce in AR5/6/7.

Since Ajinomoto's 2020-21 statement does not break out energy costs anywhere else, the line item "administrative and other expenses" arguably includes the costs of energy. However, this line item is a residual basket category encompassing myriad and disparate administrative and non-energy-related miscellaneous expenses. Moreover, there is no evidence that energy costs are a predominant component of this basket category line item. As discussed below, allocating the total amount of expense reported in "administrative and other expenses" solely to the "Energy" category significantly distorts the resulting overhead and SGA ratios.

The line item, "administrative and other expenses" includes two undisputed G&A expenses:

> (a) administrative expenses; and
>
> (b) non-energy portions of "other expenses."

As such, allocation of the entire line item, "administrative and other expenses" to the "Energy" category results in two separate distortions:

1. distorted MLE and consequently distorted cost of manufacture ("COM"), which is a sum total of MLE and overheads. COM is included in the denominator of the formula used for computation of SGA ratio.

2. distorted amount of SGA, which is the numerator in the SGA ratio formula.

In result, both the overhead and SGA ratios are distorted.

Indeed, Commerce concedes this distortion possibility when admitting that "placing 'administrative and other expenses' in the MLE denominator might remove certain G&A expenses," yet supports its new methodology reasoning that "it ensures against double counting electricity in Commerce's NV calculation." IDM at 14. As discussed below, Commerce's flawed reasoning in support of its new methodology is contradicted by substantial record evidence.

Under the new methodology, the resulting overhead and SGA ratios are irredeemably distorted. This is because, by Commerce's own admission, "certain G&A expenses," IDM at 14, are firstly, improperly excluded from SGA (distorting the amount of SGA) and secondly, improperly allocated to Energy (distorting the amount of MLE). Commerce's alibi that a direct valuation of Fufeng's energy cost "results in the calculation of a *more* accurate margin," *id*. at 13, flatly contradicts the agency's admission of improper allocation of "certain G&A expenses"—which irreparably distorts the overhead and SGA ratios. *Id*. at 14. Because Commerce fails to weigh the *presumably enhanced margin accuracy* (based on the direct valuation of energy FOPs) against the *actually reduced margin accuracy* (resulting from distorted overhead and SGA ratios), its findings are unsupported by substantial record evidence.

Further, Commerce's rationale that the new methodology avoids double-counting of energy is unavailing. Under the prior methodology when Fufeng's energy expenses were valued indirectly as part of the SGA ratio, those energy expenses were not double counted. In contrast, Commerce's new methodology introduces distortions in the overhead and SGA ratios. Had

Commerce followed its *Preliminary Results* methodology, allocating the sub-line item "administrative and other expenses" to SGA, energy would have been valued indirectly as part of the SGA ratio; energy expenses would not have been double counted; "certain G&A expenses" would not have distorted MLE (by improper inclusion) and SGA (by improper exclusion). Consequently, the resulting overhead and SGA ratios would have remained undistorted.

In sum, as compared to the prior methodology, Commerce's new methodology results in a *less* "accurate margin," IDM at 13, which is not supported by substantial evidence.

### D.   *Chlor Iso* Does Not Support Commerce's New Methodology

The *Final Results* misplace reliance on "*Chlor{} Iso{}*, {where} Commerce treated certain line items in the surrogate financial statements (*i.e.*, rental, light, janitorial and security expenses) as energy expenses and excluded them from the surrogate ratio calculations despite our acknowledgement 'that this line item may include certain expenses that are not related to electricity.'" IDM at 14. Commerce asserts that "{t}he reasoning in *Chlor{} Iso{}* is applicable here, given that the 'administrative and other expenses' sub-line item in the 2021 financial statements of Ajinomoto{} may include electricity expenses *as well as* expenses not related to electricity." *Id*.

In *Chlor Iso*, Commerce reasoned:

> MVC's financial statements do not separately identify electricity costs. **However, MVC's financial statements do provide information in a detailed cost of goods sold line item, rental, light, janitorial, and security expenses, that are associated with electricity costs.** While we acknowledge that this line item may include certain expenses that are not related to electricity, to avoid double counting of the electricity costs, and likewise ensure we account for the energy intensive nature of the production process by using the reported electricity FOPs, **we are treating the line item rental, light, janitorial and security expenses as energy costs, and not as part of manufacturing overhead.**

78 Fed. Reg. 4,386 (Jan 22, 2013) (final results), IDM Cmt. 13 (emphases added).

Commerce erroneously attempts a false equivalence between Ajinomoto's line item, "administrative and other expenses" and *Chlor Iso* line item, "rental, light, janitorial and security expenses." The two line items are not comparable.

First, "rental, light, janitorial and security expenses" is a line item under "cost of goods sold", which is categorized under MLE. In contrast, "administrative and other expenses" is a sub-line item under "other operating expenses," which is categorized under SGA. As such, "rental, light, janitorial and security expenses" is unambiguously and directly related to energy. In contrast, the nexus of "administrative and other expenses" with energy cost is unclear and, at best, indirect.

Second, "rental, light, janitorial and security expenses" specifically enumerates "light"—suggesting that energy cost is the predominant component of this line item. This fact is corroborated by Commerce's findings in *Chlor Iso* that "rental, light, janitorial, and security expenses . . . are associated with electricity costs." 78 Fed. Reg. 4,386, IDM Cmt. 13

In contrast, the line item, "administrative and other expenses" contains only basket category terms, administrative expenses and other expenses, which suggests that non-energy costs are predominant in this line item. Therefore, Commerce's reliance on *Chlor Iso* to support its new methodology is misplaced and unsupported by substantial evidence.

## II.   COMMERCE UNLAWFULLY VALUED FUFENG'S ENERGY COAL UNDER HTS 2701.12.9000 INSTEAD OF 2701.19

In its *Final Results*, Commerce valued Fufeng's energy coal using Malaysian import data under HTS 2701.12.9000 instead of 2701.19. *Compare* Commerce Memorandum (Feb. 1, 2023) ("Final SV Memo"), Attachment 1, Tab: "SV" *with* Fufeng First SV Submission Exhibit 1. The scope of the two competing HTS subheadings are as follows:

1. HTS 2701.12.9000 – Coal, Whether Or Not Pulverised, But Not
   Agglomerated: Bituminous Coal: O/T Coking Coal. Final SV Memo,
   Attachment 1, Tab: "SV"; and

2. HTS 2701.19 – Coal, Other Than Anthracite Or Bituminous, Whether Or Not
   Pulverized, But Not Agglomerated. Fufeng First SV Submission Exhibit 1.

