IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE

| | | |
|---|---|---|
| NEIMENGGU FUFENG BIOTECHNOLOGIES CO., LTD., *ET AL.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| and | ) ) | |
| MEIHUA GROUP INTERNATIONAL (HONG KONG) LIMITED AND XINJIANG MEIHUA AMINO ACID CO., LTD., | ) ) ) ) | |
| Consolidated Plaintiffs, | ) ) | Consol. Court No. 23-00068 |
| v. | ) ) | |
| UNITED STATES, | ) ) | |
| Defendant. | ) ) ) | |

**DEFENDANT'S MOTION TO DISMISS IN PART
AND OPPOSITION TO PLAINTIFFS' AND CONSOLIDATED
PLAINTIFFS' RULE 56.2 MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

L. MISHA PREHEIM
Assistant Director

Of Counsel:

SPENCER NEFF
Attorney
Office of the Chief Counsel for
    Trade Enforcement & Compliance
U.S. Department of Commerce


February 27, 2024

DANIEL BERTONI
Trial Attorney
Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
(202) 353-7968

Attorneys for Defendant

## TABLE OF CONTENTS

**PAGE**

STATEMENT PURSUANT TO USCIT R. 56.2(c).................................................................. 2

    I.    Administrative Decision Under Review .................................................. 2

    II.    Statement Of The Issues ...................................................................... 2

STATEMENT OF FACTS ................................................................................................ 2

SUMMARY OF THE ARGUMENT ................................................................................ 4

ARGUMENT ................................................................................................................ 7

    I.    Standards Of Review ........................................................................... 7

        A.    Motion To Dismiss For Lack Of Standing Pursuant To USCIT R. 12(b)(1) ........................................................................ 7

        B.    Motion For Judgment On The Agency Record Pursuant To USCIT R. 56.2 ...................................................................... 7

    II.    Fufeng Lacks Standing To Challenge Commerce's Differential Pricing Methodology ............................................................................ 9

    III.    Commerce's Decision To Directly Value Energy Is Supported By Substantial Evidence .......................................................................... 11

        A.    Commerce's Factors-Of-Production Calculation Methodology ............... 11

        B.    Commerce Used Surrogate Financial Information Available For The First Time During This Review To Calculate A More Accurate Dumping Margin ............................................................................ 13

    IV.    Fufeng Failed To Exhaust Its Administrative Remedies With Respect To Commerce's Selection Of Surrogate Value Information For Coal ...................... 19

        A.    Fufeng Did Not Submit Information On Its Coal When Commerce Inquired ...................................................................... 19

        B.    Fufeng Failed To Exhaust Administrative Remedies .............................. 22

     C.     Commerce Properly Rejected Fufeng's Unsolicited And Untimely Coal Test Reports ......................................................................................... 25

V.     Because Section 301 Duties Address Broad, National Concerns And Are Intended To Be Additional Duties, Commerce Reasonably Deducted These Duties From Fufeng's U.S. Price ......................................................................................... 28

     A.     Legal Background ...................................................................................... 28

     B.     Commerce Followed The Text Of The Implementing Instruments When Deducting Section 301 Duties From Fufeng's U.S. Price ........................ 30

VI.     Meihua's Rate Should Remain Consistent With Fufeng's ................................... 33

CONCLUSION ........................................................................................................... 33

# **TABLE OF AUTHORITIES**

**PAGE(S)**

## **CASES**

*ABB Inc. v. United States*,
  190 F.Supp.3d 1159 (2016) ................................................................... 25

*Am. Farm Lines v. Black Ball Freight Serv.*,
  397 U.S. 532 (1970) ............................................................................... 9

*APEX Exps. v. United States*,
  777 F.3d 1373 (Fed. Cir. 2015) ............................................................. 30

*Atl. Sugar, Ltd. v. United States*,
  744 F.2d 1556 (Fed. Cir. 1984) ............................................................. 8

*Best Mattresses Int'l Co. Ltd. v. United States*,
  622 F. Supp. 3d 1347 (Ct. Int'l Trade 2023) ..................................... 7, 10

*Boomerang Tube LLC v. United States*,
  856 F.3d 908 (Fed. Cir. 2017) ............................................................... 22

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
  63 F.4th 25 (Fed. Cir. 2023) ......................................... 29, 30, 31, 32, 33

*Coalition for the Preservation of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States*,
  44 F. Supp. 2d 229 (Ct. Int'l Trade 1999) ........................................ 25, 27

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938) ............................................................................... 7

*Consol. Fibers, Inc. v. United States*,
  535 F. Supp. 2d 1345 (Ct. Int'l Trade 2008) ........................................ 8

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966) ............................................................................... 8

*Corus Staal BV v. Dep't of Commerce*,
  395 F.3d 1343 (Fed. Cir. 2005) ............................................................. 33

*Corus Staal BV v. United States*,
  502 F.3d 1370 (Fed. Cir. 2007) ............................................................. 23

*Dongtai Peak Honey Indus. v. United States*,
    777 F.3d 1343 (Fed. Cir. 2015) ........................................................................... 8

*Dorbest Ltd. v. United States*,
    462 F. Supp. 2d 1262 (Ct. Int'l Trade 2006) .................................................... 12

*Dorbest Ltd. v. United States*,
    604 F.3d 1363 (Fed. Cir. 2010) ................................................................... 23, 24

*Ellwood City Forge Co. v. United States*,
    582 F. Supp. 3d 1259 (Ct. Int'l Trade 2022) .................................................. 23

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ......................................................................................... 17

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215 (1990) ........................................................................................... 7

*Huvis Corp. v. United States*,
    570 F.3d 1347 (Fed. Cir. 2009) ....................................................................... 17

*In re Gartside*,
    203 F.3d 1305 (Fed. Cir. 2000) ......................................................................... 9

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ........................................................................................... 7

*Mid Continent Steel & Wire, Inc. v. United States*,
    203 F. Supp. 3d 1295 (Ct. Int'l Trade 2017) .................................................... 8

*Mittal Steel Point Lisas Ltd. v. United States*,
    548 F.3d 1375 (Fed. Cir. 2008) ................................................................... 23, 24

*Nation Ford Chem. Co. v. United States*,
    166 F.3d 1373 (Fed. Cir. 1999) ....................................................................... 18

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) ......................................................................... 8

*PAM S.p.A. v. United States*,
    463 F.3d 1345 (Fed. Cir. 2006) ......................................................................... 9

*Qingdao Ge Rui Da Rubber Co. v. United States*,
    664 F. Supp. 3d 1369 (Ct. Int'l Trade 2023) .................................................. 23

*Shanghai Tainai Bearing Co., Ltd. v. United States,*
  658 F. Supp. 3d 1269 (Ct. Int'l Trade 2023) .......................................... 30, 31, 32, 33

*Shenzhen Xinboda Indus. Co., Ltd. v. United States,*
  361 F. Supp. 3d 1337 (Ct. Int'l Trade 2019) ........................................................ 12

*SKF USA, Inc. v. United States,*
  537 F.3d 1373 (Fed. Cir. 2008) ............................................................................. 17

*SmithKline Beecham Corp. v. Apotex Corp.,*
  439 F.3d 1312, (Fed. Cir. 2006) ............................................................................ 25

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) ......................................................................................... 7, 11

*Stupp Corp. v. United States,*
  5 F.4th 1341 (Fed. Cir. 2021) ............................................................................. 9, 10

*Trust Chem Co. Ltd. v. United States,*
  791 F.Supp.2d 1257 (2011) ................................................................................... 25

*Unicatch Indus. Co. v. United States,*
  422 F. Supp. 3d 1355 (Ct. Int'l Trade 2019) ......................................................... 23

*United States Steel Corp. v. United States,*
  348 F. Supp. 3d 1248 (Ct. Int'l Trade 2018) ...................................................... 8, 16

*United States v. L.A. Tucker Truck Lines, Inc.,*
  344 U.S. 33 (1952) ................................................................................................. 23

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,*
  435 U.S. 519 (1978) ............................................................................................... 25

*Wheatland Tube Co. v. United States,*
  495 F.3d 1355 (Fed. Cir. 2007) ......................................................................... 30, 32

*Zhejiang DunAn Hetian Metal Co. v. United States,*
  652 F.3d 1333 (Fed. Cir. 2011) ................................................................... 11, 15, 17

## STATUTES

19 U.S.C. § 1516a ........................................................................................................ 7
19 U.S.C. § 1677a(c)(2)(A) ........................................................................... 19, 32, 33
19 U.S.C. § 1677b(c)(1)(B) ....................................................................................... 11
19 U.S.C. § 1677b(c)(3)(C) ....................................................................................... 12
19 U.S.C. § 1677f-1(d)(1)(A) ...................................................................................... 9

19 U.S.C. § 1677f-1(d)(1)(B) .................................................................. 9
19 U.S.C. § 1862 ................................................................................... 29
19 U.S.C. § 2411 ................................................................................... 28
28 U.S.C. § 1581(c) ................................................................................ 7
28 U.S.C. § 2637(d) .............................................................................. 22

