A-570-985
Remand
Slip Op. 24-139
POR:  07/01/2020 – 06/30/2021
~~Business Proprietary Document~~
**Public Version**
E&C/OIV: RA

***Neimenggu Fufeng Biotechnologies Co. v. United States*,
741 F. Supp. 3d 1354 (CIT 2024)
Xanthan Gum from the People's Republic of China**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (CIT) in

*Neimenggu Fufeng Biotechnologies Co. v. United States*.[1]  This litigation pertains to certain

issues in the final results of the administrative review of the antidumping duty (AD) order on

xanthan gum from the People's Republic of China (China), covering the July 1, 2020, through

June 30, 2021, period of review (POR).[2]

The CIT remanded Commerce to:  (1) reconsider or further explain its direct valuation of

Fufeng Biotechnologies Co., Ltd. (aka Inner Mongolia Fufeng Biotechnologies Co., Ltd.),

Shandong Fufeng Fermentation Co., Ltd., and Xinjiang Fufeng Biotechnologies Co., Ltd.

(collectively, Fufeng)'s energy factors of production (FOP), and (2) reconsider its classification

of Fufeng's coal under a certain Harmonized System (HS) subheading, conditional on a

determination on remand to directly value Fufeng's coal.[3]  On remand, we have reconsidered our

---

[1] *See Neimenggu Fufeng Biotechnologies Co. v. United States*, 741 F. Supp. 3d 1354 (CIT 2024) (*Remand Order*).
[2] *See Xanthan Gum from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-2021*, 88 FR 9861 (February 15, 2023) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[3] *See Remand Order* at 1370, 1376.

determination in the *Final Results* and continue to find that it is appropriate to calculate energy expenses based on Fufeng's submitted energy FOPs. In making this redetermination, pursuant to the Court's *Remand Order*,[4] we considered the precedent raised by the Court and Fufeng and concluded that valuing energy directly here is consistent with Commerce's practice. Because we continued to directly value energy, we have also determined that HS 2701.12.9000 is the proper subheading for the valuation of Fufeng's coal FOP. In making this determination, we accounted for Fufeng's agency- and CIT-level filings, in accordance with the *Remand Order*.[5] Accordingly, in these final results of redetermination, our approach with regard to the two aforementioned issues remains unchanged from the *Final Results*, and as a result we have not changed the 17.36 percent dumping margin.

## II.    BACKGROUND

On September 7, 2021, we initiated the underlying review of several xanthan gum exporters and producers, including Fufeng and Meihua Group International (Hong Kong) Limited and Xinjiang Meihua Amino Acid Co., Ltd. (collectively, Meihua).[6] We selected Fufeng as the sole mandatory respondent.[7]

On August 5, 2022, Commerce preliminarily determined that Fufeng did not make sales at less than fair value during the POR and calculated a preliminary dumping margin of zero for Fufeng.[8] In the *Preliminary Results*, we used Malaysian data to value Fufeng's FOPs, and based surrogate financial ratios, a component of its FOP calculation, on the 2021 public financial

---

[4] *Id.* at 1370.
[5] *Id.* at 1376.
[6] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 FR 50034 (September 7, 2021).
[7] *See* Memorandum, "Selection of Mandatory Respondent for Individual Examination," dated October 21, 2021, at 1.
[8] *See Xanthan Gum from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2020-2021*, 87 FR 47970 (August 5, 2022) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).

statements of Ajinomoto (Malaysia) Berhad (Ajinomoto (Malaysia)).[9]  Energy costs were

preliminarily incorporated within the selling, general, and administrative (SG&A) expense ratio

derived from Ajinomoto's 2021 financial statements.[10]

On February 15, 2023, Commerce published the *Final Results*.[11]  As part of its *Final*

*Results*, we determined to value Fufeng's energy FOP directly, *i.e.* separately from SG&A.[12]  We

valued energy inputs (in this instance, coal) using HS 2701.12.9000, but did not articulate a

rationale for selecting this HS subheading in the *Final Results*.[13]  As a result of this change,

Commerce assigned dumping margins of 17.36 percent to Fufeng and Meihua.[14]  Fufeng and

Meihua subsequently challenged Commerce's *Final Results* at the CIT.  On December 16, 2024,

the CIT remanded the *Final Results*, holding that Commerce's determination to value energy

directly was unsupported by substantial evidence, and that Commerce failed to address Fufeng's

arguments regarding the selection of a HS subheading for coal.[15]  The Court then ordered

Commerce to:  (1) reconsider or further explain its direct valuation of Fufeng's energy FOP, and

(2) if Commerce continues to value energy directly, upon consideration of Fufeng's agency- and

CIT-level filings, reconsider its classification of Fufeng's coal under a certain HS subheading,

conditional on a determination on remand to directly value Fufeng's coal.[16]

---

[9] *See Preliminary Results* PDM at 13-14, 21.
[10] *Id.* at 20.
[11] *See Final Results*, 88 FR at 9861.
[12] *See Final Results* IDM at 11-14.
[13] *See* Memorandum, "Fufeng Final Surrogate Value Memorandum," dated February 1, 2023 (Final SV Memorandum), at Attachment I at tab SV, cell D32.
[14] *See Final Results*, 88 FR at 9861.
[15] *See, generally*, *Remand Order*.
[16] *Id.* at 1370, 1376.

## III.    DISCUSSION

### A.    Commerce's Direct Valuation of Fufeng's Energy Factors of Production

The Court in its *Remand Order* held:

> The court does not compel a result on remand. Commerce may, for instance, attempt to explain why the change in Ajinomoto's financial reporting between prior administrative reviews and the *Final Results* constitutes substantial evidence for the direct valuation of Fufeng's reported energy costs. Alternatively, perhaps, Commerce may attempt to explain its rationale for any change in agency practice that the direct-valuation determination in this case might represent.[17]

On remand, and in compliance with the *Remand Order*, Commerce has further considered its determination to directly value Fufeng's energy costs, and finds that the changes in Ajinomoto (Malaysia)'s financial statements between reviews constitute substantial evidence which warrants the direct valuation of Fufeng's energy costs in this review.  We also clarify that our determination here is not a change in agency practice, and that our finding comports with our practice, which is to utilize a methodology that directly values a respondent's energy FOPs while avoiding double-counting.  Therefore, we continue to find it appropriate to calculate energy expenses based on Fufeng's submitted energy FOPs.

We begin by articulating agency practice with respect to the selection of FOPs.  As highlighted by the Court, once Commerce calculates the value of FOPs, there "shall be added an amount for general expenses and profit… based on the best available information regarding the values of such factors in a market economy country."[18]  These additional general expenses include:  "(1) factory overhead, (2) {SG&A} expenses, and (3) profit."[19]  Commerce's practice is to value these factors "by using financial ratios derived from financial statements of producers of

---

[17] *See Remand Order* at 23-24.
[18] *See* section 773 of the Tariff Act of 1930, as amended (the Act); *see also Remand Order* at 1360.
[19] *See Stanley Works (Langfang) Fastening Sys. Co. v. United States*, 964 F. Supp. 2d 1311, 1319 (CIT 2013) (citing section 773(c)(3) of the Act).

comparable merchandise in the surrogate country."[20]  In the underlying review and in three previous administrative reviews (*i.e*., 2017-2018, 2018-2019, 2019-2020) of xanthan gum from China, Commerce valued these expenses by using financial ratios derived from Ajinomoto (Malaysia)'s financial statements , a Malaysian producer of monosodium glutamate.[21]  No parties challenged Commerce's determination to use Ajinomoto (Malaysia)'s financial statements.