Further, per Explanatory Notes to the HTS that are publicly-available and judicially-

noticeable,[2] subheading Note 2 to Chapter 27 limits the scope of 6-digit HTS 2701.12 (and,

consequently, the 10-digit HTS 2701.12.9000) to the subset of bituminous coal having heat value

equal or greater than 5,833 kcal/kg:

> 2.- For the purposes of subheading 2701.12, "bituminous coal" means coal having
> a volatile matter limit volatile matter limit (on a dry, mineral-matter-free basis)
> exceeding 14 % and a calorific limit (on a moist, miner-matter-free basis) equal to
> or great than 5,833 kcal/kg.[3]

Record evidence, discussed *infra*, establishes that Fufeng utilized coal having heat value less

than the threshold limit of 5,833 kcal/kg.

Therefore, substantial evidence as well as settled administrative and judicial precedent

directly contradict Commerce's choice of Malaysian HTS 2701.12.9000, and instead supports

HTS 2701.19 as the only proper SV choice for valuing Fufeng's energy coal.

### A.    Fufeng's Energy Coal Has Heat Value <5800 kcal/kg Covered By HTS 2701.19

The record confirms "that the coal utilized by Fufeng as a source of energy had a calorific

value limit (on a moist, mineral-matter-free basis) ***less than 5800 Kcal/Kg.***" SDQR at 6

---

[2] *Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States*, 322 F.Supp.3d 1308, 1324 (CIT
2018) ("As a legal reference on the interpretation of the GIRs and the HS nomenclature,
including the scope of headings and six-digit subheadings, the WCO's Explanatory Notes are in
this context essentially no different than any other legal reference a party may cite in a case brief
before Commerce or argue before a court, such as a statute, judicial precedent, or restatement of
the law.")

[3] Available at: https://www.wcotradetools.org/en/harmonized-system (accessible upon payment
of subscription fee).

(emphasis added). Fufeng's reporting of the heat value of its energy coal was never disputed by Commerce or Petitioner. In other words, this factual information is settled and is not an issue.

Record evidence further shows that "{t}he FOP E-COAL Fufeng utilizes for generation of energy is a type of coal that is commercially traded as a bituminous coal . . . {and} is exclusively of a non-coking grade." 4SQR at 5. Therefore, Fufeng's energy coal is a non-coking bituminous coal with a heat value less than 5,800 kcal/kg.

Commerce's selected HTS subheading 2701.12.9000, which, in pertinent part, describes the goods covered therein as "Bituminous Coal: Other than Coking Coal." Final SV Memo, Attachment 1, Tab: "SV." Determination of this HTS subheading's proper scope, per general rules of interpretation, requires that its nominal tariff description be interpreted in conjunction with the universally harmonized Note 2 to HTS Chapter 27. As this Court has already determined for Malaysian HTS, Chapter 27: "Note 2 limits HS 2701.12, *inter alia*, to bituminous coal with "a calorific value limit . . . equal to or greater than 5,833 {kcal/kg}. *Carbon Activated Tianjin Co. v. United States*, 547 F.Supp.3d 1310, 1315 (CIT 2021), n.6. As such, the underlying 10-digit HTS subheading 2701.12.9000 encompasses a subset of non-coking bituminous coal whose heat value equals or exceeds the 5,833 kcal/kg threshold limit.

Conversely, the residual 6-digit HTS 2701.19 covers "Coal, Other Than Anthracite Or Bituminous," *i.e.*, all types of coal other than anthracite and bituminous coal. Because bituminous coal in HTS 2701.12, by definition, covers only a subset of bituminous coal, *i.e.* with heat value equal to or exceeding 5,833 kcal/kg, "other coal" in HTS 2701.19 *ipso facto* encompasses the other subset of bituminous coal, *i.e.* with heat value less than 5,833 kcal/kg. Accordingly, Fufeng's bituminous coal having heat value less than 5,800 kcal/kg is properly covered by HTS 2701.19.

23

Indeed, in the remand proceeding arising from an appeal of the eleventh administrative review ("AR11") of activated carbon from China, Commerce valued bituminous coal having the same range of heat value as Fufeng's energy coal using HTS 2701.19. *Carbon Activated Tianjin Co. v. United States*, 547 F.Supp.3d 1310, 1314-15 (CIT 2021) ("*Carbon Activated AR11*"). There, this Court upheld Commerce's valuation under HTS 2701.19:

> For the *Final Results*, Commerce valued all bituminous coal using Romanian import data under {HTS} heading 2701.12 (Bituminous Coal, Not Agglomerated). . . . The court remanded the issue to Commerce for further explanation as to the applicability of Chapter 27, Subheading Note 2 ("Note 2") to Commerce's selection of a {SV}. . . . On remand, Commerce determined that Note 2 applied to Malaysian HS data and chose different data sets to value bituminous coal depending on whether the calorific value of the bituminous coal was known to be below 5,833 kcal/kg. . . . **Commerce . . . determined to use Malaysian import data under HS 2701.19 (Other Coal) to value bituminous coal with a known calorific value below 5,833 kcal/kg in light of its determination that Note 2 applied to the Malaysian import data**.

*Id*. (emphasis added) (citations omitted).

Consistent with *Carbon Activated AR11*, Commerce in AR8 was required to "use Malaysian import data under HS 2701.19 (Other Coal) to value {Fufeng's} bituminous coal with a known calorific value {less than 5,800 kcal/kg, *i.e.*} below 5,833 kcal/kg." *Id*. at 1315.

In a subsequent thirteenth administrative review ("AR13"), Commerce in accordance with *Carbon Activated AR11* again selected HTS 2701.19 over HTS 2701.12:

> As HTS 2701.19 is for heat values below 5,833 kcal/kg, it is necessarily more product-specific than HTS 2701.12. As the bituminous coal used by Datong Juqiang and its supplier fit that singular criterion, we will use HTS 2701.19 to value the mandatory respondents' bituminous coal raw material input for the final results.

*Activated Carbon from China*, 86 Fed. Reg. 73,731 (Dec. 28, 2021) (final results), IDM Cmt. 4.

This Court in *Carbon Activated Tianjin Co. v. United States* again affirmed the choice:

> For the *Final Results*, Commerce used Malaysian import data under HTS subheading 2701.19 as the {SV} for bituminous coal. . . . In doing so, Commerce

24

relied on its finding in AR11, in which it determined, on court-ordered remand, that bituminous coal with a calorific value of less than 5,833 kcal/kg should be classified under HTS 2701.19. . . . Specifically, in AR11, Commerce found that Note 2 to Chapter 27 . . . limits the applicability of HTS subheading 2701.12 to bituminous coal with "a calorific value limit . . . equal to or greater than 5,833 kcal/kg." . . . .

When Commerce had the heat value information, Commerce relied on that information in connection with the HTS descriptions to select the {SV} for bituminous coal with a known heat value of less than 5,833 kcal/kg.