## **REGULATIONS**

19 C.F.R. § 351.102(b)(21)(i) ............................................................... 27
19 C.F.R. § 351.301(c) .......................................................................... 27
19 C.F.R. § 351.301(c)(1) ..................................................................... 26
19 C.F.R. § 351.301(c)(1)(v) ................................................................ 27
19 C.F.R. § 351.309(c)(2) ..................................................................... 23
19 C.F.R. § 351.309(d)(2) ............................................................... 23, 24
19 C.F.R. § 351.408(c) .......................................................................... 12

## **OTHER AUTHORITIES**

*Citric Acid and Certain Citrate Salts from the People's Republic of China*,
    74 Fed. Reg. 16,838, 16,838 (Dep't Commerce Apr. 13, 2009)................................ 12

*Chlorinated Isocyunarates from the People's Republic of China*,
    78 Fed. Reg. 4,386 (Dep't Commerce Jan. 22, 2013) ....................................... 14, 15

*Xanthan Gum from the People's Republic of China*,
    78 Fed. Reg. 43,143 (Dep't Commerce July 19, 2013) .......................................... 2

*Addressing China's Laws, Policies, Practices, and Actions Related to Intellectual Property,
    Innovation, and Technology*,
    82 Fed. Reg. 39,007 (Executive Office of the President Aug. 17, 2017) ................................ 28

*Proclamation 9705*,
    83 Fed. Reg. 11,625 (Mar. 15, 2018)................................................... 30, 31

*Notice of Determination and Request for Public Comment Concerning Proposed Determination
    of Action Pursuant to Section 301*,
    83 Fed. Reg. 14,906 (U.S. Trade Rep. Apr. 6, 2018) .............................................. 29

*Notice of Action and Request for Public Comment Concerning Proposed Determination of
    Action Pursuant to Section 301*,
    83 Fed. Reg. 28,710 (U.S. Trade Rep. June 20, 2018) ....................................... 29, 31

*Notice of Action Pursuant to Section 301*,
    83 Fed. Reg. 40,823 (U.S. Trade Rep. Aug. 16, 2018)....................................... 29, 31

*Notice of Modification in Section 301 Action*,
    83 Fed. Reg. 47,974 (U.S. Trade Rep. Sept. 18, 2018) ................................................ 29, 31, 32

*Xanthan Gum from the People's Republic of China*,
    84 Fed. Reg. 64,831 (Dep't Commerce November 25, 2019) ................................................ 13

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
    86 Fed. Reg. 50,034 (Dep't Commerce Sept. 7, 2021) ............................................................ 3

*Xanthan Gum from the People's Republic of China*,
    87 Fed. Reg. 47,970 (Dep't Commerce Aug. 5, 2022) ............................................................ 3

*Xanthan Gum From the People's Republic of China*,
    88 Fed. Reg. 9,861 (Dep't Commerce Feb. 15, 2023) ...................................................... 2, 3, 4

U.S. Constitution, Art. III, § 1 ......................................................................................... 7

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE

_____
                                        )
NEIMENGGU FUFENG                        )
BIOTECHNOLOGIES CO., LTD., *ET AL.*,    )
                                        )
            Plaintiffs,                 )
                                        )
        and                             )
                                        )
MEIHUA GROUP INTERNATIONAL              )
(HONG KONG) LIMITED AND XINJIANG        )
MEIHUA AMINO ACID CO., LTD.,            )
                                        )
            Consolidated Plaintiffs,    )       Consol. Court No. 23-00068
                                        )
        v.                              )
                                        )
UNITED STATES,                          )
                                        )
            Defendant.                  )
_____ )

**DEFENDANT'S MOTION TO DISMISS IN PART**
**AND OPPOSITION TO PLAINTIFFS' AND CONSOLIDATED**
**PLAINTIFFS' RULE 56.2 MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rules 12(b)(1) and 56.2 of the Rules of the United States Court of

International Trade (USCIT R.) and the Court's January 29, 2024 order, ECF No. 29, defendant,

the United States, respectfully requests that the Court dismiss count six of the complaint filed by

plaintiffs Neimenggu Fufeng Biotechnologies Co., Ltd., Shandong Fufeng Fermentation Co.,

Ltd., and Xinjiang Fufeng Biotechnologies Co., Ltd. (collectively, Fufeng) for lack of standing,

and deny the motions for judgment on the administrative record filed by Fufeng and by

consolidated plaintiffs, Meihua Group International (Hong Kong) Limited and Xinjiang Meihua

Amino Acid Co., Ltd. (collectively, Meihua).  Because substantial evidence supports the

Department of Commerce's (Commerce) final determination in its administrative review of the

antidumping order covering xanthan gum from the People's Republic of China and the final determination is otherwise in accordance with law, we respectfully request that the Court deny Fufeng's and Meihua's motions and sustain Commerce's final determination.

## STATEMENT PURSUANT TO USCIT R. 56.2(c)

I.    Administrative Decision Under Review

The administrative decision under review is the results of the 2020 to 2021 administrative review of the antidumping order covering xanthan gum from China:  *Xanthan Gum From the People's Republic of China*, 88 Fed. Reg. 9,861 (Dep't of Commerce Feb. 15, 2023) (P.R. 241) (Final Results) and the accompanying Issues and Decision Memorandum (IDM) (P.R. 233).  The period of review is July 1, 2020 to June 30, 2021.

II.   Statement Of The Issues

1.    Whether Fufeng lacks standing to challenge Commerce's differential pricing methodology when Fufeng cannot point to any injury resulting from Commerce's actions.

2.    Whether substantial evidence supports Commerce's determination to directly value Fufeng's energy factors as part of its factors-of-production methodology for calculating normal value.

3.    Whether Fufeng failed to exhaust its administrative remedies with respect to Commerce's selection of surrogate value information for Fufeng's coal inputs.

4.    Whether substantial evidence supports Commerce's determination to deduct section 301 duties from Fufeng's U.S. price.

## STATEMENT OF FACTS

This litigation relates to the antidumping duty order on xanthan gum from China.

*Xanthan Gum from the People's Republic of China*, 78 Fed. Reg. 43,143 (Dep't of Commerce July 19, 2013) (Antidumping Order).  On September 7, 2021, Commerce initiated a review of the

Antidumping Order for the period of July 1, 2020 to June 30, 2021. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 50,034 (Dep't of Commerce Sept. 7, 2021). Commerce initiated a review of several Chinese xanthan gum producers, including Fufeng and Meihua. *Id.* at 50,043. Commerce selected only Fufeng for mandatory examination. *See* Respondent Selection Memorandum at 1 (Oct. 21, 2021) (P.R. 36).

On August 5, 2022, Commerce preliminarily determined that Fufeng did not make sales at less than fair value during the period of review and calculated a preliminary dumping margin of zero for Fufeng. *See Xanthan Gum from the People's Republic of China*, 87 Fed. Reg. 47,970, 47,972 (Dep't of Commerce Aug. 5, 2022) (P.R. 202) (Preliminary Results) and the accompanying Issues and Decision Memorandum (P.R. 196) (PDM).

 In the Preliminary Results, Commerce explained that it would use a factors-of-production methodology to calculate normal value for Fufeng, because Commerce considers China to be a non-market economy country. PDM at 6. Commerce preliminarily used Malaysian data to value Fufeng's factors of production. *Id.* at 13-14. Commerce based its surrogate financial ratios, a component of its factors-of-production calculation, on the 2021 public financial statement of Ajinomoto (Malaysia) Berhad (Ajinomoto), a Malaysian producer of monosodium glutamate. *Id.* at 21. Energy costs were preliminarily incorporated within the selling, general, and administrative (SG&A) expense ratio derived from Ajinomoto's 2021 financial statement. *Id.* at 20.

On February 15, 2023, Commerce published the final results of its administrative review. *See Xanthan Gum From the People's Republic of China*, 88 Fed. Reg. 9,861 (Dep't of Commerce Feb. 15, 2023) (P.R. 241) (Final Results) and the accompanying Issues and Decision Memorandum (P.R. 233) (IDM). In the Final Results, Commerce modified its factors-of-

production calculation for Fufeng to value energy directly, rather than as part of the SG&A ratio. IDM at 11-14.  Commerce then calculated a final dumping margin of 17.36 percent, which applied to Fufeng and to Meihua.  Final Results, 88 Fed. Reg. at 9,862.

Fufeng and Meihua then sought judicial review of Commerce's Final Results before this Court.  Fufeng challenges seven aspects of Commerce's decision:  Commerce's direct valuation of energy factors of production (count one), Commerce's choice of a Harmonized Tariff System (HTS) number for Fufeng's energy coal (count two), Commerce's decision to cap the value assigned to Fufeng's soybean dregs (count three), Commerce's adjustment of the valuation of ocean freight (count four), Commerce's deduction of section 301 duties (count five), Commerce's application of the Cohen's *d* test (count six), and Commerce's rejection of Fufeng's submissions of factual information (count seven).  *See* Compl. ¶¶ 18, 20, 22, 26, 28, 30, ECF No. 13.  Fufeng now seeks judgment on the agency record based on counts one, two, five, six, and seven of its complaint.  *See* Pl. Mot. for Judgment on the Agency Record Pursuant to Rule 56.2, ECF No. 25 (Pl. Br.).  After its case was consolidated with Fufeng's, Meihua incorporated by reference Fufeng's motion for judgment on the agency record, arguing that any rate calculated for Fufeng on remand be applied to Meihua as well.  *See* Mot. for Judgment on the Agency Record Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade at 4, ECF No. 26 (Consol. Pl. Br.).