Ajinomoto (Malaysia)'s financial statements did not provide enough detail to segregate energy costs from the other operating expenses that were used in the numerators of the financial ratio calculations.  As explained in *Citric Acid*, Commerce's practice in this circumstance is typically to exclude the respondents' energy expenses in the calculation of normal value (NV) to avoid double counting.[22]  However, in *Citric Acid*, Commerce found that it was unable to segregate energy from another factor (factory overhead) so as to value both without double counting.  Similarly, in  prior administrative reviews, Commerce found that it was unable to segregate energy costs from SG&A costs in Ajinomoto (Malaysia)'s financial statements.[23] Specifically, for prior reviews of the underlying proceeding, Commerce found that energy costs were contained in the "other operating expenses" line item in Ajinomoto (Malaysia)'s financial statements and concluded that because energy expenses were embedded in the SG&A expense line item of the surrogate financial statements, adding energy expenses based on the energy FOPs reported by the mandatory respondents would double count energy expenses in

---

[20] *See Remand Order* at 1360 (quotation excluded).

[21] *See Final Results*; *see also Xanthan Gum from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 FR 7104 (February 8, 2022) (*Xanthan Gum 2019-2020 AR*); *Xanthan Gum from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2018-2019*, 86 FR 16189 (March 26, 2021) (*Xanthan Gum 2018-2019 AR*); *Xanthan Gum from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 84 FR 64831 (November 25, 2019) (*Xanthan Gum 2017-2018 AR*).

[22] *See Citric Acid and Certain Citrate Salts from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 74 FR 16838 (April 13, 2009) (*Citric Acid*), and accompanying IDM at Comment 2.

[23] *See, e.g*., *Citric Acid and Certain Citrate Salts from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2013-2014*, 80 FR 77323 (December 14, 2015).

Commerce's NV calculation.[24]  However, unlike prior reviews, Ajinomoto (Malaysia)'s 2021 financial statements break out the SG&A expense line item for "other operating expenses" into two sub-line items, "selling and distribution expenses," and "administrative and other expenses." The presentation of the 2021 financial statements of Ajinomoto (Malaysia) is otherwise identical to the financial statements relied on it previous administrative reviews.[25]

As explained above, one of the goals in Commerce's practice is to avoid double counting.[26]  Commerce acknowledges that energy has always been captured under "other operating expenses" in previous iterations of the Ajinomoto (Malaysia)'s financial statements. Accordingly, we were not able to properly isolate energy expenses so as to avoid double counting without significantly distorting SG&A expenses until the underlying review.

In the immediately prior administrative review, "other operating expenses" constituted 92.68 percent of identified SG&A expenses of Ajinomoto (Malaysia).[27]  Removing the "other operating expenses" line item from the SG&A ratio's numerator in order to directly value energy would have left only 7.32 percent of the company's SG&A (and energy) costs in the SG&A ratio

---

[24] *See Final Results* IDM at Comment 1; *see also Xanthan Gum 2019-2020 AR* (citing Memorandum, "Fufeng's Preliminary Surrogate Value Memorandum," dated July 30, 2021, at 2 (stating, "we did not include the reported energy FOPs in our NV calculations, but rather incorporated energy costs in the other operating expenses captured in the manufacturing SG&A ratio; so as not to double count energy expenses.")).

[25] *See* Fufeng's Letter, "Fufeng's First Surrogate Value Comments Resubmitted Along with Client Certs," dated March 31, 2022 (Fufeng's Surrogate Values), at Exhibit 8; *see also Xanthan Gum 2017-2018 AR* IDM at Comment 4 ("Production energy expenses are likely included in the 'other operating expenses' line item and cannot be separately identified; thus, production energy expenses will be part of the SG&A ratio.").

[26] *See Xanthan Gum from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 FR 33351 (June 4, 2013) (*Xanthan Investigation*), and accompanying IDM at Comment 1; *see also Citric Acid and Certain Citrate Salts from the People's Republic of China: Final Affirmative Determination of Sales at less Than Fair Value*, 74 FR 16838 (April 13, 2009) (*Citric Acid Investigation*), and accompanying IDM at Comment 2.

[27] *See Xanthan Gum 2019-2020 AR* (citing Memorandum, "Fufeng Final Analysis Memorandum," dated February 1, 2022 (Fufeng Final Analysis Memo), at Attachment VI).  Commerce notes that this figure is calculated by dividing 73,464,599 Malaysian Ringgit (MYR) in other operating expenses as found in the Income Statement by total SG&A expenses (*i.e.*, 79,266,225 MYR).  Total SG&A expenses are comprised of 3,811,909 MYR in executive directors' remuneration as found in note 6, 1,114,595 MYR in motor vehicles depreciation and 875,122 MYR in furniture, fixtures and fittings depreciation as found in note 12, and 73,464,599 MYR in other operating expenses as found in the Income Statement.

calculation and prevented Commerce from accurately calculating most of respondents' SG&A expenses in our calculation of NV.

In the 2020-2021 review, "other operating expenses" also constituted the majority (*i.e.*, 93.20 percent)[28] of Ajinomoto (Malaysia)'s SG&A expenses.  However, as explained above, "other operating expenses" were further broken out into "selling and distribution expenses" and "administrative and other expenses," for the first time in this proceeding.  Commerce determined that the category "selling and distribution expenses," by its description, cannot contain energy.[29]  Therefore, since energy cannot be included in "selling and distribution expenses," and can only be captured under the "administrative and other expenses" line item, the removal of "administrative and other expenses" from the numerator in Commerce's calculation of SG&A expenses allowed Commerce to continue to isolate and value the majority of SG&A expenses while simultaneously using Fufeng's own FOPs to value energy.  Specifically, more than half (*i.e.*, 55.91 percent)[30] of the original SG&A expenses remained accounted for in Commerce's revised SG&A ratio calculation after the removal of "administrative and other expenses" from the numerator.

The Court found that Commerce did not explain why the narrower "administrative and other expenses" line item does not continue to blend energy expenses with general and administrative (G&A) expenses that remained within the line item even after Ajinomoto

---

[28] *See Final Results*; *see also* Final SV Memorandum at Attachment I.   Commerce notes that this figure is calculated by dividing 75,595,156 MYR in other operating expenses as found in the Income Statement by total SG&A expenses if Commerce included other operating expenses in SG&A (*i.e.*, 81,150,315 MYR).  Total SG&A expenses, when including other operating expenses, are comprised of 3,628,672 MYR in executive directors' remuneration as found in note 6, 1,168,441 MYR in motor vehicles depreciation and 758,046 MYR in furniture, fixtures and fittings depreciation as found in note 12, and 75,595,156 MYR in other operating expenses as found in the Income Statement.