2023 WL 4678995, *13-14 (CIT July 21, 2023) (citations omitted).

Notably, this Court pointedly rejected HTS 2701.12—including 2701.12.9000—in favor of HTS 2701.19 based on the product specificity criteria (of matching heat value):

Calgon argues that the AR13 record contains evidence specifying "that **HTS subheading 2701.12 covers 'bituminous coal' including** coking and **non-coking bituminous coal** that are **classifiable under** HTS subheading 2701.12.1000 and **HTS subheading 2701.12.9000**." . . . **The fact that HTS subheading 2701.12 covers** both coking and **non-coking bituminous coal does not contradict** Commerce's determination {because} when interpreted in conjunction with Note 2, **HTS subheading 2701.19 was more specific**, *id.*

Based on the foregoing, the court finds that Commerce's determination to value bituminous coal using Malaysian import data under HTS subheading 2701.19 is supported by substantial evidence.

*Id.* *15. (emphases added). Therefore, Commerce's choice of HTS 2701.12.9000 in AR8 is directly contrary to Commerce's established precedent, as affirmed by this Court.

Further, Commerce's ordinary practice is to value energy coal or steam coal under HTS 2701.19. *See Oil Country Tubular Goods from China*, 75 Fed. Reg. 20,335 (Apr. 19, 2010) (final determination), IDM Cmt. 21 n.359 ("*See Activated Carbon/PRC 11/10/09* (where the Department used HTS category 2701.19.20: "Steam Coal" to value coal reported by the respondent as energy coal)."). Therefore, Fufeng's energy coal that is utilized in its energy generating workshop to produce steam and electricity is properly valued under HTS 2701.19 at 0.34 Malaysian Ringgit/kilogram ("RM/kg"). Fufeng First SV Submission Exhibit 1.

25

In sum, record evidence as well as settled administrative and judicial precedent unequivocally establish that Fufeng's bituminous coal with less than 5800 kcal/kg heat value is covered by HTS 2701.19.

### B.      Commerce Unlawfully Rejected Coal Test Reports Evidencing Heat Value

Record evidence unequivocally establishes that Fufeng's energy coal had heat value less than 5,800 kcal/kg and is covered by HTS 2701.19. Section II.A, *supra*. In addition, Fufeng submitted coal test certificates evidencing the coal's heat value, along with certain public factual information pertaining to heat value, on May 27, 2022 (in its factual information submitted 30 days before the *Preliminary Results*) and on July 11, 2022 (in its originally-submitted 4SQR). This information simply corroborated record evidence confirming that heat value of Fufeng's bituminous coal was less than 5,800 kcal/kg. Yet Commerce improperly rejected this corroborative evidence claiming the evidence was "unsolicited {NFI}." Commerce July 27 Rejection Letter. Specifically, in rejecting Fufeng's May 27 submission, Commerce reasoned:

> On May 27, 2022, Fufeng submitted factual information on Coal. . . . In Fufeng's Submission, Fufeng cited to 19 CFR 351.102(b)(21)(v) and 19 CFR 351.301(c)(5) when submitting factual information on Coal and stated that "this information does not meet the definition of factual information under 19 CFR 351.102(b)(21)(i)-(iv)." However, {Commerce} is rejecting and removing Fufeng's Submission from the record pursuant to 19 CFR 351.302(d), 19 CFR 351.102(b)(21)(i) and 19 CFR 351.301(c)(1)(v) as **it contains unsolicited {NFI}**, evidence, including statements of fact, documents, and data submitted either in response to initial and supplemental questionnaires, and is untimely filed, respectively. Fufeng's Submission was not requested by Commerce. Thus, the information is unsolicited. Additionally, **Fufeng's Submission, specifically Exhibits 5A and 5B, is evidence that is submitted to rebut, clarify, or correct Fufeng's February 16, 2022 supplemental questionnaire responses because it is directly responsive to Question 9 in the supplemental questionnaire by providing additional information about the calorific value limit of Fufeng's coal.**

*Id.* (emphasis added) (footnotes omitted).

Commerce is wrong. First, as Fufeng's supplemental questionnaire response to Question 9, excerpted below, shows Commerce did not require that Fufeng report the energy content of its coal:

> 9. Fufeng reported both electricity and the fuel used to produce the electricity (*i.e.*, coal) as energy inputs. Commerce's questionnaire specifically asks to report the fuel used to generate electricity.

> a. Please confirm that you have reported these energy inputs correctly.

> **ANSWER: Fufeng confirms that the company reported the energy inputs correctly, using the same method it used in the previous review. We note that the coal utilized by Fufeng as a source of energy had a calorific value limit (on a moist, mineral-matter-free basis) less than 5800 Kcal/Kg.**

SDQR at 6.

As Commerce never previously required Fufeng to submit coal test reports, Fufeng on May 27, 2022—pursuant to the authority of 19 C.F.R. §§ 351.102(b)(21)(v), 351.301(c)(5)—properly submitted the test reports of its bituminous coal. Commerce's rationale that the test reports were "directly responsive to Question 9. . . by providing additional information about the calorific value limit of Fufeng's coal," Commerce July 27 Rejection Letter, misconstrues Question 9, which simply asked Fufeng to confirm whether it had "reported these energy inputs {*i.e.* coal} correctly." SDQR at 6. That question neither expressly directed that Fufeng also submit the test reports of coal, nor implied that Fufeng was being asked to submit additional factual information in support of its claimed SV. As such, Commerce's rationale is an afterthought and Fufeng's test reports were unlawfully rejected.

Likewise, Commerce rejected identical information on coal that Fufeng subsequently provided in its 4SQR, reasoning:

> In addition to responding to Commerce's question of whether Fufeng's FOP ECoal is of a specific, Fufeng also provided comments, information, and other data regarding Fufeng's suggested {HTS} for Fufeng's FOP's E-Coal {SV}.

27

> The comments, information, and other data regarding the FOP E-Coal submitted by Fufeng was not requested by Commerce, and is thus unsolicited.

Commerce July 27 4SQR Rejection Letter.

Contrary to Commerce's reasoning, the heat value information in Fufeng's coal test reports were directly responsive to the description and type of E-Coal Commerce had asked Fufeng to provide. Fufeng first noted that "{t}he FOP E-COAL Fufeng utilizes for generation of energy is a type of coal that is commercially traded as a bituminous coal . . . {and} is exclusively of a non-coking grade." 4SQR at 5. Thereafter, because the generic "bituminous coal" is split in tariff into two species based on its heat value—2701.12.9000 (≥5,833 kcal/kg) and 2701.19 (<5,833 kcal/kg)—Fufeng, through test reports, simply qualified its bituminous coal's heat value, which is its essential attribute and also necessary for its proper classification and valuation.

Therefore, Commerce's subsequent decision to arbitrarily narrow the ambit of an open-ended question is improper. Consequently, Commerce's decision to redact the coal heat value information from the record is unlawful.