## <u>SUMMARY OF THE ARGUMENT</u>

Fufeng lacks standing to challenge Commerce's differential pricing methodology and this count of its complaint should be dismissed.  Although Commerce applied the Cohen's *d* test to determine whether Fufeng's sales exhibited a pattern of differential pricing, Commerce ultimately found that the use of an average-to-transaction methodology resulted in no meaningful

difference to Fufeng's dumping margin. Therefore, Commerce's differential pricing methodology has no impact on the dumping margin calculated in this case and Fufeng has suffered no injury as a result of the Cohen's *d* test.

The Court should sustain the Final Results. Commerce's determination to directly value Fufeng's energy factors as part of its factors-of-production methodology for calculating normal value is supported by substantial evidence and in accordance with law. Although Commerce, in the Final Results, used a different methodology than in the Preliminary Results and in past reviews of the Antidumping Order, Commerce articulated the reasons why its revised methodology contributed to the calculation of a more accurate dumping margin. First, the surrogate financial statements which Commerce relied upon to calculate a selling, general and administrative (SG&A) expense ratio in this review broke out SG&A expenses in a different manner from during previous reviews, which enabled Commerce to directly value energy more precisely than in past reviews and to avoid double counting. Second, the production process for xanthan gum is energy intensive, which warrants the direct valuation of energy inputs where possible. Finally, Commerce puts particular importance on specificity when valuing factors of production, and directly valuing energy enabled Commerce to calculate a normal value using Fufeng' own reported energy inputs. To argue that Commerce's revised methodology is inconsistent with its past practice, Fufeng neglects the factual distinctions between Commerce's past administrative proceedings and the underlying review. Moreover, even if Commerce had changed its practice here, Fufeng does not explain why Commerce's revised methodology is unreasonable.

Fufeng failed to exhaust its administrative remedies with respect to the selection of surrogate value information for its coal inputs. Commerce granted Fufeng several opportunities

to comment on or provide argument regarding the HTS number used to value coal. Following the Preliminary Results, Fufeng failed to challenge Commerce's selection of a preliminary HTS number for coal until its administrative rebuttal brief. Because no parties contested the HTS number used to value coal in an administrative case brief, Fufeng's rebuttal brief improperly raised a new issue and Commerce's determination to reject the brief was supported by substantial evidence and in accordance with law. Fufeng argues that CP Kelco effectively raised the issue in its administrative case brief by contesting Commerce's preliminary determination not to directly value energy factors, however this issue is distinct from that of the surrogate value information used to value coal. Fufeng also argues that Commerce improperly rejected coal test reports submitted to the record by Fufeng. Although the coal test reports would not have absolved Fufeng of its failure to exhaust this issue through legal argument, Commerce's rejection of Fufeng's test reports is nonetheless supported by substantial evidence and in accordance with law because Fufeng's submissions constituted untimely and unsolicited questionnaire responses.

Commerce's determination to deduct section 301 duties from Fufeng's U.S. price is supported by substantial evidence and in accordance with law. The Federal Circuit has held that the relevant consideration when determining whether duties are deductible United States import duties is whether the legal instrument implementing those duties indicates that the duties are intended to be assessed in addition to antidumping or countervailing duties. This Court has since held that the section 301 duties proclaimed in 2018 are intended to be assessed in addition to antidumping duties and are therefore United States import duties. In arguing that deducting section 301 duties double-counts those duties, Fufeng misinterprets the intent of section 301 duties, which are to be assessed in addition to antidumping duties. Further, Fufeng makes an inapposite argument that Commerce failed to address the *Wheatland Tube* factors, because the

Federal Circuit subsequently held than an analysis of the *Wheatland Tube* factors is not necessary to determine whether a specific duty is a deductible United States import duty.

**ARGUMENT**

I.    Standards Of Review

    A.    Motion To Dismiss For Lack Of Standing Pursuant To USCIT R. 12(b)(1)

A party may assert by motion that the Court lacks subject-matter jurisdiction.  USCIT R. 12(b)(1).  This Court possesses "exclusive jurisdiction of any civil action commenced under section 516A or 517 of the Tariff Act of 1930."  28 U.S.C. § 1581(c).  But for a party to be entitled to the exercise of judicial power, the party must demonstrate the existence of a case or controversy and the party's standing to litigate.  U.S. Constitution, Art. III, § 1; *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337-38 (2016).  Thus, a party invoking this Court's jurisdiction bears the burden of showing that it has constitutional standing.  *See Best Mattresses Int'l Co. Ltd. v. United States*, 622 F. Supp. 3d 1347, 1367 (Ct. Int'l Trade 2023) (citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)).  Plaintiffs seeking to establish standing must establish that they have suffered an "injury in fact" that is "concrete and particularized," and "actual or imminent, not conjectural or hypothetical."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Further, plaintiffs must identify a causal link between the conduct complained of and the injury suffered, and it must be likely, as opposed to speculative, that the injury will be redressed by a favorable decision.  *Id.* at 560-561.

    B.    Motion For Judgment On The Agency Record Pursuant To USCIT R. 56.2

The Court sustains Commerce's determinations if they are supported by "substantial evidence on the record" and otherwise "in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence denotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

The possibility of drawing two inconsistent conclusions from the record "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  A party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation and internal quotation marks omitted), and the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions, *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

To comply with the statutory requirement that Commerce's determinations be made "in accordance with law," Commerce must "follow its established practice or explain why it is reasonable for it to deviate from its practice."  *United States Steel Corp. v. United States*, 348 F. Supp. 3d 1248, 1260 (Ct. Int'l Trade 2018).  Commerce's actions establish a practice "'when a uniform and established procedure exists that would lead a party, in the absence of notification of change, reasonably to expect adherence to' the agency's past action."  *Id*. at 1254 (quoting *Mid Continent Steel & Wire, Inc. v. United States*, 203 F. Supp. 3d 1295, 1312 (Ct. Int'l Trade 2017)).

Additionally, the Court reviews the administrative proceedings conducted by Commerce for abuse of discretion.  *See Dongtai Peak Honey Indus. v. United States*, 777 F.3d 1343, 1351 (Fed. Cir. 2015).  The Court "(1) must consider whether {Commerce's} decision was based on a consideration of relevant factors and whether there has been a clear error of judgment, and (2) analyze whether a rational connection exists between {Commerce's} factfindings and its ultimate action."  *Consol. Fibers, Inc. v. United States*, 535 F. Supp. 2d 1345, 1354 (Ct. Int'l

Trade 2008) (citing *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000)).  The Federal Circuit

has recognized that it is "within the discretion of a court or an administrative agency to relax or

to modify its procedural rules adopted for the orderly transaction of business" when the ends of

justice so require.  *PAM S.p.A. v. United States*, 463 F.3d 1345, 1348 (Fed. Cir. 2006) (citing *Am.

Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 539 (1970)).

II.    Fufeng Lacks Standing To Challenge Commerce's Differential Pricing Methodology

Fufeng lacks standing to challenge Commerce's application of the Cohen's *d* test,

because Fufeng cannot point to any injury that it has suffered.  Therefore, count six of Fufeng's

complaint should be dismissed.  *See* Compl. ¶ 28, ECF No. 13.

Commerce typically measures dumping margins either by comparing the weighted

average of normal values to the weighted average of export prices (average-to-average

comparison) or by comparing the normal values of individual transactions to the export prices of

individual transactions (transaction-to-transaction comparison).  *See* 19 U.S.C. § 1677f-

1(d)(1)(A).  Only when Commerce identifies a pattern of differential pricing and cannot account

for that pattern using either an average-to-average or a transaction-to-transaction comparison is

Commerce permitted to compare the weighted average of normal values to the export prices of

individual transactions (average-to-transaction comparison).  *Id.* § 1677f-1(d)(1)(B).

As part of its determination whether a foreign exporter or producer exhibits a pricing

pattern that differs significantly among purchasers, producers, or time periods, Commerce

employs the Cohen's *d* test.  *See Stupp Corp. v. United States*, 5 F.4th 1341, 1346-48 (Fed. Cir.

2021).  The purpose of the test is ultimately to determine whether to employ an average-to-

average or an average-to-transaction comparison.  *Id.*  If Commerce finds from the results of the

Cohen's *d* test that a pattern of differential pricing exists, but that there is no meaningful

difference in the dumping margin calculated using an average-to-transaction as opposed to an

average-to-average methodology, Commerce uses its standard average-to-average methodology to calculate the dumping margin.  *Id.* at 1347.