[29] *See Final Results* IDM at Comment 1, page 13.

[30] *Id*.  Commerce notes that this figure is calculated by dividing 45,369,013 MYR in remaining SG&A expenses after Commerce excluded the "administrative and other expenses" line item from the SG&A numerator calculation by the amount of SG&A expenses had all "other operating expenses" been included in the numerator (*i.e.*, 81,150,315 MYR).

(Malaysia)'s segregation of "other operating expenses" line item.  The Court went on to hold that Commerce failed to articulate why the disaggregation of "selling and distribution expenses" from "other operating expenses" in Ajinomoto's financial statements would enable Commerce to segregate and exclude costs from the calculation of surrogate financial ratios.[31]  While we acknowledge that "administrative and other expenses" may continue to blend energy expenses with G&A, we clarify here that energy expenses are sufficiently isolated such that we are able to exclude energy costs from the calculation of surrogate financial ratios while still including an amount for SG&A in the numerator of the ratio.[32]  Therefore, the facts of the underlying review are distinct from those of the *Citric Acid Investigation*, where Commerce was seemingly unable to segregate energy and overhead expenses at all.[33]  In fact, our reclassification of the administrative and other expenses from the numerator of the SG&A expense ratio to the denominator of the ratio, will understate the SG&A expense ratio.  However, here, the extent to which SG&A and energy are blended in Ajinomoto (Malaysia)'s financial statements is such that Commerce, unlike in past reviews, is actually able to segregate the two as separate factor values. While this method is necessarily imprecise and will understate the SG&A expense ratio, it is not inconsistent with Commerce's practice, which is to value energy indirectly only where valuing energy directly results in double counting.

Further, we find that, unlike in prior reviews, the level of imprecision involved in segregating energy here does not warrant valuing energy indirectly.  Here, the importance of direct valuation of energy in an energy-intensive production process outweighs the potential

---

[31] *See Remand Order* at 22 (citing *Citric Acid Investigation* IDM at Comment 2).

[32] *See Final Results* IDM at 14 ("{w}hile placing 'administrative and other expenses' in the MLE denominator might remove certain G&A expenses… it ensures against double counting electricity in Commerce's NV calculation").

[33] *See Citric Acid Investigation* IDM at Comment 2 ("{Respondent}'s financial statement does not include a separate line item for energy in the reported cost of manufacturing, thus the Department has concluded that energy is recorded as part of {respondent}'s factory overhead").

removal of a share of SG&A expenses.  Specifically, an analysis of SAS calculation program

outputs indicates that Fufeng's energy expenses constitute a greater majority of its costs when

compared to direct materials.  In its accompanying calculation memorandum, Commerce noted

that "{t}he resulting total energy expense calculated by Commerce's program was [          ]

USD while the total direct materials expense was [          ] USD."[34]  The relative importance

of energy in the production of xanthan gum, as reflected on the record of the underlying

proceeding, is a key consideration behind Commerce's direct valuation of energy FOPs.

Therefore, while Commerce may have excluded certain SG&A expenses from the numerator of

the SG&A ratio, our methodology is consistent with our practice, which here is to value energy

directly where possible and without double counting.[35]  The change in the line-item breakout to

the Ajinomoto (Malaysia)'s 2021 financial statements presented Commerce with a different set

of facts from the previous administrative reviews and these facts allowed us to implement our

practice.  Specifically, in prior reviews it would have been inappropriate for Commerce to

directly value energy, because such an approach would have required removing the line item for

"other operating expenses" (which included energy) from the numerator of the SG&A

calculation that, in turn, would have resulted in a distortive SG&A ratio.  In the review at issue,

the breakout of the "other operating expenses" line item, permitted for the first time the direct

valuation of energy without double-counting.  Therefore, for these draft results of remand

redetermination, Commerce continues to include the "selling and distribution expenses" line item

in the SG&A ratio calculation, exclude the "administrative and other expenses" line item from

the SG&A ratio calculation, include the "administrative and other expenses" in the Material,

Labor and Energy denominator, and value energy expenses using the FOPs reported by Fufeng.

---

[34] *See* Fufeng Final Analysis Memo at 3.
[35] *See Citric Acid Investigation* IDM at Comment 2.

**B.  HS Subheading Selection to Value Fufeng's Coal FOP:**

Because we are determining to continue to directly value energy, we address the second issue remanded by the Court.  Specifically, the Court remanded Commerce to determine whether HS subheadings 2701.12.9000 or 2701.19 is the proper subheading for the valuation of Fufeng's coal FOP.  As discussed in greater detail below, Commerce determines that HS 2701.12.9000 is the proper subheading for the valuation of Fufeng's coal FOP.

We start by, in compliance with the *Remand Order*,[36] incorporating Fufeng's arguments as presented to the Court in Fufeng's Rule 56.2 Motion for Judgment on the Agency Record.[37] Fufeng argued:

- Fufeng's coal had a "calorific value limit of less than 5800 Kcal/Kg."[38]
- The proper scope of HS subheading 2701.12.9000 "encompasses a subset of non-coking bituminous coal whose heat value equals or exceeds the 5,833 kcal/kg threshold limit."[39]
- Commerce's precedent, as affirmed by the Court, is to use HS subheading 2701.19 rather than 2701.12 for valuing coal with heat values below 5,833 kcal/kg.[40]
- Commerce's "ordinary practice" is to value energy coal or steam coal under HS 2701.19.[41]

Because this is the first instance in which Commerce is addressing this issue, we articulate a rationale for our determination in the underlying *Final Results* before addressing Fufeng's comments as outlined above.

---

[36] *See Remand Order* at 1376.  We note that Fufeng's agency-level arguments with respect to this issue remain absent from the record of this proceeding, and we have determined not to open the record of this proceeding. Therefore, while we consider Fufeng's agency-level filings as part of our factual determination, our analysis of Fufeng's argument will be limited to the materials filed at the CIT.

[37] *See* Fufeng's Motion for Judgment on Agency Record and accompanying Memorandum of Law, ECF No. 25 (October 30, 2023) (Fufeng's Motion) at 21-26.

[38] *Id.* at 22 (citing Fufeng's Letter, "Fufeng Section D Supplemental Questionnaire Response," dated February 16, 2022, at 6 (Fufeng Section D Supp) (emphasis removed)).

[39] *Id.* at 23 (citing *Carbon Activated Tianjin Co. v. United States*, 547 F.Supp.3d 1310, 1315 (CIT 2021) n.6).

[40] *Id.* at 24 (citing *Certain Activated Carbon from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; and Final Determination of No Shipments; 2019-2020*, 86 FR 73731 (December 28, 2021) (*Activated Carbon 19-20 AR*), and accompanying IDM at Comment 4; *Carbon Activated Tianjin Co. v. United States*, 650 F.Supp.3d 1354, 1374-1375 (CIT 2023)).