Further, Commerce unlawfully compelled Fufeng to redact portions of its Rebuttal Brief referencing coal test reports and related arguments. Commerce Nov. 18 Rejection Letter; Commerce Dec. 12 Rejection Letter. Specifically, Commerce reasoned,

> In Fufeng's Redacted Rebuttal Case Brief, Fufeng challenged the {SV HTS} selection for coal. Although the petitioner argued for directly valuing reported energy FOP in its {NV} calculation, the petitioner did not challenge Commerce's {SV} selection (i.e., {SV} HTS selection for coal). However, Fufeng challenged Commerce's surrogate value selection (i.e., surrogate value HTS selection for coal) in Fufeng's Redacted Rebuttal Case Brief.

Commerce Dec. 12 Rejection Letter at 2.

Commerce is wrong. When Petitioner contested Commerce's preliminary decision to not value Fufeng's energy coal input, Petitioner effectively argued that the Department should value

energy coal in the *Final Results* using the Malaysian SV reported in HTS 2701.12.9000. In its

Rebuttal Brief, Fufeng rebutted Petitioner's arguments based on double-counting issues and

alternatively argued that the correct valuation of coal should be based on either HTS 2701.19 or

an average of SVs reported in HTS subheadings 2701.12.9000 and 2701.19.

Commerce's rationale to reject Fufeng's rebuttal arguments against coal HTS subheading

was that "petitioner did not challenge Commerce's {SV} selection (*i.e.*, {SV} HTS selection for

coal)." Commerce Dec. 12 Rejection Letter. This rationale cannot be sustained because coal was

not valued in the *Preliminary Results*. Moreover, Fufeng's alternative argument merely modified

the methodology that Petitioner proposed. Commerce's practice is to consider such arguments as

proper rebuttal arguments. In *Oil Country Tubular Goods from Mexico*, Commerce accepted

similar rebuttal arguments reasoning:

> The Department notes that Hylsa argued in its June 17, 2005, Rebuttal Brief that
> Domestic Interested Parties CV profit comment in its June 14, 2005, Rebuttal
> Brief is a new argument, as opposed to a rebuttal argument, and should be
> rejected by the Department. The Department disagrees with Hylsa. **Domestic
> Interested Parties CV profit comment is an alternative to Hylsa's proposed
> methodology for calculating CV profit and as such is appropriately
> included in its rebuttal brief**.

70 Fed. Reg. 60,492 (Oct. 18, 2005) (final results), IDM at 5, n.1 (emphasis added)

Likewise, Fufeng's proposed valuation of coal "is an alternative to {Petitioner's}

proposed methodology for calculating {the value of coal} and as such is appropriately included

in its rebuttal brief." *Id*. As such, Commerce's rationale is not supported by its past practice.

Finally, at a minimum, should the Fufeng's coal's heat value be deemed as indeterminate

(which based on this record it legally and factually cannot), Fufeng's E-Coal should be valued by

applying an average of the SVs reported in HTS 2701.12.9000 (0.84 RM/kg) and HTS 2701.19

(0.34 RM/kg), *i.e.* 0.59 RM/kg. Final SV Memo, Attachment 1, Tab: "SV"; Fufeng First SV

Submission Exhibit 1.

### III.   COMMERCE UNLAWFULLY DEDUCTED SECTION 301 DUTIES FROM U.S. PRICE

Fufeng challenged Commerce's preliminary deduction of Section 301 duties from U.S.

price. Fufeng Case Brief at 11-18. The *Final Results* improperly continued this deduction, from

the U.S. sales prices when calculating its dumping margin, treating the special Section 301

assessment as "United States import duties." IDM at 29-32.

Commerce's deduction of Section 301 duties is not consistent with its own legal

framework established in *Stainless Steel Wire Rod from Korea*, 69 Fed. Reg. 19,153, 19,159-61

(Apr. 12, 2004) (final results) ("*SSWR*") in the context of Section 201 duties and affirmed by the

CAFC. *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1361 (Fed. Cir. 2007). As set forth

below, Section 301 duties, like Section 201 duties, are "special duties" that are remedial in nature

and therefore are not normal U.S. customs duties.

### A.   Commerce Erroneously Differentiated Section 301 Duties from Remedial Special Duties and Equated Them with U.S. Import Duties

*Wheatland* established a bright line distinction between normal U.S. import duties and

special duties such as ADD, CVD, and safeguard duties ("SD"), all of which are imposed as

trade remedies. Post-*Wheatland*, those special duties are to be not deducted from the U.S. price

pursuant to Section 772(c)(2)(A) of the Tariff Act of 1930, as amended ("Act"). 19 U.S.C.

§ 1677a(c)(2)(A).

First, Commerce unpersuasively attempts to contrast Section 301 duties from "special

duties." IDM at 31-32. Commerce reasons that "Section 301 duties are imposed to address a

variety of unfair trading acts, policies, and practices of U.S. trading partners" while "special

duties, such as antidumping, countervailing, and section 201 duties, are imposed to address the specific threat of injury or actual injury to a domestic industry as a result of imported merchandise." *Id*. Commerce, accordingly, infers that "harm from imports is not a perquisite {sic} for the imposition of section 301 duties." *Id*. at 32. Commerce is wrong. As explained below, Section 301 duties, like all other special duties, are imposed to remedy the harm arising from unfairly traded goods.

The statute itself instructs that the Office of the United States Trade Representative ("USTR"), upon finding that:

> **an act, policy, or practice of a foreign country** is unreasonable or discriminatory and **burdens or restricts United States commerce** . . .
>
> **shall take all appropriate and feasible action** . . . to **obtain the elimination of that act, policy, or practice**. Actions may be taken that are within the power of the President **with respect to trade in any goods or services** . . . .

19 U.S.C. § 2411(b) (emphases added). As such, in assessing Section 301 duties at issue, USTR had the remedial objective of eliminating harmful Chinese government practices that "burdens or restricts . . . trade in any goods." *Id*.

Accordingly, using Commerce's own longstanding findings rendered in the context of Section 201 duties, Section 301 duties should be considered "**special remedial measures**." *SSWR*, 69 Fed. Reg. at 19,159-61. "Although they are not identical to {ADD}, they are more like them in purpose and function than they are like ordinary customs duties." *Id*. at 19,159.

Section 301 duties at issue remedy the specific types of harm to domestic companies that USTR found was caused by China's actions concerning technology transfer, intellectual property, and innovation. *Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg.

31

14,906, 14,907 (Apr. 6, 2018). Commerce's strained attempts to distinguish Section 301 duties from the well recognized trio of special remedial duties (*i.e.*, ADD, CVD, and SD) is unavailing because "while all of these three types of duties remedy 'distinct harms' **they are all directed at the same overarching purpose—protecting the bottom line of domestic producers**." *Wheatland*, 495 F.3d 1355, 1363-64 (emphasis added). To the contrary, this remedial nature makes Section 301 duties akin to ADD, CVD, and SD.