Commerce applied the Cohen's *d* test to Fufeng's sales in the Preliminary Results.  PDM at 15-17.  Commerce found that, for Fufeng, a pattern of differential pricing existed, but that there was no meaningful difference between the dumping margins calculated using the average-to-average and average-to-transaction methods.  *Id.* at 17.  Therefore, Commerce used the "standard method" — an average-to-average comparison — to calculate Fufeng's preliminary dumping margin.  Commerce affirmed this decision in the final results and used the average-to-average method to calculate the final dumping margin.  IDM at 34.  Therefore, because Commerce ultimately employed the average-to-average method, the Cohen's *d* test had no effect on the method Commerce used to calculate Fufeng's dumping margin.

Fufeng recognizes that Commerce ultimately employed an average-to-average comparison, Pl. Br. 38, yet nonetheless requests that the Court order Commerce to "adhere exclusively to the {average-to-average} method without the intervening step of differential pricing analysis," *id.* at 45.  Fufeng's claim does not meet the most basic standing requirements, because Fufeng does not even attempt to establish that it has suffered injury as a result of Commerce's use of the Cohen's *d* test.  Fufeng does not explain how the Cohen's *d* test has caused it harm — or could even hypothetically cause it harm — and does not attempt to explain how the relief that it seeks from the Court would redress any harm.  In an identical situation, the Court dismissed as non-justiciable a challenge to the Cohen's *d* test when Commerce employed the test and concluded that no meaningful difference existed between dumping margins calculated using the average-to-average and average-to-transaction methods.  *See Best Mattresses*, 622 F. Supp. 3d at 1368.  The Court determined that any "bare procedural violation"

from a pricing analysis that resulted in the use of the average-to-average method that the plaintiff preferred did not amount to the sort of concrete harm necessary to show standing. *See id.* (quoting *Spokeo*, 578 U.S. at 341).

Similarly here, Commerce calculated Fufeng's dumping margin using the method Fufeng prefers. Therefore, Fufeng's lack of injury means that it lacks standing to challenge Commerce's differential pricing methodology. Count six of Fufeng's complaint should be dismissed.

III.    <u>Commerce's Decision To Directly Value Energy Is Supported By Substantial Evidence</u>

Substantial evidence supports Commerce's decision to directly value Fufeng's energy factor of production. When Commerce valuates factors of production, "the critical question" is whether Commerce uses the "best available information" and calculates the antidumping margins "as accurately as possible." *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (cleaned up)). The Court should sustain a determination if "a reasonable mind could conclude that Commerce chose the best available information." *Id.* (cleaned up). Here, Commerce relied upon a previously unavailable breakdown of expenses in the financial statements of the surrogate producer to more accurately account for the cost of energy in the energy-intensive process of manufacturing xanthan gum. IDM at 12-14.

A.    <u>Commerce's Factors-Of-Production Calculation Methodology</u>

In antidumping determinations pertaining to imports from nonmarket economy countries, when available information does not permit a direct calculation of normal value, Commerce calculates normal value based on "the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." 19 U.S.C. § 1677b(c)(1)(B). Commerce bases its factor valuations on the "best available information regarding the values of such factors in a market economy country." *Id.* The factors of production that Commerce considers include

"amounts of energy and other utilities consumed." *Id.* § 1677b(c)(3)(C). Commerce values factors of production using data from a single surrogate country, and values selling, general, and administrative (SG&A) expenses using public information gathered from producers of identical or comparable merchandise in that surrogate country. 19 C.F.R. § 351.408(c). Commerce uses a ratio to value SG&A expenses. *See Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262, 1301 n.36 (Ct. Int'l Trade 2006) (providing an overview of Commerce's factors-of-production methodology). First, Commerce calculates the surrogate producer's total SG&A expenses from the surrogate producer's financial statements. This value becomes the numerator of the SG&A ratio. Commerce then sums the surrogate producer's material, labor and energy costs, again obtained from the surrogate producer's financial statements, with an amount for the surrogate producer's factory overhead to become the denominator of the SG&A ratio. Commerce multiplies the SG&A ratio — which is derived solely from the surrogate producer's financial statements — by the sum of the material, labor, and energy costs and the factory overhead calculated for the actual producer of the subject merchandise.

The formula then is as follows:

$$\frac{SG\&A_S}{MLE_S + Overhead_S} \times (MLE_P + Overhead_P) = SG\&A_P$$

"MLE" designates the sum of material, labor, and energy costs, subscript "S" represents values derived from surrogate financial statements, and subscript "P" represents values derived from the producer's reported factors of production.

When calculating normal value based on factors of production, Commerce's practice is to avoid the double counting of factors. *See Shenzhen Xinboda Indus. Co., Ltd. v. United States*, 361 F. Supp. 3d 1337, 1350 n.8 (Ct. Int'l Trade 2019) (citations omitted); *see also Citric Acid*

*and Certain Citrate Salts from the People's Republic of China*, 74 Fed. Reg. 16,838, 16,838

(Dep't of Commerce Apr. 13, 2009).

       In circumstances when Commerce has been unable to isolate energy costs from overall

SG&A expenses in surrogate financial statements, Commerce has declined to directly value

energy as part of its normal value calculations.  *See Citric Acid*, 74 Fed. Reg. at 16,838.  In these

circumstances, energy costs remain a part of SG&A in the numerator of the ratio and are not

counted separately as part of materials, labor, and energy in the denominator of the ratio.

       B.     Commerce Used Surrogate Financial Information Available For The First Time
              During This Review To Calculate A More Accurate Dumping Margin

       In the underlying review, Commerce was able to directly value Fufeng's energy factor of

production — resulting in a more accurate dumping margin — because the 2021 surrogate

financial statements contained a breakdown of costs that was not present in previous surrogate

financial statements.  The surrogate financial information was derived from Ajinomoto.  PDM at

21; IDM at 11-14.  Ajinomoto's 2021 financial statements enabled Commerce to partially, but

not entirely, isolate energy costs from overall SG&A.  IDM at 13; Fufeng's Surrogate Value

Comments (Mar. 31, 2022), Exhibit 8 at 49, 70 (P.R. 147-149) (Ajinomoto's 2021 Financial

Statements).  The financial statements included a line item for "operating expenses," which

subdivided those expenses into line items for "selling and distribution expenses," and

"administrative and other expenses."  Ajinomoto's 2021 Financial Statements at 70.  In this

respect, Ajinomoto's 2021 financial statements differ from the prior-year financial statements

that Commerce relied on in earlier reviews of the Antidumping Order, because the prior-year

financial statements did not break "operating expenses" into any sub-items at all.  IDM at 12; *see*
*also Xanthan Gum from the People's Republic of China*, 84 Fed. Reg. 64,831 (Dep't of

Commerce Nov. 25, 2019) and accompanying Issues and Decision Memorandum at Comment 4

("Production energy expenses are likely included in the 'other operating expenses' line item and cannot be separately identified; thus, production energy expenses will be part of the SG&A ratio.") (*Xanthan Gum 2017-2018* IDM).

In the underlying review, because energy was not identified elsewhere in Ajinomoto's 2021 financial statements, and because energy is not a selling or distribution expense, Commerce determined that a value for energy purchases was contained in the line item for "administrative and other expenses" on Ajinomoto's 2021 financial statements.  IDM at 13.  Commerce therefore determined that direct valuation of Fufeng's energy factor of production was warranted.  *Id.*  To avoid double counting, Commerce included the amount reported by Ajinomoto as "administrative and other expenses" in the denominator, rather than the numerator, of the SG&A ratio — effectively treating the line item for administrative and other expenses in its entirety as energy.  *Id.*  This change did not "zero" Commerce's value for SG&A expenses, because several components of the SG&A ratio, including the amount for "selling and distribution expenses," remained in the numerator of Commerce's SG&A ratio.  *Id.* at 14.  In so doing, Commerce was able to more precisely value energy than in prior reviews of the Antidumping Order, with no danger of double-counting.  *Id.* at 13-14.

Commerce's decision to directly value energy in this case was driven by the fact that xanthan gum production is an energy-intensive process, and also by Commerce's preference for using a respondent's reported energy factors when calculating normal value for energy-intensive merchandise.  *Id.* at 12.  Commerce also cited in support of its decision a separate instance in which it valued energy factors using a line item that potentially contained amounts that would otherwise be considered SG&A.  IDM at 13-14 (citing *Chlorinated Isocyunarates from the People's Republic of China*, 78 Fed. Reg. 4,386 (Dep't of Commerce Jan. 22, 2013)

(*Chlorinated Isos*) and accompanying Issues and Decision Memorandum at 23 (*Chlorinated Isos* IDM). In *Chlorinated Isos*, Commerce selected surrogate financial statements which, like those of Ajinomoto, did not separately identify energy costs. *Chlorinated Isos* IDM at 23. However, Commerce found that a specific line item in the financial statements for "rental, light, janitorial, and security expenses" was associated with energy costs, and treated that line item as a component of energy costs notwithstanding the fact that it also contained expenses unrelated to energy. *Id.* Commerce's reasoning in *Chlorinated Isos* is analogous to its reasoning here because in both situations Commerce based its decision to directly value energy on a line item in a surrogate financial statement that potentially contained other administrative expenses, citing the importance of accounting for an energy-intensive production process. *Id.*; IDM at 13-14.