[41] *Id.* at 25-26 (citing *Certain Oil Country Tubular Goods from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value, Affirmative Final Determination of Critical Circumstances and Final Determination of Targeted Dumping*, 75 FR 20335 (April 19, 2010), and accompanying IDM at Comment 21).

In Commerce's initial questionnaire, we requested that Fufeng respond to Appendix VII, which is a spreadsheet for summarizing FOPs and market-economy purchases.[42]  Fufeng provided the requested spreadsheet for all FOPs where it described its E_COAL FOP as "COAL."[43]  However, Commerce found that the variable descriptions were insufficient and, in a supplemental questionnaire, requested that Fufeng provide a detailed description for each FOP as requested in Appendix VII of its initial questionnaire.[44]  In response, Fufeng reported that E_COAL was "Energy Coal."[45]  However, Commerce determined that this information was insufficient to determine which HS to use to value Fufeng's coal consumption.  Therefore, in a separate supplemental questionnaire, Commerce requested additional information about Fufeng's coal designation.[46]  Fufeng responded to the supplemental questionnaire with the following information:

> The FOP E-COAL Fufeng utilizes for generation of energy is a type of coal that is commercially traded as a bituminous coal.  Specifically, Fufeng's coal is exclusively of a non-coking grade.  Fufeng does not consume coking grade bituminous coal, which is primarily used for producing coke utilized for manufacturing steel.[47]

Commerce also notes that on the record of the underlying proceeding, Fufeng stated that "the coal utilized by Fufeng as a source of energy had a calorific value limit (on a moist, mineral-matter-free basis) less than 5800 Kcal/Kg."[48]

---

[42] *See* Commerce's Letter, "Request for Information," dated October 25, 2021 (Initial Questionnaire), at Appendix VII.

[43] *See* Fufeng's Letter, "Fufeng's Sections C, D and Appendices Response," dated December 15, 2021.

[44] *See* Commerce's Letter, "Third Supplemental Questionnaire," dated April 25, 2022 (Third Supplemental Questionnaire).

[45] *See* Fufeng's Letter, "Fufeng Third Supplemental Questionnaire Response," dated May 2, 2022, at Exhibit 3S-5.

[46] *See* Commerce's Letter, "Fourth Supplemental Questionnaire," dated July 6, 2022 (Fourth Supplemental Questionnaire), at question 1(a).

[47] *See* Fufeng's Letter, "Fufeng's Resubmission of Its Fourth Supplemental Questionnaire Response," dated July 28, 2022 (Fufeng's Fourth SQR).

[48] *See* Fufeng Section D Supp.

In response to Commerce's request for surrogate values (SVs), Fufeng and CP Kelco U.S., Inc. (the petitioner) proposed two HS subheadings from the primary surrogate country (SC) to value Fufeng's coal FOP, *i.e.*, HS 2701.19 and HS 2701.12.9000, respectively.[49]  According to Fufeng's submission, the Trade Data Monitor describes HS 2701.19 as follows:  "Coal, Other Than Anthracite Or Bituminous, Whether Or Not Pulverized, But Not Agglomerated."[50] According to the petitioner's submission, the Global Trade Atlas describes HS 2701.12.9000 as follows:  "-- Mineral Fuels, Mineral Oils And Products Of Their Distillation; Bituminous Substances; Mineral Waxes; -- Coal; Briquettes, Ovoids And Similar Solid Fuels Manufactured From Coal; -- Bituminous Coal, Whether Or Not Pulverized, But Not Agglomerated; -- Coal, Whether Or Not Pulverised, But Not Agglomerated: Bituminous Coal: O/T Coking Coal."[51]

Fufeng also submitted the SVs described in the SV memorandum for the preliminary results of *Activated Carbon 20-21 AR*,[52] which included certain HS subheadings (*e.g.*, HS 2701.11, HS 2701.12, and HS 2701.19) for valuing coal and their average unit values (AUVs). Fufeng's submission was not accompanied by narrative explanations for why it submitted the information to the record, and the HS subheadings for valuing coal were only one part of the SV memorandum, which also referenced the HS subheadings used for other inputs.  Absent arguments for considering an HS subheading other than the two mentioned above and absent AUVs for 2701.11 and 2701.12 from the POR, Commerce is limiting its analysis on remand to

---

[49] *See* Fufeng's Surrogate Values at Exhibit 1; *see also* Petitioner's Letter, "Surrogate Values," dated February 2, 2022 (Petitioner's Surrogate Values), at Exhibit 1.
[50] *See* Fufeng's Surrogate Values at Exhibit 1.
[51] *See* Petitioner's Surrogate Values at Exhibit 1.
[52] *See* Fufeng's Letter, "Fufeng's Final Surrogate Value Comments," dated June 29, 2022, at Exhibits 1B (citing *Certain Activated Carbon from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination of No Shipments; 2020-2021*, 87 FR 27094 (May 6, 2022) (*Activated Carbon 20-21 AR*), and accompanying surrogate value memorandum).

whether HS subheading 2701.12.9000 and/or HS subheading 2701.19 more accurately reflect Fufeng's coal FOP.

Commerce determines that HS subheading 2701.12.9000 is more specific to Fufeng's coal FOP.  Specifically, HS subheading 2701.12.9000 explicitly covers bituminous and non-coking coal as used by Fufeng.  HS subheading 2701.19 is a broader category, which explicitly does not cover bituminous coal and may include coking grade coal.

While Commerce has previously valued a respondent's coal FOP based on HS subheading 2701.19 due to its heat values, Commerce's determination in the *Activated Carbon 17-18 AR Remand* is inapposite.[53]  Contrary to Fufeng's argument presented in Fufeng's Rule 56.2 Motion for Judgment on the Agency Record,[54] determinations of which SV to assign to a given input do not apply across proceedings.  Commerce's practice in this regard is to "weigh available information with respect to each input value and make a product-specific and case-specific decision as to what the 'best' {SV} is for each input."[55]  Consistent with our practice, in the *Activated Carbon 17-18 AR Remand*, Commerce made a determination based on the specific input provided and on the facts on the record of that proceeding.  Specifically, Commerce selected HS subheading 2701.19, as opposed to HS subheading 2701.12, to value the respondent's bituminous coal FOP based on the calorific value limit of the two subheadings and the preference to value all FOPs from a single SC.[56]  However, Commerce notes that the record of the underlying proceeding is substantively different from the facts in the *Activated Carbon 17-*

---

[53] *See Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation, et al. v. United States*, Court No. 20-00007, Slip Op. 21-35, dated April 2, 2021 (*Activated Carbon 17-18 AR Remand*), available at https://enforcement.trade.gov/remands/21-35.pdf.
[54] *See* Fufeng's Motion.
[55] *See Ashley Furniture Indus., LLC v. United States*, 607 F. Supp. 3d 1210, 1234 (CIT 2022); *see also Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 73 FR 55039 (September 24, 2008) (*PET Film 2008*), and accompanying IDM at Comment 2.
[56] *See Activated Carbon 17-18 AR Remand.*