Further, Commerce's decision declining to deduct Section 232 duties from U.S. prices used language underscoring the necessity of doing so for Section 301 duties:

> The objective of section 201 duties is to "**remedy the injurious effect** on the U.S. industry **of significant surge in imports**." In addition, the objective of {ADD} is to "**remedy sales** by a foreign exporter in the U.S. market **at less than fair value**." . . . As such, these types of duties "are all directed at **the same overarching purposes - protecting the bottom line of domestic producers**."

*Circular Welded Carbon-Quality Steel Pipe from Oman*, 86 Fed. Reg. 18,513 (Apr. 9, 2021) (final results) ("*CWP from Oman*"), IDM Comment 1 (emphases added) (citing *Wheatland*, 495 F.3d at 1363-64).

Thus, the CAFC decision affirming Commerce's action with respect to Section 232 duties—because they addressed the "national security . . . threat{} by the unsustainably low utilization of domestic steel-producing capacity"—is readily distinguishable from the Section 301 duties at issue in this case. *Borusan Mannesmann Boru Sanyi ve Ticaret A.S. v. United States*, 63 F.4th 25, 35 (Fed. Cir. 2023). Like Section 201 duties, Section 301 duties serve a trade-related, remedial purpose. This Court, therefore, should not follow the CAFC decision affirming Commerce's practice with respect to Section 232 duties.

Further, this Court should not follow *Shanghai Tainai Bearing Co. v. United States*, which affirmed Commerce's deduction of Section 301 duties from the U.S. price. 2023 WL

5974083, *16-17 (CIT Sept. 24, 2023). *Shanghai Tainai* did so by improperly extending

*Borusan*'s rationale in the context of Section 232 duties, having a materially different purpose of

safeguarding national security instead of providing trade remedies:

> {T}he Notice of Action Pursuant to Section 301, 83 Fed. Reg. 40,823 (U.S. Trade
> Rep. Aug. 16, 2018), also refers to the Section 301 duty as an "additional duty."
> *Id.* at 40,824. . . . The rates of duty applicable to products of China . . . *apply in*
> *addition to all other applicable duties, fees, exactions, and charges.*" *Id.* at 40,824
> (emphasis added). This language tracks that of Proclamation 9705, which
> "directed that the {Section 232 duty} was to be imposed 'in addition to any other
> duties, fees, exactions, and charges applicable to such imported steel articles.' "
> *Borusan*, 63 F.4th at 29 (quoting Proclamation 9705, 83 Fed. Reg. at 11,627).
> Under *Borusan*, Commerce's decision to treat Section 301 duties as deductible
> "United States import duties" is correct.

*Id*. *16.

Shanghai Tainai also sidestepped analysis of the Section 301 duties with regard to the

*Wheatland Tube* factors—whether ordinary or special, whether permanent or temporary—by

conveniently resting on *Borusan*, which focused on Section 232 duty that is driven by national

security concerns:

> *Borusan* instructs that it is the text of the legal order levying duties that is
> paramount; and it is unnecessary for a reviewing court to apply the *Wheatland*
> *Tube* factors where that text has spoken clearly. *See Borusan*, 63 F.4th at 36 ("We
> do not decide whether {the holding} could soundly rest on distinctions between
> § 232 and the § 201 regime more generally, and the distinction between 'normal'
> and 'special' duties . . . . That approach presents challenges that we may avoid.
> The Commerce decision sufficiently rests on the proclamation-specific basis set
> forth above."). If the legal instrument enacting statutory duties provides that such
> duties are intended to be additional to existing duties, then it is reasonable for
> Commerce to treat them as "United States import duties" and deduct them from
> the U.S. price when calculating dumping margins. **This principle, as elucidated**
> **in *Borusan*, extends beyond Section 232 duties and applies to other statutory**
> **duties.** . . . Here, "the particular exercise of the authority" to enact the Section 301
> duties at issue intended for these duties to be additional to antidumping duties.
> The Court therefore affirms Commerce's determination.

*Id*. *17 (emphasis added).

33

The summary extension of *Borusan* to Section 301 duties is not supported by the controlling law or CAFC precedent. For example, the levy of ADD/CVD is pursuant to statutory language similar to that for imposing Section 301 duties. *See* 19 U.S.C. § 1671(a) ("there shall be imposed upon such merchandise a {CVD}, *in addition to any other duty* imposed") (emphasis added); 19 U.S.C. § 1673 ("there shall be imposed upon such merchandise an {ADD}, *in addition to any other duty* imposed") (emphasis added). Yet ADD/CVD is not deducted from the U.S. sale price, based on the purpose underlying the imposition of such special duties (trade remedies) and effects of deducting them from the U.S. sale price (double-counting). Indeed, the CAFC ruling *Yangzhou Bestpak Gifts & Crafts Co. v. United States* instructs that, in determining ADD margins, "{f}orm should be disregarded for substance." 716 F.3d 1370, 1378 (Fed. Cir. 2013). Accordingly, this Court should not follow *Shanghai Tainai*'s analysis to affirm Commerce's 301 duty deduction.

Second, Commerce unpersuasively attempts a false equivalence of Section 301 duties and U.S. import duties, reasoning that "section 301 duties are imposed to address three broad categories of acts, policies, or practices of a foreign country" and then claiming that normal U.S. customs duties "address broad national concerns." IDM at 32 & n.157 (citing *Wheatland*, 495 F.3d at 1362-63). Contrary to Commerce's assertion, *Wheatland* nowhere tied U.S. import duties with alleged broad national concerns. To the contrary, *Wheatland* clarified that "normal customs duties . . . have no remedial purpose {and that} {t}hey are imposed regardless of whether the U.S. industry is suffering adverse effects as a result of imports." *Wheatland*, 495 F.3d at 1362. Further, *Wheatland* supports plaintiff's position that Section 301 duties "are like {ADD} and unlike normal customs duties because they provide only temporary relief from the injurious

effects of imports." *Id*. In other words, unlike Section 301 duties, "normal customs duties . . .

have no termination provision and are permanent unless modified by Congress." *Id*.

Therefore, Commerce's rationale that Section 301 duties are akin to U.S. customs duties

lacks judicial support. As there is consequently no basis to distinguish Section 301 duties from

ADD/CVD and Section 201 remedial duties, none of which are deducted from U.S. price,

Commerce in AR8 erroneously deducted Section 301 duties from U.S. price.

## B.   Imposing Section 301 Duties During the POR Does Not Make Them Normal U.S. Import Duties

In the *Final Results*, Commerce conclusively and arbitrarily determined that: "as a factual

matter, section 301 duties were imposed during the POR and, pursuant to the Act, Commerce

considers these normal U.S. import duties in its dumping margin calculations." IDM at 32. This

rational is specious. The fact that Section 301 duties were imposed and assessed on shipments

entered during the POR does not mean that they mutated into "normal U.S. import duties." *Id*.