Therefore, because Commerce explained why it made use of the "best available information" provided by the breakdown of expenses on Ajinomoto's 2021 financial statements and why valuing energy directly permitted it to calculate the antidumping margin "as accurately as possible," Commerce's determination is supported by substantial evidence and should be sustained. *See Zhejiang DunAn*, 652 F.3d at 1341.

Fufeng contests Commerce's determination, first arguing that it is Commerce's practice not to directly value energy when energy cannot be segregated as an individual line item in surrogate financial statements. Pl. Br. 8-13. Fufeng draws upon several prior administrative determinations to support its argument. *Id.* But whether Commerce decides to directly value energy where energy is not clearly segregated in financial statements is a fact-specific question that depends on the financial statements themselves. We do not disagree that, in certain instances where energy costs were not segregated, Commerce has included energy as part of SG&A, as the multitude of cases cited by Fufeng indicates. *See* Pl. Br. 8-11. Indeed, in a

previous period of this same proceeding, Commerce found that energy expenses were likely

included in Ajinomoto's "other operating expenses" line item and were not separately

identifiable, and that Commerce could not exclude such expenses from the SG&A ratio in a

manner that would avoid double-counting.  *See Xanthan Gum 2017-2018* IDM at Comment 4.

But here, Commerce identified a change in the facts which distinguish this review from prior

reviews:  Ajinomoto's 2021 financial statements subdivided "other operating expenses" into the

two line items of "selling and distribution expenses" and "administrative and other expenses."

*See* IDM at 13.  Because different information led to a different methodology, Commerce's

determination is not arbitrary, but rather based on the unique record in this case.  *See United

States Steel Corp.*, 348 F. Supp. 3d at 1260.

      Further, Commerce identified support for its methodology in the *Chlorinated Isos* case.

IDM at 13 (citing *Chlorinated Isos* IDM at Comment 4).  Commerce cited *Chlorinated Isos* not

for a direct factual comparison, but for reasoning that supported the direct valuation of energy

where financial statements contain a line item that potentially contained amounts for non-energy

expenses.  *Id.*  Fufeng argues that Commerce's determination in *Chlorinated Isos* is inapposite

because the line item which Commerce found to contain energy in that case is not comparable to

the line item "administrative and other expenses" that Commerce found to contain energy in the

underlying review.  *See* Pl. Br. 20-21.  But factual comparisons between the two cases are

inappropriate, not least because the financial statements which Commerce relied upon in

*Chlorinated Isos* are not part of the record of this proceeding.  Fufeng focuses on a narrow

factual distinction, without undermining the reasoning that Commerce used in *Chlorinated Isos*,

reasoning which is consistent with the reasoning Commerce used in the underlying review:

classifying as energy a potentially overinclusive line item from the surrogate financial statement enables Commerce to directly value energy when considering an energy-intensive process.

In the same vein, Fufeng attempts to minimize the factual distinction underpinning Commerce's decision to directly value energy factors during this review when Commerce had not done so in the past. *See* Pl. Br. 13-18. Fufeng acknowledges that the layout of the 2021 financial statements from Ajinomoto are identical to prior Ajinomoto financial statements in all relevant aspects except for the newly split "operating expenses" line item. *Id.*; *see* IDM at 13. But Fufeng fails to explain why this "solitary change" in the record evidence is not sufficient to warrant Commerce's novel approach. *See* Pl. Br. 14. Because Commerce was, in this review, able to separate energy costs from approximately half of the "other operating expenses" component of Ajinomoto's overall SG&A expenses, Commerce was able to value energy in a manner that contributed to a more accurate margin. IDM at 13; *see Zhejiang DunAn*, 652 F.3d at 1341. Fufeng does not explain why Commerce should have ignored this change.

Moreover, even assuming that Commerce's decision to directly value Fufeng's energy in this case constituted a change in practice, Commerce is permitted to change its practice when it provides a reasoned basis for doing so. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). In particular, Commerce may change its methodologies when those changes lead to the calculation of more accurate margins. *See Huvis Corp. v. United States*, 570 F.3d 1347, 1355 (Fed. Cir. 2009) (citing *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1380 (Fed. Cir. 2008)). Here, Commerce found in the Final Results that directly valuing energy "more accurately captures the direct production experience and expenses of the company." IDM at 13. Commerce supported its finding by identifying the energy-intensive nature of the xanthan gum production process and the fact that Fufeng's reported energy costs "constitute a greater majority

of its costs when compared to direct materials." *Id.* In this respect, Commerce's methodology contributes to accuracy in two ways because it directly values energy and also removes energy costs from the numerator of the SG&A ratio. Finally, Commerce's methodology avoids double-counting and therefore is not distortive. *Id.* at 14.

Fufeng argues, without support, that Commerce's methodology, by directly valuing energy factors, leads to a less accurate dumping margin. Pl. Br. 18-21. Fufeng provides no evidence for its assertion and does not rebut the points made by Commerce to support its methodology. *See id.* Fufeng's contention appears to be based on the notion that directly valuing energy using an amount that potentially contains some SG&A expenses, "irreparably distort{s}" the SG&A and overhead ratios. *Id.* But this argument is fallacious, because Fufeng fails to consider the inaccuracies inherent in its proposed alternative. Particularly, by valuing energy as part of SG&A, as Fufeng appears to prefer, Commerce would be using an indirect approach that is not specific to the input values actually reported by Fufeng. *See* IDM at 13. Lacking information in the surrogate financial statement that contained a discrete line item for electricity expenses, Commerce opted for an approach that allowed it to calculate normal value that relied, in part, on Fufeng's actual electricity usage while also avoiding double counting. Under this approach, Commerce found, within its discretion, that it arrived at a more accurate result than the one utilized in the Preliminary Results or advocated by Fufeng. *See Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) ("{T}he process of constructing foreign market value for a producer in a nonmarket economy country is difficult and necessarily imprecise. . . . {Section 1677b(c)} accords Commerce wide discretion in the valuation of factors of production in the application of those guidelines.") (cleaned up).

Although Fufeng may have preferred that Commerce adopt a different methodology, it fails to demonstrate that Commerce's chosen methodology was unreasonable.

IV.     Fufeng Failed To Exhaust Its Administrative Remedies With Respect To Commerce's
        Selection Of Surrogate Value Information For Coal

The Court should not reach the merits of Fufeng's argument that Commerce selected surrogate value information for coal that is not commensurate with the coal used in Fufeng's production process. *See* Pl. Br. 21-26. Fufeng failed to exhaust its administrative remedies with respect to this issue by failing to raise it in its administrative case brief.

A.     Fufeng Did Not Submit Information On Its Coal When Commerce Inquired

Commerce requested that Fufeng report each type of energy used in the production of xanthan gum and any fuel Fufeng might use to generate electricity. Questionnaire at D-8 to D-9 (Oct. 25, 2021) (P.R. 38). Commerce also requested that Fufeng complete a spreadsheet that required Fufeng to provide a description of each of its factors of production. *Id.* at 1-2 and Appendix VII (P.R. 39).

On December 15, 2021, Fufeng responded by listing coal as one of the factors used in the production of xanthan gum, but Fufeng did not provide any further detail as to the type of coal. *See* Questionnaire Response at Exhibit 2 (Dec. 15, 2021) (P.R. 84/C.R. 87) and Data File at tab D-5(3) (C.R. 93) (Questionnaire Response) (listing "N/A" where Commerce requested a description of coal inputs).

On January 5, 2022, Commerce notified interested parties that it would be selecting publicly available information to value factors of production, and invited interested parties to comment. Request for Surrogate Value Comments (Jan. 5, 2022) (P.R. 91) (Request for SV Comments). On January 27, 2022, Commerce issued a supplemental questionnaire to Fufeng asking Fufeng to confirm that it had reported its energy inputs correctly. Supplemental

Questionnaire at 4 (Jan. 28, 2022) (P.R. 107) (Supplemental Questionnaire).  In response, Fufeng

confirmed that it had reported its energy inputs correctly and added that the coal used by Fufeng

as a source of energy had a "calorific value limit (on a moist, mineral-matter-free basis) less than

5800 Kcal/Kg."  Supplemental Questionnaire Response at 6 (Feb. 16, 2022) (P.R. 126)

(Supplemental Questionnaire Response).  Fufeng did not provide any documentation to support

this claim, or any further information regarding the coal used in its production process.

On March 31, 2022, Fufeng submitted surrogate value comments, commenting at length

on several factors of production, but not on the valuation of coal.  Surrogate Value Comments

(Mar. 31, 2022) (P.R. 147-151) (Fufeng SV Comments).  As part of its surrogate value

comments, Fufeng included a "summary sheet of the surrogate values that should be used to

value the factors of production" that Fufeng had reported.  *Id.* at 2 (P.R. 147).  The summary

sheet listed for coal the Harmonized Tariff Schedule (HTS) number 270119, which covers "Coal,

Other Than Anthracite Or Bituminous, Whether Or Not Pulverized, But Not Agglomerated."  *Id.*,

Exhibit 1 at 1.