*18 AR Remand*.  In *Activated Carbon 17-18 AR Remand*, Commerce analyzed whether it should

value the respondent's bituminous coal using HS subheading 2701.19 from Malaysia or HS

subheading 2701.12 from Romania.  The HS subheading 2701.12 proposed in the *Activated*

*Carbon 17-18 AR Remand* is distinct from the HS subheading proposed here, because it is not

from the primary SC and broader than the HS subheading presented in the underlying

proceeding.  We noted that Commerce has a strong preference to value all FOPs in a single SC,

pursuant to 19 CFR 351.408(c)(2).[57]  Because certain bituminous coal consumed by the

respondent in *Activated Carbon 17-18 AR Remand* had a calorific value limit below 5,833

kcal/kg, and because Malaysia in that case was the primary SC, Commerce determined that HS

subheading 2701.19 was appropriate to value its coal FOP.[58]

As further elaborated in *Activated Carbon 19-20 AR*, HS subheading 2701.12 covered

both coking and non-coking bituminous coal under HS subheadings 2701.12.1000 2701.12.9000,

respectively.[59]  Because the respondent only used non-coking bituminous coal, Commerce

determined that HS subheading 2701.12 was overly broad.[60]  Therefore, Commerce relied on HS

subheading 2701.19 pursuant to the heat value as described in *Activated Carbon 17-18 AR*

*Remand*.[61]

In the underlying review at issue here, record evidence establishes that Fufeng's coal is

both non-coking and bituminous.  However, contrary to both *Activated Carbon 17-18 AR*

*Remand* and *Activated Carbon 19-20 AR*, Commerce has a proposed HS subheading from its

primary SC that exclusively captures non-coking and bituminous coal, *i.e.*, HS subheading

---

[57] *Id.,* at 4 (citing *Sodium Hexametaphosphate from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review,* 77 FR 59375 (September 27, 2012), and accompanying IDM at Comment 1).
[58] *See Activated Carbon 17-18 AR Remand.*
[59] *See Activated Carbon 19-20 AR* IDM at Comment 4.
[60] *Id*.
[61] *Id*.

2701.12.9000.[62]  Therefore, HS subheading 2701.12.9000 is not too broad to capture the coal

used by Fufeng.  And while Fufeng claims that its coal has a calorific heat value that is below

5,800 kcal/kg, there is no record information to further support this claim, or any indication on

the record of this review of the relevance of heat values in selecting between an HS subheading

that explicitly excludes non-coking grade coal (*i.e.*, HS subheading 2701.12.9000) and one that

does not reference the coking designation (*i.e.*, HS subheading 2701.19).  Further, Commerce

has the necessary SVs on the record to value Fufeng's coal that is commercially traded as

bituminous coal of a non-coking grade.  Therefore, the facts of the underlying review are

substantively different from those of *Activated Carbon 17-18 AR Remand* and *Activated Carbon

19-20 AR*, and Commerce's determination to value Fufeng's coal using HS subheading

2701.12.9000 here is warranted.  Therefore, on remand, we continue to value Fufeng's coal

using HS subheading 2701.12.9000.

## IV.    INTERESTED PARTY COMMENTS

On March 4, 2025, Commerce released the draft results of redetermination to all

interested parties and invited parties to comment.[63]  We only received comments from Fufeng.[64]

**Comment 1: Energy Factor of Production**

The following is a verbatim summary of the argument submitted by Fufeng.  For further

details, *see* Fufeng's Comments at 1-4.

> The Draft Remand unlawfully values Fufeng's energy FOPs.  {Commerce's}
> rationale that a two-way split of line item, "Other Operating Expenses" in
> Ajinomoto's 20-21 statement enables it to isolate a narrower subset,
> "Administrative and Other Expenses" containing energy costs, and migrate these
> costs from SGA to MLE, and consequently avoid double counting while valuing

---

[62] *See, e.g.*, Petitioner's Surrogate Values at Exhibit 1.
[63] *See* Draft Results of Remand Redetermination, *Neimenggu Fufeng Biotechnologies Co. v. United States*, Consol. Court No. 23-00068, Slip Op. 24-139 (CIT 2024), dated March 4, 2025 (Draft Remand).
[64] *See* Fufeng Letter, "Fufeng's Comments Pursuant to Draft Remand Redetermination: Remand Proceeding, Eighth Administrative Review of the Antidumping Duty Order on Xanthan Gum from the People's Republic of China," dated April 1, 2025 (Fufeng's Comments).

Fufeng's energy FOPs, is flawed.   There is no evidence that the sub-line,
"Administrative and Other Expenses" contains predominantly energy costs.
Moreover, the Draft Remand concedes that this line item includes G&A expenses,
which results in a distortive calculation of overhead and SGA ratios.  In its endeavor
to accentuate Fufeng's energy consumption as compared to its direct material cost,
the Draft Remand erroneously overstates Fufeng's energy cost through a higher
surrogate value under {HS} 2701.12.9000 than is unsupported by the record
evidence. Ultimately, the Draft Remand fails to rely on the requisite conjunctive,
comparative analysis of two proposed methodologies.  This analysis leads to the
inescapable conclusion that the Department should not directly value Fufeng's
energy coal in order to avoid distortions in resulting overhead and SGA ratios, but
instead should follow its AR 5/6/7 precedents to indirectly value energy FOPs as
part of Ajinomoto's SGA ratios.

**Commerce's Position:**  We have considered Fufeng's comments and have determined to make

no changes to our finding in the Draft Remand.  We have, however, made certain minor

clarifications to the language used in the Draft Remand so as to better explain how we complied

with the *Remand Order*.  The Court ordered us here to reconsider or further explain our

determination to directly value Fufeng's energy expenses.[65]  In doing so, the Court held that it

did not compel a particular result on remand, and added:

> Commerce may, for instance, attempt to explain why the change in Ajinomoto's
> financial reporting between prior administrative reviews and the Final Review
> constitutes substantial evidence for the direct valuation of Fufeng's reported energy
> costs.  Alternatively, perhaps, Commerce may attempt to explain its rationale for
> any change in agency practice that the direct-valuation determination in this case
> might represent.[66]

Fufeng argues that we failed to address the Court's concerns regarding Commerce's

determination in the underlying review.[67]  We disagree.  Consistent with the Court's instructions,

we explain here and in the Draft Remand that the change in Ajinomoto's financial statements

warranted Commerce's determination to directly value energy in this review, in contrast to

Commerce's determination in the fifth, sixth, and seventh administrative reviews of the *Order*.[68]

---

[65] *See Remand Order* at 1370.
[66] *Id.*
[67] *See* Fufeng's Comments at 2.
[68] *See Xanthan Gum 2019-2020 AR*; *see also Xanthan Gum 2018-2019 AR*; *Xanthan Gum 2017-2018 AR*

Specifically, we find that the fact that Ajinomoto's financial statements on the record of the underlying review split the "other operating expenses" line item into two sub-line items constitutes substantial evidence to warrant the direct valuation of Fufeng's energy in this review.