Under this circular logic, Commerce would have to treat ADD as "normal U.S. import duties"

and deduct the imposed ADD from U.S. sales prices, because the ADD determined from the

prior review were <u>imposed</u> during the AR8 POR.[4] Therefore, Commerce's rationale is without

merit.

## C.   Deducting Section 301 Duties "Double-Counts" the Amount of Those Duties

Fufeng further demonstrated that deducting Section 301 duties would constitute double-

counting, a key argument that Commerce entirely disregarded. *Compare* Fufeng Case Brief at

---

[4] *See Xanthan Gum from China*, 84 Fed. Reg. 64,831 (Nov. 25, 2019) (final results) (although
the calculated dumping margin was *de minimis* for both individually examined respondents in
AR5 (2017-2018), companies who did not receive separate rate status continued to be subject to
154.07% ADD for entries made during the AR6 (2018-2019) POR; *see also Xanthan Gum from
China*, 84 Fed. Reg. 26,813 (June 10, 2019) (preliminary results).

16-17. *with* IDM Cmt. 7. As this Court has recognized, deducting special duties like ADD (or Section 301 duties) would double-count those duties. In *AK Steel Corp. v. United States*, this Court held:

> In this context, making an additional deduction from USP for the same {ADD} that correct this price discrimination would result in double-counting." This is a reasonable explanation for Commerce's decision to exclude antidumping duties from its definition of "United States import duties" in this context. A similar explanation would apply to Commerce's refusal to deduct countervailing duties from United States Price

988 F.Supp.594 (CIT 1998).

> In *Hoogovens Staal v. United States*, this Court again held,

> If Commerce were to deduct existing {ADD} as a matter of course in its administrative reviews, it would reduce the U.S. price—and increase the margin—artificially. As discussed earlier, an antidumping order is designed to raise the price of dumped goods to a fair level in the import market. It is not a normal import duty or an extra "cost" or "expense" to the importer—it is an element of a fair and reasonable price.

4 F.Supp.2d 1213, 1220 (CIT 1998).

Similarly, Commerce declined to deduct Section 201 duties in *SSWR*, explaining that deducting Section 201 duties would likely "double-count," because:

> Where there is a pre-existing dumping margin, deducting 201 duties from U.S. prices effectively would collect the 201 duties twice—first as 201 duties, and a second time as an increase in that dumping margin. Where there was no pre-existing dumping margin, the deduction of 201 duties from U.S. prices in an AD proceeding could create a margin. Nothing in the legislative history of section 201 or the AD law indicates that Congress intended such results.

*Id*.

Likewise, deducting Section 301 duties from the U.S. sales price would likely result in double-counting the amount of Section 301 duties: first, as Section 301 duties, and a second time, as an increase in the dumping margin. Therefore, Commerce erred in deducting Section 301 duties when calculating Fufeng's dumping margin.

D.     **Deducting Section 301 Duties from U.S. Price is Contrary to Law, Procedurally Defective, and Contrary to the United States' WTO Obligations**

Finally, Commerce disregarded Fufeng's argument that Section 301 duties are unlawful such that they should never have been imposed and, consequently, not deducted from U.S. price. Fufeng Case Brief at 16-18. World Trade Organization ("WTO") dispute resolution panel found that Section 301 duties imposed by the United States on two lists (List 1 and List 2) of Chinese products imported from China are unlawful. WORLD TRADE ORGANIZATION, *DS543: United States – Tariff Measures on Certain Goods from China* (Sept. 15, 2020).[5] Specifically, the WTO panel found that the additional *ad valorem* duties were *prima facie* inconsistent with:

1) GATT Art. I: 1 (most-favoured-nation treatment) because they applied only to products from China; and

2) GATT Art. II because they were applied in excess of the rates to which the United States bound itself in its Schedule of Concessions.

*Id*. at 65. Because the United States unlawfully imposed Section 301 duties on goods imported from China including certain subject merchandise, Commerce compounded the unlawful impact of those Section 301 duties by deducting them from the U.S. price—which unfairly punished Fufeng by increasing its dumping margin.

In sum, for the reasons discussed above, this Court should order remand to require that Commerce not deduct Section 301 duties from the U.S. price.

IV.    **COMMERCE UNLAWFULLY APPLIED ITS COHEN'S *d* METHODOLOGY**

In the *Final Results*, Commerce "continued to apply . . . standard differential pricing analysis," using the Cohen's *d* test to Fufeng's U.S. sales database in order to determine if "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ

---

[5] Available at: https://www.wto.org/english/tratop_e/dispu_e/cases_e/ds543_e.htm (last visited Oct. 28, 2023).

significantly among purchaser, regions, or periods of time." IDM at 34; 19 U.S.C. § 1677f-1(d)(1)(B)(i). Commerce brushed aside Fufeng's legal arguments, which were based on *Stupp Corp. v. United States,* 5 F.4th 1341 (Fed. Cir. 2021), claiming that "Federal Circuit's concerns in *Stupp* . . . do{es} not invalidate the differential pricing methodology." IDM at 41.

Pursuant to its differential pricing analysis, Commerce found "that there is no meaningful difference between the weighted-average dumping margin calculated using the {average-to-average ('A-to-A')} method and the weighted-average dumping margin calculated using an alternative comparison method based on applying the {average-to-transaction ('A-T')} method to those U.S. sales which passed the Cohen's *d* test and the A-to-A method to those sales which did not pass the Cohen's *d* test." *Id*. at 34. Therefore, Commerce applied "the A-to-A method for all U.S. sales to calculate the weighted-average dumping margin for Fufeng." *Id*.

While the *Final Results* retained the A-A methodology simply because there was no "meaningful difference" between the A-A and A-T margins, Commerce's differential pricing methodology as applied to Fufeng's U.S. sales is unlawful. As set forth below, absent a demonstration that Fufeng's sales data satisfy the prescribed conditions for the application of Cohen's *d* test, record evidence and controlling law do not support Commerce's differential pricing analysis.