CP Kelco U.S., Inc. (CP Kelco), a domestic producer of xanthan gum, also submitted

surrogate value comments and proposed HTS number 2701129000 for coal, which covers:

> Mineral Fuels, Mineral Oils And Products Of Their Distillation; Bituminous
> Substances; Mineral Waxes; — Coal; Briquettes, Ovoids And Similar Solid Fuels
> Manufactured From Coal; — Bituminous Coal, Whether Or Not Pulverized, But
> Not Agglomerated; — Coal, Whether Or Not Pulverised, But Not Agglomerated:
> Bituminous Coal: O/T Coking Coal.

*See* Surrogate Value Comments (Feb. 2, 2022), Exhibit 1 at 2 (P.R. 110).

On April 26, 2022, Commerce issued another supplemental questionnaire requesting that

Fufeng resubmit a surrogate value spreadsheet — identical to the Appendix VII included in

Commerce's initial questionnaire — with the requested descriptions for each factor.

Supplemental Questionnaire at 4 (Apr. 26, 2022) (P.R. 154). Fufeng responded, describing its

coal simply as "Energy Coal." Supplemental Questionnaire Response at 2-3 (May 5, 2022) (P.R.

155); Exhibit 3S-5 at 1 (P.R. 156) (Third Supplemental Questionnaire Response).

On May 27, 2022, Fufeng filed an unsolicited submission containing new factual

information pertaining to its usage of coal, which Commerce rejected and removed from the

record. *See* Rejection Letter at 1 (July 27, 2022) (P.R. 193) (NFI Rejection Letter). Commerce

explained that the information submitted by Fufeng was unsolicited and was additionally

intended to rebut or clarify Fufeng's February 16, 2022 supplemental questionnaire response

regarding the calorific content of its coal. *Id.*

Fufeng filed additional unsolicited information on July 11, 2022, in response to a

supplemental questionnaire in which Commerce asked Fufeng a binary question related to the

type of coal Fufeng used. *See* Rejection Letter at 1 (July 27, 2022) (P.R. 192) (Fourth

Supplemental QR Rejection Letter); Fourth Supplemental Questionnaire at 3 (July 6, 2022) (C.R.

163) (Fourth Supplemental Questionnaire). In addition to answering Commerce's binary

question, Fufeng had included comments, factual information, and other data including Fufeng's

preferred HTS number. *Id.* Because this information constituted unsolicited information outside

of the limited scope of what Commerce requested, Commerce removed Fufeng's submission

from the record and provided Fufeng with an opportunity to re-file a questionnaire response with

the unsolicited information redacted. *Id.* at 2.

On July 28, 2022, Fufeng resubmitted its supplemental response pursuant to Commerce's

rejection letter, explaining that it uses "a type of coal that is commercially traded as a bituminous

coal." Fourth Supplemental Questionnaire Response at 5 (July 28, 2022) (P.R. 194). Fufeng

further explained that its coal "is exclusively of a non-coking grade" and that it "does not

consume coking grade bituminous coal, which is primarily used for producing coke utilized for manufacturing steel{.}"

On August 5, 2022, Commerce published the Preliminary Results, in which it selected for coal the HTS number 2701129000, which had been proposed by CP Kelco.  Preliminary Surrogate Value Spreadsheet, tab SV at cell D32 (Aug. 1, 2022) (P.R. 198) (Preliminary SV Spreadsheet).  On September 12, 2022, Fufeng submitted a case brief that did not address Commerce's valuation of energy.  *See* Case Brief (Sept. 12, 2022) (P.R. 209) (Fufeng's Case Brief).  On the same day, CP Kelco submitted a case brief to Commerce arguing that Commerce should directly value Fufeng's energy factors.  Case Brief at 2-20 (Sept. 12, 2022) (P.R. 211/C.R. 173).  CP Kelco did not address Commerce's selection of an HTS number for coal in its case brief.

On September 21, 2022, Fufeng filed a rebuttal brief.  *See* Rejection Letter at 1 (Nov. 18, 2022) (P.R. 223) (Rebuttal Brief Rejection Letter).  Fufeng raised several arguments for the first time in its rebuttal brief, including a challenge to the HTS number used by Commerce to value coal.  *Id.* at 2.  Commerce therefore rejected Fufeng's rebuttal brief and asked that Fufeng refile the brief after redacting any untimely arguments.  *Id.* at 3.

In the Final Results, Commerce made no changes to the HTS number used to value coal.  Final Surrogate Value Spreadsheet, tab SV at cell D32 (Feb. 1, 2022) (P.R. 236) (listing HTS number 2701129000).

B.    Fufeng Failed To Exhaust Administrative Remedies

Congress has mandated that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."  28 U.S.C. § 2637(d).  This statute "indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies."  *Boomerang Tube LLC v.*

*United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (citing *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007)).  The purpose of the exhaustion requirement is to ensure that the agency and parties to a proceeding can consider challenges at the administrative level.  *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1383-84 (Fed. Cir. 2008).  "Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."  *Id.* (quoting *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)) (emphasis removed).

A party that fails to raise an issue in its administrative case brief before Commerce has failed to exhaust its administrative remedies.  *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010).  Commerce's regulations specify that case briefs must present "all arguments" that the submitter considers "to be relevant" to the final results of a review.  19 C.F.R. § 351.309(c)(2).  Additionally, rebuttal briefs submitted in response to a case brief "may respond only to arguments raised in case briefs."  *Id.* § 351.309(d)(2).  This Court regularly refuses to review unexhausted issues that were not asserted in a party's case brief.  *See, e.g.*, *Qingdao Ge Rui Da Rubber Co. v. United States*, 664 F. Supp. 3d 1369, 1378 (Ct. Int'l Trade 2023); *Ellwood City Forge Co. v. United States*, 582 F. Supp. 3d 1259, 1273 (Ct. Int'l Trade 2022); *Unicatch Indus. Co. v. United States*, 422 F. Supp. 3d 1355, 1362 (Ct. Int'l Trade 2019).

Fufeng failed to exhaust its administrative remedies with respect to Commerce's selection of an HTS number for coal.  As an initial matter, Fufeng did not raise this issue in its administrative case brief as is required by 19 C.F.R. § 351.309(c)(2).  Fufeng raised the issue of the HTS number for coal for the first time in its rebuttal brief.  *See* Rebuttal Brief Rejection

Letter at 2.  But this action contravenes the requirement that rebuttal briefs "may respond only to arguments raised in case briefs."  *See* 19 C.F.R. § 351.309(d)(2); *Dorbest*, 604 F.3d at 1375 ("{T}he rebuttal brief is an inappropriate place to raise an issue for the first time.").  Therefore, Commerce appropriately rejected Fufeng's rebuttal brief because Fufeng failed to raise the issue of the HTS number for coal in its case brief.

By failing to raise this issue in its case brief, Fufeng frustrated the purpose of the exhaustion requirement, which is to give the agency the opportunity to consider challenges.  *See Mittal Steel*, 548 F.3d at 1383-84.  The sequence of events in this review demonstrates how important it was for Commerce to select surrogate value information:  Commerce invited comment from Fufeng on surrogate values, including HTS numbers, *see* Request for SV Comments; Commerce asked Fufeng directly for information regarding its energy inputs, *see* Supplemental Questionnaire at 4; in response, Fufeng confirmed that it had reported its energy inputs correctly, *see* Fufeng's Supplemental Questionnaire Response at 6; and Fufeng itself proposed a HTS number for coal, *see* Fufeng's SV Comments, Exhibit 1 at 1, which Commerce declined to select, *see* Preliminary SV Spreadsheet, Tab SV at cell D32.  Fufeng was therefore aware that Commerce desired information on its coal inputs and also that Commerce had selected an HTS number for coal that Fufeng had not proposed.  Fufeng does not provide an explanation for why it failed to raise this issue in its initial case brief, or even attempt to argue that it adequately exhausted its administrative remedies.

Fufeng attempts to shift to CP Kelco its responsibility to raise the issue of the HTS number for coal by suggesting that CP Kelco's request for Commerce to directly value energy amounted to a discussion of which HTS number Commerce should use.  *See* Pl. Br. 28-29.  As a result, Fufeng argues that it should not have been required to redact its rebuttal brief.  *Id.*  But

"{m}erely bringing up a general issue does not serve to 'exhaust all specific issues under that general umbrella.'" *ABB Inc. v. United States,* 190 F. Supp. 3d 1159, 1181 (Ct' Int'l Trade 2016) (citing *Trust Chem Co. Ltd. v. United States*, 791 F. Supp. 2d 1257, 1268 n. 27 (Ct. Int'l Trade 2011)). Further, undeveloped arguments are not preserved. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006). Commerce's factors-of-production methodology and whether Commerce directly values a factor are issues distinct from the underlying factual information Commerce uses to value the factors. Although Fufeng claims that CP Kelco "effectively" argued for the use of the HTS number selected by Commerce in the Preliminary Results, Pl. Br. 29, CP Kelco's case brief made no mention of any HTS number to value coal. Consequently, CP Kelco was deprived of an opportunity to address this issue when Fufeng raised it for the first time in its rebuttal brief.