Fufeng's opposition to the Draft Remand rests on the notion that the approach used by Commerce in prior reviews is inherently more accurate than the direct valuation of energy used in the *Final Results*. To that end, Fufeng argues that Commerce failed to conduct a "conjunctive, comparative" analysis which "weigh{s} the presumably enhanced margin accuracy … against the actually reduced margin accuracy."[69] However, it is unclear what Fufeng views to be an appropriate basis of comparison here. The indirect valuation of energy, as used by Commerce in prior reviews, was the most appropriate approach and led to the most accurate estimate of NV based on the record of those reviews. This is an imperfect approach, because it requires Commerce to zero out the energy usage reported by Fufeng, effectively disregarding the entirety of Fufeng's actual energy reporting in calculating NV.[70] Disregarding Fufeng's reported energy consumption is not ideal because the statute directs Commerce to consider the amount of energy consumed by a producer as an FOP.[71] Moreover, the importance of directly valuing energy is heightened in this proceeding, where we have found that the production process for xanthan gum is energy intensive.[72]

Indirect valuation of energy was warranted in past reviews, because *almost all* of Ajinomoto's SG&A expenses were "blended" with energy expenses in the "other expenses" line

---

[69] *See* Fufeng's Comments at 4.
[70] *See, e.g.,* Preliminary Surrogate Value Memorandum (Aug. 1, 2022) at 3 ("{W}e did not include the reported energy FOPs in our NV calculations, but rather incorporated energy costs in the other operating expenses captured in the manufacturing SG&A ratio so as not to double count energy expenses.").
[71] *See* section 773(c)(3)(C) of the Act.
[72] While Fufeng disputes the selection of a SV for coal, which we discuss in Issue 2 *infra*, it has never disputed that the production process for xanthan gum is energy intensive. Commerce's finding in this respect is consistent with the investigation which resulted in the *Order*. *See Xanthan Investigation* and accompanying IDM at Comment 2.

item.[73]  This finding, however, was not tantamount to a general rule that a "blended" line item may never be used to directly value energy.  Fufeng argues as much, but provides no support in the law or in Commerce's practice for its position.[74]  Although we recognize that the "administrative and other expenses" line item may contain certain non-energy expenses, and that it is impossible to ascertain the extent to which energy expenses "predominate over G&A" within that line item, neither the Court nor Fufeng dispute Commerce's finding that energy is contained in the "administrative and other expenses" line item in Ajinomoto's financial statements.[75]  Consequently, we find that it is appropriate to isolate a line item that allows us to directly value energy, account for the majority of SG&A expenses, and avoid double-counting in a situation where the production process for subject merchandise is energy-intensive.  Because this finding is derived from the change to Ajinomoto's financial statements in the underlying review, substantial evidence exists to warrant a change in methodology from past reviews.

**Comment 2: Coal Factor of Production**

The following is a verbatim summary of the argument submitted by Fufeng.  For further details, *see* Fufeng's Comments at 4-19.

> The Draft Remand unlawfully values Fufeng's energy coal under {HS} 2701.12.9000 instead of {HS}2701.19.  Its rationale that {HS}2701.12.9000 explicitly covers noncoking and bituminous coal while {HS}2701.19 is a basket "Others" coal category ignores the threshold heat value of 5,833 kcal/kg under sub-heading Note 2 to Chapter 27, required to classify bituminous coal under {HS}2701.12 (or, 2701.12.9000).  As such, bituminous coal having heat values less than 5,833 kcal/kg (which is the range of Fufeng's energy coal) is automatically classified under {HS}2701.19.  Heat value of energy coal being a primary product-specificity attribute and non-coking bituminous grade being a secondary attribute, the classification of Fufeng's energy coal is properly governed by its heat value (under {HS}2701.19) rather than its formal name, bituminous non-coking coal (under {HS}2701.12.9000).  {Commerce's} precedents in the Activated Carbon from China 17-18, 19-20, 20-21 and 21-22 ARs are directly on point confirming

---

[73] By contrast, in the underlying review, we are able to isolate 55.91% of Ajinomoto's SG&A expenses by assigning values contained in the "selling and other expenses" line item to the SG&A numerator.

[74] *See* Fufeng's Comments at 3-4.

[75] *See Final Results* IDM at 13.

{Commerce's} consistent practice to value bituminous coal based on its heat value content. In accordance with this practice, {Commerce} has consistently valued coal having heat value (moist, mineral matter free basis) lower than 5,833 kcal/kg under {HS}2701.19 instead of {HS}2701.12 (or any subheading thereto). The Draft Remand's attempts to distinguish Activated Carbon AR 17-18 & 19-20 are unavailing. Therefore, in the final remand, {Commerce} should value Fufeng's energy coal under {HS}2701.19.

**Commerce's Position:** We have considered Fufeng's comments and have determined to make no changes to the Draft Remand. Therefore, we continue to value coal using HS 2701.12.9000, which covers: "-- Mineral Fuels, Mineral Oils And Products Of Their Distillation; Bituminous Substances; Mineral Waxes; -- Coal; Briquettes, Ovoids And Similar Solid Fuels Manufactured From Coal; -- Bituminous Coal, Whether Or Not Pulverized, But Not Agglomerated; -- Coal, Whether Or Not Pulverised, But Not Agglomerated: Bituminous Coal: O/T Coking Coal."[76] Fufeng continues to argue that we should have valued its coal inputs using HS 2701.19, which covers: "Coal, Other Than Anthracite Or Bituminous, Whether Or Not Pulverized, But Not Agglomerated."[77]

In response to Commerce's supplemental, Fufeng described its coal as "commercially traded as a bituminous coal… of a non-coking grade."[78] Therefore, we based our assignment of an SV to Fufeng's coal on two attributes: first, whether or not the coal is bituminous; and second, whether the coal is of a non-coking grade. Fufeng's argument to the Court centers on one of two attributes that Commerce used to select an HS subheading for coal, which is the bituminous coal designation. Fufeng does not, however, address the relative importance of the coking designation and does not address the volatile matter limit of the bituminous designation as found in subheading note 2 to Chapter 27.

---

[76] *See* Petitioner's Surrogate Values at Exhibit 1.
[77] *See* Fufeng's Surrogate Values at Exhibit 1.
[78] *See* Fufeng Section D Supp.