### A.    Controlling Law and Judicial Precedent Constrain Application of the Cohen's *d* Test to Specific Circumstances

The statute prioritizes use of the A-A method to calculate dumping margins. 19 U.S.C. § 1677f-1(d)(1)(A); *see* 19 C.F.R. § 351.414(c)(1) ("In an investigation or review, the Secretary will use the average-to-average method **unless** the Secretary determines another method is appropriate in a particular case.") (emphasis added). Commerce may resort to the statutory exception and use the A-T method **only if** "there is a pattern of export prices

38

(or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time." 19 U.S.C. § 1677f-1(d)(1)(B). The statutory exception "addresses situations 'where targeted dumping may be occurring.'" *Dillinger France S.A. v. United States*, 981 F.3d 1318, 1324 (Fed. Cir. 2020) (quoting Statement of Administrative Action ("SAA"), H.R. Rep. 103-316 (1994), 1994 U.S.C.C.A.N. 4040, 4178). "Targeted dumping occurs where 'an exporter may sell at a dumped price to particular customers or regions, while selling at higher prices to other customers or regions.'" *Id.* (quoting SAA, 1994 U.S.C.C.A.N. at 4177-78). The CAFC in *Stupp Corp. v. United States* held that:

> while Commerce's decision to consider applying the {A-T} method is within its discretionary power, its determination of whether the {A-T} method is appropriate in a particular case is not solely within its discretion, because that determination is confined by the statutory language of 19 U.S.C. § 1677f-1(d)(1)(B): (i) there must be a "pattern of export prices . . . that differ significantly among purchasers, regions, or periods of time," and (ii) Commerce must "explain{} why such differences cannot be taken into account" using the {A-A} particular method.

5 F.4th at 1351-52 (quoting 19 U.S.C. § 1677f-1(d)(1)(B)).

The CAFC remanded Commerce's reliance on A-T, based on a review of the academic literature underpinning the Cohen's *d* test:

> We agree that there are significant concerns relating to Commerce's application of the Cohen's *d* test in this case and, more generally, in adjudications in which the data groups being compared are small, are not normally distributed, and have disparate variances.

*Id.* at 1357.

In other words, *Stupp* held that in order for the Cohen's *d* test to reliably determine the "effect sizes" of the price comparisons, which Commerce uses to determine whether differences in prices are "significant", a dataset must fulfill three key preconditions:

(1) there must be an adequate number of observations on which the test is performed ("numerosity of data");

(2) the distribution of the data must be normal ("normality of distribution"); **and**

(3) the variances of the test and comparison groups must be reasonably homogeneous ("homoscedasticity" or "homogeneity of variances").

Citing Professor Cohen, the CAFC in *Stupp* notably underscored these three criteria: "'we maintain the assumption that the populations being compared are normal and with equal variability, and conceive them further as equally numerous.'" *Id*. at 1357 (quoting J. Cohen, *Statistical Power Analysis for the Behavioral Sciences* (2d ed. 1988), at 21).

Regarding the *numerosity of data* criteria, *Stupp* held that "{t}he use of Cohen's *d* with test groups consisting of very few observations may be particularly problematic." *Id.* at 1358. Based on a hypothetical scenario in which the number of observations in the test group and comparison groups were small, *Stupp* found that "{t}he literature concludes that using Cohen's *d* in such a situation {involving a small number of observations in those groups} may produce an upward bias in the calculated effect size." *Id*. at 1359. This, in turn, "might produce more 'passing' results under the Cohen's *d* test, *which would tend to exaggerate dumping margins*." *Id.* (emphasis added).

Regarding the *normality of distribution* criteria, *Stupp* quoted from a treatise that explained that: "'{w}hen the distribution of scores of a comparison population is not normal, the usual interpretation of a *d*G or *d* in terms of estimating the percentile standing of the average-scoring members of another group with respect to the supposed normal distribution of the comparison group's scores would be invalid.'" *Id.* (quoting R. Grissom & J. Kim, *Effect Sizes for Research*: *Univariate and Multivariate* (2d ed. 2012), at 66). That treatise further explained that, because standard deviations—on which Commerce's Cohen's *d* test is based—

"can be very sensitive to a distribution's shape, . . . *nonnormality can greatly influence the value of a standardized- mean-difference effect size and its estimate.*" *Id.* (quoting *Effect Sizes for Research*: *Univariate and Multivariate* at 66) (emphasis added).

Regarding the *homogeneity of variances* criteria, the CAFC quoted from a study that: "concluded that Cohen's *d* 'was found to be inaccurate when the normality and homogeneity-of- variances assumptions were violated . . . , *thereby severely affecting the accuracy of* d *in evaluating the true {effect size}* in the research literature.'" *Id.* at 1358 (quoting Johnson Ching-Hong Li, *Effect size measures in a two-independent- samples case with nonnormal and nonhomogeneous data*, 48 BEHAVIORAL RESEARCH 1560, 1571 (2015) (emphasis added).

Yet Commerce, ignoring *Stupp*, failed to analyze Fufeng's U.S. sales database in terms of the three necessary preconditions—numerosity of data, normality of distribution, and homogeneity of variances—before subjecting it to Cohen's *d* test. Instead, Commerce asserted that it "provided an explanation on remand that the statistical limitations are necessary to ensure that a sample is representative of population and that they do not apply in the context of differential pricing analysis where Commerce uses the whole population of relevant pricing data." IDM at 41. However, *Stupp* pointedly rejected this precise argument that Commerce "need not . . . worry about normality, because it is not sampling data but instead possesses the entire universe of data." *Id*. at 1359-60. With respect to Commerce's claimed distinction between analyzing sampled data and an entire universe of data, *Stupp* cautioned that, although Commerce does not "sample" data, "that observation does not address the fact that Professor Cohen derived his interpretive cutoffs under the assumption{s} of normality …, homogeneity-of-variances and the number of observations being compared." *Id*. at 1360.

The *Final Results* also fail to explain Commerce's reliance on Cohen's *d*'s 0.8 cutoff, which *Stupp* questioned because it "fails to address the fact that Professor Cohen derived his interpretive cutoffs under certain assumptions," and "{v}iolating those assumptions can {result in} a meaningless comparator." *Id.* at 1360.

An agency practice that is biased towards generating positive findings and inflating dumping margins cannot be considered reasonable. *Id.* at 1354 (CAFC holding that the standard of review to determine the general validity of the differential pricing methodology and "the components of that methodology" is "reasonableness."). To the contrary, such a practice is arbitrary, capricious, and unfair. As *Stupp* concluded, the evidence "call{ed} into question whether Commerce's application of the Cohen's *d* test to the data in this case violated the assumptions of normality, sufficient observation size, and roughly equal variances associated with that test." *Id.* at 1360. Subsequently, the CAFC in *NEXTEEL Co. v. United States* found Commerce's methodology as similarly flawed "because Commerce's use of Cohen's *d* here presents identical concerns to those in *Stupp*." 28 F.4th 1226 (Fed. Cir. 2022).