C.     **Commerce Properly Rejected Fufeng's Unsolicited And Untimely Coal Test Reports**

Commerce's rejection of the unsolicited and untimely information Fufeng attempted to file does not affect the above analysis. Fufeng's argument to the contrary is based on its contention that Commerce should not have rejected the "coal test reports" included in its May 27, 2022 submission and in its July 11, 2022 supplemental questionnaire response. Pl. Br. 26-28; *see* NFI Rejection Letter at 1; Fourth Supplemental QR Rejection Letter at 1.

Commerce has "broad discretion to fashion its own rules of administrative procedure, including the authority to establish and enforce time limits concerning the submission of written information and data." *Coalition for the Preservation of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States*, 44 F. Supp. 2d 229, 237 (Ct. Int'l Trade 1999) (citing *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 544-45 (1978)). Commerce does not consider or retain on the record unsolicited or untimely questionnaire

responses, with an exception — not relevant here — for materials from voluntary respondents. 19 C.F.R. § 351.301(c)(1).

Fufeng states that the coal test reports contained in its untimely and unsolicited filings evinced the heat value of the coal used in Fufeng's production process and "corroborated" other record evidence. Pl. Br. 26. Commerce afforded Fufeng several opportunities to provide details regarding the coal it uses in its production process. In its first questionnaire response, when Commerce asked Fufeng to provide a description of each of its reported factors of production, Fufeng did not provide any description of the coal used in its production process. *See* Questionnaire Response at Exhibit 2 and Data File at tab D-5(3). After Commerce asked Fufeng to confirm that it had reported its coal correctly, Fufeng only "noted" that its coal had a calorific limit of 5,800 Kcal/kg, but without support and without explanation as to how this information would be relevant to Commerce's selection of an HTS number for coal. *See* Supplemental Questionnaire Response at 6. When Commerce for a third time attempted to glean from Fufeng a description of the coal used in its production process, Fufeng described its coal only as "Energy Coal." *See* Third Supplemental Questionnaire Response, Exhibit 3S-5 at 1.

Regarding Fufeng's unsolicited and untimely May 27, 2022 submission, Fufeng could have, in response to any of Commerce's first three questionnaires, submitted the coal test reports to the record to the extent that they "corroborated" the information included in those questionnaire responses. Fufeng provides no explanation as to why it did not provide its coal test reports in response to any of those requests for information. Fufeng argues only that Commerce did not specifically request coal test reports in its questionnaires. Pl. Br. 27. But this point is flatly contradicted by Fufeng's insistence that its coal test reports "corroborate" its statements regarding the calorific content of its coal inputs. If, as Fufeng claims, the coal test reports

"corroborated" information provided in its questionnaire responses, the test reports qualify as factual information pursuant to 19 C.F.R. § 351.102(b)(21)(i) ("Evidence . . . submitted either in response to initial and supplemental questionnaires") and were therefore unsolicited and untimely pursuant to 19 C.F.R. § 351.301(c)(1)(v).  Ultimately, Commerce gave Fufeng three opportunities to further describe and document the nature of its coal inputs, and these responses were the appropriate vehicle for Fufeng to describe its coal inputs, not an unsolicited filing. Therefore, Commerce's finding that Fufeng's coal test reports as included in its May 27, 2022 filing were unsolicited and untimely questionnaire responses is supported by substantial evidence and in accordance with law.  *See* 19 C.F.R. § 351.301(c).

Fufeng's coal test reports as included in its July 11, 2022 supplemental questionnaire response were also unsolicited and untimely questionnaire responses, for the same reasons as Fufeng's May 27, 2022 filing.  Fufeng's attempt to provide this information in the context of its fourth supplemental questionnaire response is arguably more egregious, because Commerce issued its fourth supplemental questionnaire less than a month before the Preliminary Results were published on August 5, 2022.  As the deadline loomed, Commerce posed a binary question related to Fufeng's coal.  *See* Fourth Supplemental Questionnaire.  Fufeng responded not only by answering Commerce's question, but by including a lengthy and unsolicited filing.  *See* Fourth Supplemental QR Rejection Letter at 1.  Although Fufeng contends that it was only answering Commerce's binary question by providing this information, Pl. Br. 28, Fufeng usurps Commerce's responsibility to fashion the administrative procedure, *see Am. Brake Drum*, 44 F. Supp. 2d at 237, and ignores its own argument that the coal test reports were responsive to earlier requests.

In any event, it is unclear what relevance resides in the coal test reports with which Fufeng sought to supplement the record.  As Fufeng itself acknowledges, Pl. Br. 26, the record — even without the untimely information provided by Fufeng — contains Fufeng's description of its coal inputs as having a heat value of less than 5,800 Kcal/kg.  Supplemental Questionnaire Response at 6.  No parties sought to undermine or dispute this evidence before Commerce, nor is this issue in dispute before this Court.  To the extent that Fufeng seeks to add the coal test results to the record to further support a claim that it failed to make administratively, the Court should not entertain any such claim because it was not exhausted before Commerce.

Therefore, Commerce's rejection of Fufeng's test reports was supported by substantial evidence and in accordance with law.  And even if Commerce improperly rejected the test reports, Fufeng still failed to exhaust its administrative remedies regarding the surrogate value information used to value coal, and the Court should reject this aspect of its challenge to the Final Results.

V.    Because Section 301 Duties Address Broad, National Concerns And Are Intended To Be Additional Duties, Commerce Reasonably Deducted These Duties From Fufeng's U.S. Price

A.    Legal Background

On August 18, 2017, the President directed the Office of the United States Trade Representative (USTR) to initiate an investigation pursuant to section 301 of the Trade Act of 1974, as amended.  *Addressing China's Laws, Policies, Practices, and Actions Related to Intellectual Property, Innovation, and Technology*, 82 Fed. Reg. 39,007 (Executive Office of the President Aug. 17, 2017); *see* 19 U.S.C. § 2411.  After a notice and comment period, USTR determined that "the acts, policies, and practices of the Government of China related to technology transfer, intellectual property, and innovation covered in the investigation are unreasonable or discriminatory and burden or restrict U.S. commerce."  *Notice of Determination*

*and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301*, 83 Fed. Reg. 14,906, 14,906 (U.S. Trade Rep. Apr. 6, 2018).  As a result, pursuant to sections 301(b) and (c) of the Trade Act, USTR proposed an "additional duty of 25 percent" on certain goods of Chinese origin, and included a list of tariff subheadings for the products of Chinese origin that would be covered by this action.  *Id.* at 14,907-54.  On June 20, 2018, USTR implemented "an additional ad valorem duty of 25 percent" on a subset of the products already identified in the April 6 notice, and proposed to extend the additional 25 percent tariff to an additional tranche of products of Chinese origin.  *Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301*, 83 Fed. Reg. 28,710, 28,711-12 (U.S. Trade Rep. June 20, 2018).  On August 16, 2018, USTR implemented section 301 duties of "an additional ad valorem duty of 25 percent" to most of the products identified in the June 20 notice.  *Notice of Action Pursuant to Section 301*, 83 Fed. Reg. 40,823, 40,824 (U.S. Trade Rep. Aug. 16, 2018).  On September 18, 2018, USTR imposed "additional duties" on another tranche of Chinese products, including xanthan gum, which is classified at HTS subheading 3913.90.20.  *See Notice of Modification in Section 301 Action*, 83 Fed. Reg. 47,974, 47,975, 48,076 (U.S. Trade Rep. Sept. 18, 2018); *see* IDM at 3 ("Merchandise covered by the scope of this Order is classified . . . at subheading 3913.90.20.").

The Tariff Act requires Commerce to reduce export price by an amount attributable to United States import duties.  19 U.S.C. § 1677a(c)(2)(A).  The Federal Circuit has held that certain duties imposed pursuant to section 232 of the Trade Expansion Act of 1962 (19 U.S.C. § 1862), constitute United States import duties that should be deducted from the U.S. price.  *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 63 F.4th 25, 36-37 (Fed. Cir. 2023).  By contrast, the Federal Circuit previously held that safeguard duties imposed

pursuant to section 201 of the Trade Act are not normal United States import duties and that

they should not be deducted from the U.S. price. *Wheatland Tube Co. v. United States*, 495

F.3d 1355, 1365-67 (Fed. Cir. 2007).

> B.    Commerce Followed The Text Of The Implementing Instruments When
>        Deducting Section 301 Duties From Fufeng's U.S. Price

In the underlying review, Commerce found that section 301 duties constitute United

States import duties, and because they were assessed on Fufeng's imports of xanthan gum

during the period of review, Commerce deducted them from Fufeng's U.S. price. IDM at 31-

32. Commerce found that section 301 duties are intended to address broad, national concerns,

and that harm from imports is not a prerequisite for the imposition of section 301 duties. *Id.*

Commerce also found that, in this respect, section 301 duties are distinct from antidumping,

countervailing, and section 201 duties, which are "imposed to address the specific threat of

injury or actual injury to a domestic industry as a result of imported merchandise." *Id.* at 32.