Fufeng argues that because its coal is "utilized for the generation of electricity, the underlying heat value is its most significant relevant product-specific attribute because it is directly linked to the end-use of the coal (*i.e.*, generation of the required amount of heat and electricity) during the production of the subject merchandise."[79]  Fufeng further states that "energy coal's grade – bituminous, non-coking – is its secondary attribute in the context of the production of the subject merchandise."[80]  However, no record evidence supports this aspect of Fufeng's argument.  Fufeng fails to support its claim that the non-coking designation should be secondary to its "underlying heat value."  Moreover, the HS note which Fufeng references in its argument to the Court was not timely raised by Fufeng for consideration in selecting an HS category and therefore not considered by Commerce in assigning an SV to value Fufeng's reported coal FOP.  Commerce identified the note on the record as part of Fufeng's surrogate value submission at Exhibit 9H.[81]  However, this exhibit was described by Fufeng as "Xanthan Gum POR 1 and POR 2 – Fufeng's Preliminary Analysis Memo," and covers a range of decisions made by Commerce in previous administrative reviews of the proceeding (*e.g.*, corn HS selection, freight expense adjustments, packing adjustments).[82]  Fufeng did not explain the relevance of this exhibit.  Therefore, Commerce had no information on whether the decisions made in these analysis memoranda or corresponding note about bituminous coal applied or was relevant to its decision in the underlying proceeding.

Fufeng claimed that "the coal utilized by Fufeng as a source of energy had a calorific value limit (on a moist, mineral-matter-free basis) less than 5800 Kcal/Kg."[83]  Yet again, it is not clear from the evidence on the record why this fact would be relevant to the selection of a HS

---

[79] *See* Fufeng's Comments at 6.
[80] *Id*. at 7.
[81] *See* Fufeng's Surrogate Values at Exhibit 9H.
[82] *Id*.
[83] *See* Fufeng's Section D Supp at 6.

subheading for coal.  Further, even if this information were relevant to Commerce's determination, information substantiating Fufeng's claims regarding the underlying heat value of its coal inputs is missing from the record.  Fufeng argues that Commerce is required to reinstate coal test certificates to the record pursuant to the *Remand Order*.[84]  However, the CIT only ordered Commerce to "determine in the first instance – upon consideration of Fufeng's agency- and USCIT-level filings – whether {HS} 2701.12.9000 or {HS} 2701.19 is the proper subheading for the valuation."[85]  Commerce has complied with that order in full.  Contrary to Fufeng's claim, Commerce is not required to reopen the record to Fufeng to reinstate its coal test certificates, which Commerce properly rejected from the record.[86]

As Fufeng claimed that its coal is both bituminous and of non-coking grade, Commerce must satisfy both criteria in selecting an HS category to value Fufeng's coal FOP.  Particularly with respect to SV information, it is incumbent on parties to the proceeding to develop the record.[87]  Therefore, because the record is devoid of evidence regarding the relative importance of Fufeng's non-coking grade designation, Commerce attributes this grade designation as an equivalent consideration to heat values for purposes of selecting an HS category.  Further, because Fufeng did not describe the relative importance of volatile matter thresholds, indicated that its coal is "commercially traded as bituminous coal,"[88] and subheading note 2 to Chapter 27 included volatile matter thresholds as a consideration for a "bituminous coal" designation, Commerce continues to find Fufeng's coal to be bituminous for purposes of selecting an HS category.

---

[84] See Fufeng's Comments at 7-9.
[85] *See Remand Order* at 35.
[86] *See* Commerce's Letters to Mr. Petelin dated July 27, 2022; *see also* Mid Continent Steel & Wire, Inc. v. United States, 586 F.Supp.3d 1349, 1359 (CIT 2022) ("Commerce retains significant discretion to determine whether to reopen the record on remand.")).
[87] *See QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011).
[88] *See* Fufeng's Fourth SQR.

Fufeng's claim that Commerce did not request specific information regarding the energy or heat value is misplaced. It is not apparent from the nature of the HS subheadings initially submitted by the petitioner and Fufeng that heat value is a factor that should be relevant to valuing coal. If Fufeng believes that this factor is relevant to the HS subheading assigned to its coal, it should have submitted evidence to that effect along with its SV submission. Commerce granted parties the opportunity to submit such evidence in its request for surrogate value comments and information.[89] Further, Commerce asked Fufeng to describe its coal as part of Appendix VII of the initial questionnaire, third supplemental questionnaire, and fourth supplemental questionnaire.[90] Commerce provided Fufeng with two open-ended questions, as found in the initial questionnaire and third supplemental questionnaire,[91] that would have permitted Fufeng to describe its coal FOP and provide any substantiating documentation before we resorted to a more pointed question as part of the fourth supplemental questionnaire. As stated above, interested parties to the proceeding bear the burden of establishing an adequate record. If Fufeng wanted to submit pertinent information on the record for Commerce to consider for valuing coal, it had sufficient opportunities to do so.

Fufeng claims that Commerce's classification analysis is seriously flawed since it ignored the critical fact that 2701.12.9000 "expressly excludes lower heat value coal that Fufeng purchased to utilize for the specified energy content, *i.e.*, heat value, from such energy coal."[92] Additionally, Fufeng claims that "even if {HS} 2701.19 arguable may be considered a relatively broader category than {HS} 2701.12.9000, and its description, "Coal – Others" does not

---

[89] *See* Memorandum, "Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information," dated January 5, 2022(SC and SV Request Memorandum).
[90] *See* Initial Questionnaire at Appendix VII; *see also* Third Supplemental Questionnaire at 5; Fourth Supplemental Questionnaire at 1.
[91] *See* Initial Questionnaire at Appendix VII; *see also* Third Supplemental Questionnaire at 5.
[92] *See* Fufeng's Comments at 13.

explicitly identify the subset of lower heat value non-coking bituminous coal, it is undeniably product-specific in relation to Fufeng's energy coal."[93]  Commerce notes that it considered the heat values of Fufeng's coal in its Draft Remand position.  As detailed above, and in Commerce's Draft Remand, there is no record information to further support the calorific limit threshold or any indication on the record of this review of the relevance of heat values in selecting between an HS subheading that explicitly excludes non-coking grade coal (*i.e.*, HS subheading 2701.12.9000) and one that does not reference the coking designation (*i.e.*, HS subheading 2701.19).  Commerce has the necessary SVs on the record to value Fufeng's coal that is commercially traded as bituminous coal of a non-coking grade.

Fufeng cites several administrative determinations in an attempt to characterize our determination as unreasonable in the underlying review, which was supported by the evidence on this record.  While we address these cases in turn, it is important first to emphasize that SV determinations are inherently record-based determinations, and that Commerce solicits information unique to every investigation and administrative review to value FOPs.[94]  Therefore, SV determinations made in different proceedings are of limited practical guidance absent the evidence relied upon by Commerce in making those decisions.  If Commerce were able to simply assign SVs based on determinations made in prior segments, there would be no need for Commerce to gather review-specific SV information in the first place.  Fufeng first claims that the Draft Remand misconstrues its findings in the *Activated Carbon 17-18 AR Remand* by falsely claiming that Commerce analyzed whether it should value the respondent's bituminous coal using HS subheading 2701.19 from Malaysia or HS subheading 2701.12 from Romania.  Fufeng indicates that in *Activated Carbon 17-18 AR Remand*, Commerce selected Malaysian HS

---

[93] *Id.*
[94] *See* SC and SV Request Memorandum; *see also* 19 CFR 351.408(c).