Following *Stupp*, this Court remanded several cases to Commerce. In *SeAH Steel Corp. v. United States,* the remand was triggered by Commerce's failure to "explain whether the data used in its differential pricing analysis met the assumptions associated with the Cohen's *d* test." 539 F.Supp.3d 1341, 1351 (CIT 2021). This Court explained that "{t}he evidence and arguments before the Court call into question whether the data Commerce used in its differential pricing analysis violated the assumptions of normality, sufficient observation size, and roughly equal variances associated with the Cohen's *d* test." *Id.* Accordingly, this Court remanded for Commerce "to further explain whether the limits on the use of the Cohen's *d* test were satisfied

42

or whether those limits need not be observed when the Department uses the Cohen's *d* test." *Id*.[6]

In sum, *Stupp* and its progeny require that Commerce first establish that the U.S. sales data underlying the test and comparison groups satisfy all three preconditions—numerosity of data, normality of distribution, and homogeneity of variances—before applying the Cohen's *d* test. Commerce's failure to examine the dataset as to these threshold preconditions means that Commerce's "targeted dumping" analysis in *Final Results* generated correct results only by happenstance—*i.e.*, only if the unexamined data are accidentally distributed in a way that satisfies the preconditions for the proper application of the Cohen's *d* test. Therefore, the *Final Results* are potentially flawed because Commerce failed to analyze, much less demonstrate, whether Fufeng's pricing data satisfy the conditions for the Cohen's *d* test to be considered valid.

**B.      Commerce Unlawfully Determined the Denominator in the Cohen's *d* Test**

A key element of Commerce's Cohen's *d* formula is the denominator—and in particular, its use of a simple average of the comparison group's and the test group's standard deviations (*i.e.*, σp in the denominator of the Cohen's *d* formula provided below). *See Mid Continent Steel & Wire, Inc. v. United States*, 31 F.4th 1367, 1377-81 (Fed. Cir. 2022) (term is also referred to as the "pooled standard deviation").

$$\frac{|Mc - Mt|}{\sigma p}$$

> where  Mc = the mean of the comparison group;
>             Mt = the mean of the test group; and
>             σp = the simple average of the two groups' standard deviations.

*Stupp*, 5 F.4th at 1346. The CAFC explained:

---

[6] On remand, Commerce determined that, because of revisions to its methodology for other reasons, "the selection of the comparison method {had} no material effect on the results of {the} redetermination," and this Court affirmed. *SeAH Steel Corp. v. United States*, 589 F.Supp.3d 1288, 1291, 1293-94 (CIT 2022).

> Commerce recognized that the function of the denominator in the Cohen's *d* coefficient is to be a "yardstick to gauge the significance of the difference of the means" of the sales prices of the test and comparison groups. . . . The numerator of Cohen's *d* is the difference in weighted average sales prices between the test and comparison groups. Without further context, *i.e.*, without a basis for comparison, it is impossible to say whether that difference is "significant," under 19 U.S.C. § 1677f-1(d)(1)(B)(i) or otherwise.

*Mid Continent*, 31 F.4th at 1377.

In calculating the denominator (*i.e.*, the "yardstick"), however, Commerce's use of a simple average, as opposed to a weighted average, generates distortive output and undermines the validity of Cohen's *d* test results. The CAFC reasoned:

> In implementing a statutory mandate, an agency is not duty-bound to follow published literature when, *e.g.*, the literature is inapplicable to the specific problem before the agency or is not itself well grounded. But here Commerce embraced the Cohen's *d* statistics measure and relied on the literature for that measure in making its statutory significance assessment . . . .
>
> In this situation, Commerce needs a reasonable justification for departing from what the acknowledged literature teaches about Cohen's *d*.

*Mid Continent*, 31 F.4th at 1381 (citation omitted). Further, after evaluating Commerce's justifications, the CAFC rejected the "depart{ure}" from the statistical literature's "teachings about how to calculate the denominator of Cohen's *d*, specifically in deciding to use the simple averaging when the {test and comparison} groups differ in size," and found that the Department's "explanations for doing so fail to meet the reasonableness threshold." *Id.* at 1381.

The same analysis applies in this case. Commerce provides no explanation at all—much less, one that would justify its departure from the teachings in the statistical literature regarding the calculation of the Cohen's *d* coefficient. Therefore, Commerce on remand must use, in the denominator for each Cohen's *d* calculation, either: (i) the standard deviation for the entire CONNUM-specific universe of U.S. sales; or (ii) the weighted average pooled standard deviations for the test and comparison groups of export sales.

44

### C.  The Results of the Cohen's *d* Test Are Arbitrary

Commerce uses the Cohen's *d* test to identify differences in prices, for comparable merchandise, that are significant. However, absent first satisfying the three threshold preconditions, this test potentially results in arbitrary determinations as to what price differences are or are not significant. This demonstrates that Commerce's choice of the test itself is flawed, as applied to the facts in this case.

The arbitrariness of the results of Commerce's Cohen's *d* test is strong evidence that the manner in which the Department conducts the test is fundamentally flawed and does not provide an accurate and valid indicator of whether price differences for comparable merchandise are "significant." At a minimum, the results of the Cohen's *d* test show that its application in this case is unreasonable. The fact that a methodology might be permissible under the statute does not prevent its application from being unreasonable in a given case or the results from being unsupported by substantial evidence. *See, e.g., Yangzhou Bestpak*, 716 F.3d at 1378. Commerce's conclusion that there exists a pattern of prices that differ "significantly" based on arbitrary results of the Cohen's *d* test is thus fatally undermined.

Consequently, Commerce on remand should adhere exclusively to the A-to-A method without the intervening step of differential pricing analysis.

Alternatively, this Court should stay its analysis of Commerce's application of the Cohen's *d* test to the facts in this case pending resolution of appellate proceedings in *Stupp*, at which time this Court may decide to request additional briefing on this issue. Acting in this manner would be consistent with this Court's recent order in *HiSteel Co. v. United States*, 2023 WL 5944119, *7-10 (CIT Sept. 12, 2023).

**CONCLUSION**

For the foregoing reasons, Fufeng respectfully requests that this Court order remand for

Commerce to reconsider its *Final Results* and recalculate Fufeng's ADD rate.

Respectfully submitted,

 */s/ Ned H. Marshak*
Ned H. Marshak*
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

*599 Lexington Ave., 36th Floor
New York, NY 10022
(212) 557-4000

*Counsel for Plaintiffs Neimenggu Fufeng
Biotechnologies Co., Shandong Fufeng
Fermentation Co., Ltd., and Xinjiang Fufeng
Biotechnologies Co., Ltd.*

Dated: October 30, 2023

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Plaintiffs' Memorandum of Law In Support of its 56.2 Motion, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2007, is 13,707 words, plus embedded graphics containing 213 words, for a total of 13,920 words, less than the 14,000 word limit.

 _/s/ Ned H. Marshak_____
*Counsel for Plaintiffs Neimenggu Fufeng*
*Biotechnologies Co., Shandong Fufeng*
*Fermentation Co., Ltd., and Xinjiang Fufeng*
*Biotechnologies Co., Ltd.*

Dated: October 30, 2023