The Federal Circuit's opinion in *Borusan*, and this Court's opinion in *Shanghai Tainan*,

further support Commerce's determination in this respect. *See Borusan*, 63 F.4th at 36-37;

*Shanghai Tainai Bearing Co., Ltd. v. United States*, 658 F. Supp. 3d 1269, 1292 (Ct. Int'l Trade

2023). In *Borusan*, the Federal Circuit found that the text of the instrument enacting the section

232 duties, which specified that the duties were intended to be applied "in addition to any other

duties" meant that the section 232 duties constituted deductible United States import duties.

*Borusan*, 63 F.4th at 34 (quoting *Proclamation 9705*, 83 Fed. Reg. 11,625, 11,627 (Mar. 15,

2018)). The Court also recognized deducting section 232 duties from U.S. price does not

present the same "double-counting" or "circularity" issues as deducting antidumping duties

from U.S. price. *Id.* at 30, 33 (citing *APEX Exps. v. United States*, 777 F.3d 1373, 1379 & n.2

(Fed. Cir. 2015)). Finally, the Court specified that its decision was based solely on the text of

Proclamation 9705, and not on any further analysis of section 232 duties more generally or on any distinction between "normal" and "special" U.S. import duties. *Id*. at 36.

This Court applied the reasoning in *Borusan* to section 301 duties in *Shanghai Tainai*, holding that the text of the instrument implementing the section 301 duties, which stated that the duties "apply in addition to all other applicable duties, fees, exactions, and charges," established that these duties constitute deductible United States import duties. *Shanghai Tainai*, 658 F. Supp. 3d at 1293 (quoting *Notice of Action*, 83 Fed. Reg. at 40,824). Therefore, the Court sustained Commerce's determination to deduct section 301 duties from U.S. price. *Id.* at 1294. The section 301 duties at issue here stem from the same series of actions by USTR and were likewise intended to be assessed in addition to antidumping duties. *See Notice of Action*, 83 Fed. Reg. at 28,711 (imposing "an additional ad valorem duty of 25 percent" on certain imports); *Notice of Action*, 83 Fed. Reg. at 40,824 (imposing "an additional ad valorem duty of 25 percent" on other classes of products); *Notice of Modification*, 83 Fed. Reg. at 47,975 (imposing "additional duties" on another tranche of Chinese products). Therefore, because the language of the instruments implementing these section 301 duties makes explicit that these duties are intended to be additional to other duties, the reasoning in *Borusan* and *Shanghai Tainai* supports Commerce's determination to deduct section 301 duties from Fufeng's import price. *See Borusan*, 63 F.4th at 34-37; *Shanghai Tainai*, 658 F. Supp. 3d at 1293-94.

Fufeng argues that Commerce improperly deducted section 301 duties from its U.S. price. Pl. Br. 30-37. Fufeng contends that deducting section 301 duties would improperly "double-count" those duties. *Id.* at 35-37. But Fufeng's argument erroneously conflates the double-counting of antidumping duties, which produces a "spiraling circularity," *see Borusan*, 64 F.4th at 35, with the deduction of section 301 duties that are designated as additional, *see*

*Shanghai Tainai*, 658 F. Supp. 3d at 1293-94.  Section 301 duties cannot be "double-counted" in the context of a dumping margin calculation, because they are distinct from the antidumping duty that Commerce assesses.  What Fufeng refers to as "double-counting" is simply the imposition of section 301 duties in addition to antidumping duties, which is an intended result of the instrument enacting the section 301 duties and is therefore an appropriate outcome.  *See Notice of Modification*, 83 Fed. Reg. at 47,975.  The contrary result, which Fufeng seeks, would result in the effective non-collection of section 301 duties in the form of a lowered dumping margin, an outcome that would defeat the purpose of the section 301 duties.  *See Borusan*, 63 F.4th at 36 (describing that failing to deduct section 232 duties that are intended to be in addition to antidumping duties would defeat the purpose of the duties).

Fufeng also argues that Commerce failed to adequately distinguish the section 301 duties applied to imports of xanthan gum from section 201 safeguard duties, which the Federal Circuit held cannot be considered United States import duties pursuant to 19 U.S.C. § 1677a(c)(2)(A).  Pl. Br. 30-35 (discussing *Wheatland Tube*, 495 F.3d at 1361).  But Fufeng's argument rests on an analysis of the remedial intent of the statutory provisions implementing the duties, rather than on whether the actual duties implemented are intended to be assessed in addition to antidumping duties.  The Federal Circuit and this Court have held that the latter is the relevant consideration when determining whether duties should be deducted from U.S. price.  *See Borusan*, 63 F.4th at 34-37; *Shanghai Tainai*, 658 F. Supp. 3d at 1293-94.  In particular, Fufeng tries to avoid the actual holding in *Borusan* by arguing that the Court in *Shanghai Tainai* improperly extended *Borusan* to section 301 duties by "sidestepp{ing} analysis of the Section 301 duties with regard to the *Wheatland Tube* factors."  Pl. Br. 33.  However, *Borusan* makes clear that an analysis of the language of the relevant legal instrument

— rather than an analysis of whether duties are "special" or "normal" United States import duties — guides the determination of whether these duties should be deducted from U.S. price. *Borusan*, 63 F. 4th at 35.  Thus, *Borusan*, *Shanghai Tainai*, and the language of the implementing instruments make clear that section 301 duties constitute deductible United States import duties pursuant to 19 U.S.C. § 1677a(c)(2)(A).

Fufeng finally argues that the section 301 duties themselves are unlawful, based on a decision by a dispute-resolution panel at the World Trade Organization (WTO).  Pl. Br. 37.  But WTO panel decisions do not bind the United States or this Court.  *Corus Staal BV v. Dep't of Commerce*, 395 F.3d 1343, 1348-49 (Fed. Cir. 2005).  And in any event, the WTO panel decision is not in effect, because the United States has an appeal pending.  *See* Notification of an Appeal by the United States Under Article 16 of the Understanding on Rules and Procedures Governing the Settlement of Disputes ("DSU"), *United States — Tariff Measures on Certain Goods from China*, WTO Doc. No. WT/DS543/10 (Oct. 27, 2020).

VI.    Meihua's Rate Should Remain Consistent With Fufeng's

The Court should also deny Meihua's motion, which "incorporate[s]" the arguments advanced by Fufeng.  *See* Consol. Pl. Br. 4.  Nevertheless, to the extent that the Court grants Fufeng's motion, we agree with Meihua that any alteration to Fufeng's rate should be applied as well to Meihua's rate.  *See id.* at 5.

**CONCLUSION**

For these reasons, we respectfully request that the Court dismiss count six of Fufeng's complaint, deny Fufeng's and Meihua's motions for judgment on the agency record, sustain Commerce's final determination, and enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

Of Counsel:

SPENCER NEFF                       /s/ Daniel Bertoni
Attorney                           DANIEL BERTONI
Office of the Chief Counsel for    Trial Attorney
    Trade Enforcement & Compliance   Department of Justice
U.S. Department of Commerce        Civil Division
                                   Commercial Litigation Branch
                                   P.O. Box 480, Ben Franklin Station
                                   Washington, DC 20044
                                   (202) 353-7968

February 27, 2024                  Attorneys for Defendant

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing response complies with the Standard Chambers

Procedures of the United States Court of International Trade, because it contains 9,984 words,

including text, footnotes, headings, and quotations.


_____/s/ Daniel Bertoni_____

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE

_____
                                                                    )
NEIMENGGU FUFENG                                     )
BIOTECHNOLOGIES CO., LTD., *ET AL.*,           )
                                                                    )
                        Plaintiffs,                              )
                                                                    )
            and                                                   )
                                                                    )
MEIHUA GROUP INTERNATIONAL                  )
(HONG KONG) LIMITED AND XINJIANG       )
MEIHUA AMINO ACID CO., LTD.,                    )
                                                                    )
                        Consolidated Plaintiffs,          )        Consol. Court No. 23-00068
                                                                    )
            v.                                                     )
                                                                    )
UNITED STATES,                                           )
                                                                    )
                        Defendant.                           )
_____)

## **ORDER**

Upon consideration of plaintiffs' and consolidated plaintiffs' motions for judgment on the agency record, defendant's response, and all other pertinent papers, it is hereby

ORDERED, that count six of the complaint filed by plaintiffs Neimenggu Fufeng Biotechnologies Co., Ltd., Shandong Fufeng Fermentation Co., Ltd., and Xinjiang Fufeng Biotechnologies Co., Ltd. is dismissed, and it is further

ORDERED that the plaintiffs' and consolidated plaintiffs' motions are denied, and it is further

ORDERED, that the underlying final determination is sustained, and it is further

ORDERED, that final judgment is entered for the United States.

_____
Gary S. Katzmann, Judge

Dated: _____, 2024
New York, New York