2701.19 over Romanian HS 2701.19 and not Romanian HS 2701.12.[95]  Commerce agrees with

Fufeng that, in *Activated Carbon 17-18 AR Remand*, Commerce invoked the primary surrogate

country as the tie breaker in selecting between Malaysian HS 2701.19 over Romanian HS

2701.19.  However, Commerce continues to find the coking designation as an equivalent

consideration in its selection of an HS category to value Fufeng's coal FOP, which was not part

of Commerce's decision as part of the *Activated Carbon 17-18 AR Remand* position.

Fufeng claims that there is no merit to Commerce's Draft Remand where Commerce

distinguishes the underlying proceeding from *Activated Carbon 19-20 AR* as the primary reason

for rejecting HS 2701.12 in favor of HS 2701.19 was the heat value of coal, and the overly-broad

nature of HS 2701.12 was merely a secondary factor in Commerce's decision.[96]  To support the

claim that the overly-broad nature of HS 2701.12 was a secondary factor in *Activated Carbon*

*19-20 AR*, Fufeng references quoted text, indicated in bolded letters below, from the following:

> **We agree with the mandatory respondents' assertion that {HS} 2701.12 is not
> specific to noncoking bituminous coal.**  According to the ASEAN tariff schedules
> on the record, the description of {HS} 2701.12 covers only "bituminous coal" and
> {HS} 2701.19 specifies only "other coal."  **Moreover, {HS} 2701.12 is a basket
> category containing both coking and non-coking bituminous coal under {HS}
> 2701.12.1000 and {HS} 2701.12.9000, respectively. As Datong Juqiang and its
> supplier only used non-coking bituminous coal, {HS} 2701.12 is an overly
> broad category.**  However, we disagree with the mandatory respondents' assertion
> that {HS} 2701.19 necessarily encompasses coal that is either non-coking or
> bituminous.  The explicit description given to {HS} 2701.19 in the ASEAN tariff
> schedule that the mandatory respondents reference in their case brief is "other coal."
> Accordingly, the two descriptions for {HS} 2701.19 asserted by the petitioner (*i.e.*,
> non-coking and bituminous) are not explicitly stated in the description of the
> subheading.  Therefore, we cannot definitively state that they are included under
> this subheading as opposed to {HS} 2701.12, which does contain explicit mentions
> of these descriptions.  However, this point is inapposite as the determination in the
> Activated Carbon AR11 Remand did not focus its analysis on the issue of coking
> versus non-coking bituminous coal, but instead focused specifically on heat value.
> **As {HS} 2701.19 is for heat values below 5,833 kcal/kg, it is necessarily more
> product-specific than {HS} 2701.12.  As the bituminous coal used by Datong**

---

[95] *Id*.at 16.
[96] *Id*. at 17-18.

24

**Juqiang and its supplier fit that singular criterion, we will use {HS} 2701.19 to value the mandatory respondents' bituminous coal raw material input for the final results.**[97]

First, Commerce disagrees with Fufeng that the overly-broad nature of HS 2701.12 was merely a secondary factor in Commerce's decision, as there is no indication in the *Activated Carbon 19-20 AR* that Commerce treated that consideration as secondary. Further, the reason for selecting HS 2701.19 was made as a result of having to decide between two imperfect categories vis-à-vis coking grade. Read in its entirety, the position is clear that Commerce found HS 2701.19 to not contain explicit mentions of bituminous and non-coking coal, as opposed to HS subheading 2701.12, and that Commerce relied on HS subheading 2701.19 pursuant to the heat value as described in *Activated Carbon 17-18 AR Remand*. Commerce did not focus its analysis on non-coking grades since *Activated Carbon 17-18 AR Remand* "did not focus its analysis on the issue of coking versus non-coking bituminous coal."[98] However, contrary to both *Activated Carbon 17-18 AR Remand* and *Activated Carbon 19-20 AR*, Commerce has a proposed HS subheading on the underlying record that exclusively captures non-coking and bituminous coal, *i.e.*, HS subheading 2701.12.9000.[99] Therefore, Commerce's analysis must consider both designations when selecting an appropriate HS subheading to value Fufeng's coal FOP.

Fufeng also cites, for the first time, *Activated Carbon 20-21 AR* and *Activated Carbon 21-22 AR* as supporting precedent in selecting HS subheading 2701.19 for valuing Fufeng's coal FOP.[100] In *Activated Carbon 20-21 AR* and *Activated Carbon 21-22 AR*, like *Activated Carbon*

---

[97] *See Activated Carbon 19-20 AR* IDM at Comment 4.

[98] *Id.*

[99] *See, e.g.*, Petitioner's Surrogate Values at Exhibit 1.

[100] *See* Fufeng's Comments at 18-20 (citing *Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; and Final Determination of No Shipments; 2020-2021*, 87 FR 67671 (November 9, 2022) (*Activated Carbon 20-21 AR*), and accompanying IDM at Comment 4, and *Certain Activated Carbon from the People's Republic of China: Final Administrative Review; and Final Determination of No Shipments; 2021-2022*, 88 FR 77553 (November 13, 2023) (*Activated Carbon 21-22 AR*), and accompanying IDM at Comment 1).

*19-20 AR*, Commerce was selecting between HS subheading 2701.19 and 2701.12 to value coal FOP, as argued by interested parties,[101] not between 2701.19 and 2701.12.9000 as found and argued by interested parties in the underlying proceeding.  Although the record of *Activated Carbon 21-22 AR* contained HS subheading 2701.12.9000, the focus of the argument in that case was whether to value coal using HS subheading 2701.19 or 2701.12, and whether 2701.12.1000 and 2701.12.9000 were anomalous to find the Malaysian import data reported under 2701.12 aberrantly high.[102]  Therefore, Fufeng's argument about HS selection and precedent set by *Activated Carbon 20-21 AR* and *Activated Carbon 21-22 AR* is inapplicable to the underlying proceeding where we must select an appropriate SV between HS subheadings 2701.19 and 2701.12.9000 according to Fufeng's coal FOP description.

## V.     FINAL RESULTS OF REDETERMINATION

In these final results of redetermination, we determine:  (1) it is appropriate to calculate energy expenses based on Fufeng's submitted energy FOPs, and that such a determination is consistent with agency practice; and (2) given that we are continuing to directly value energy, and after considering Fufeng's filings, HS subheading 2701.12.9000 is the proper subheading for the valuation of Fufeng's coal FOP.  In doing so, we have complied with the *Remand Order* to reconsider the determination to directly value energy in light of agency precedent, and to determine "on the first instance" the proper subheading for Fufeng's coal FOP.[103]  Accordingly, in these final results of redetermination, our approach with regard to the two aforementioned

---

[101] *See Activated Carbon 20-21 AR* IDM at Comment 4.
[102] *See Activated Carbon 21-22 AR* IDM at Comment 1.
[103] *See Remand Order* at 1370, 1376.

issues remains unchanged from the *Final Results*, and we have not changed the dumping margin of 17.36 percent for Meihua and Fufeng.

5/5/2025

X _Elouaradia_

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia
Deputy Assistant Secretary
  for Enforcement and Compliance

27